**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
                                                       :
In re                                                  :    Chapter 11
                                                       :
Nortel Networks Inc., et al.,[1]                       :
                                                       :    Bankr. Case No. 09-10138 (KG)
            Debtors.                                   :
                                                       :    (Jointly Administered)
                                                       :
------------------------------------------------- X
                                                       :
SNMP Research International, Inc.                       :
                                                       :
and                                                    :
                                                       :
SNMP Research, Inc.,                                   :    Adv. Proc. No. 11-53454 (KG)
                                                       :
            Plaintiffs,                                :
                                                       :
v.                                                     :
                                                       :
Nortel Networks Inc., et al.,                          :
                                                       :
and                                                    :
                                                       :
Avaya Inc.,                                            :
                                                       :
            Defendants.                                :
------------------------------------------------- X

**U.S. DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

[1]    In addition to Nortel Networks Inc. ("NNI"), the debtors in these Chapter 11 cases are:  Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. ("NN CALA").  Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

NATURE AND STAGE OF THE U.S. AND CANADIAN PROCEEDINGS ...........................3

    A. SNMP Research's Claim for More than $100 Million in "Profits" From the Nortel
       Business Line Sales ...............................................................................................6

    B. The Canadian Debtors' Motion...................................................................................7

    C. The SNMP Research Motion ......................................................................................8

    D. The U.S. Debtors' Motion ..........................................................................................9

STATEMENT OF UNDISPUTED FACTS...............................................................................10

    A. The Business Line Sales and SNMP Research's Objections.........................................11

        The Radware-Layer 4-7 Sale ..................................................................................13

        The Ericsson-CDMA/LTE Sale ..............................................................................14

        The Avaya-Enterprise Sale ....................................................................................16

        The Hitachi-Next Generation Packet Core Sale, Ericsson/Kapsch-First GSM Sale,
          Ciena-MEN Sale, GENBAND-CVAS Sale, and Ericsson-Second GSM Sale...........18

    B. The Buyers' Negotiations with SNMP Research for Continued Use of SNMP
       Research Software .................................................................................................25

ARGUMENT...........................................................................................................................29

    I.  SNMP RESEARCH HAS NO BASIS TO CLAIM PROFITS FROM THE SALE OF
       THE BUSINESS LINES BECAUSE NO RIGHTS IN SNMP RESEARCH
       SOFTWARE WERE TRANSFERRED TO PURCHASERS IN THE BUSINESS
       LINE SALES ........................................................................................................32

        A. According to the Plain Terms of the Sale Orders and Asset Purchase
          Agreements, No Business Line Sale Purchaser Obtained or Paid the U.S.
          Debtors for Rights to Use SNMP Research Software ..............................................35

        B. The Course of the Sale Hearings and the Court's Resolution of SNMP
          Research's Objections to the Sales Also Made Clear That the Purchasers
          Would Instead Have to Pay SNMP Research for the Right to Use SNMP
          Research Software ................................................................................................41

        C. In Connection With the Business Line Sales, the Purchasers Turned to SNMP
          Research to Obtain and Pay for the Right to Use SNMP Research Software.............42

II. SNMP RESEARCH'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST BE DENIED.................................................................................................................44

    A.  This Court's Orders Did Not Operate to Sell or Transfer Rights in SNMP Research Software – Which is Why No Purchasers Paid for Such Rights – And Did Not Address Transfer of the Software Itself ................................................45

    B.  The Sale Orders, Sale Agreements, and Sale Hearings Established a Framework in Which Any Purchaser Who Received SNMP Research Software Would Need to Negotiate with SNMP Research to Obtain Rights to Use the Software and Compensate SNMP Research for That Use ............................48

CONCLUSION.......................................................................................................................52

# TABLE OF AUTHORITIES

**Rules & Statutes**

17 U.S.C. § 202.......................................................................................... 47

17 U.S.C. § 504(b) ..................................................................................... 33

Del. Code Ann. tit. 6, § 2003 ..................................................................... 34

Fed. R. Civ. P. 56(a)................................................................................... 31

Fed. R. Bankr. P. 7056 ............................................................................... 31

**Cases**

Atwood Mobile Prods., LLC v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)
Bank No. 06-11202(KJC), 2010 WL 180249 (D. Del. Jan. 19, 2010) ............................ 41

Bouchat v. Baltimore Ravens Football Club, Inc.,
346 F.3d 514 (4th Cir. 2003) ...................................................................... 40

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)..................................................................................... 31

Chorman v. Foamex Int'l, Inc. (In re Foamex Int'l Inc.),
491 B.R. 100 (Bankr. D. Del. 2013) .......................................................... 31

Fleer Corp. v. Topps Chewing Gum, Inc.,
539 A.2d 1060 (Del. 1988).......................................................................... 34

Joseph v. Feit (In re Liberty Brands, LLC),
476 B.R. 443 (Bankr. D. Del. 2012) .......................................................... 32

Leonard v. Stemtech Health Sciences, Inc.,
Civ. Action No. 08-067-LPS-CJ, 2011 WL 6046701 (D. Del. Dec. 5, 2011) ...................33, 40, 43

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)..................................................................................... 32

Michaels v. New Jersey,
222 F.3d 118 (3d Cir.2000) ........................................................................ 32

Polar Bear Prods., Inc. v. Timex Corp.,
384 F.3d 700 (9th Cir. 2004) .................................................................. 33-34

Robeson Indus. Corp. v. Hartford Accident & Indem. Co.,
178 F.3d 160 (3d Cir. 1999) ....................................................................... 32

Sys. Unlimited, Inc. v. Cisco Sys., Inc.,
228 F. App'x 854 (11th Cir. 2007) ................................................................. 47

TD Bank, N.A. v. Hill,
Civil No. 12-7188 (RBK/JS), 2015 WL 4523570 (D.N.J. July 27, 2015) ........................ 34

Total Care Physicians, P.A. v. O'Hara,
798 A.2d 1043 (Del. Super. Ct. 2001) ............................................................. 34, 43

Travelers Indem. Co. v. Bailey,
557 U.S. 137 (2009) ........................................................................... 35

Varela v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.),
522 B.R. 62 (Bankr. D. Del. 2014) ................................................................. 32

Vichi v. Koninklijke Philips Elecs. N.V.,
62 A.3d 26 (Del. Ch. 2012) ......................................................................... 40

William A. Graham Co. v. Haughey,
568 F.3d 425 (3d Cir. 2009) ........................................................................ 33-34, 43

**Other Authorities**

Ballentine's Law Dictionary (3d ed. 1969) ....................................................... 46

Black's Law Dictionary (10th ed. 2014) .......................................................... 46

Peter F. Alces & Harold F. See, The Commercial Law of Intellectual Property
(1st ed. 1994) ................................................................................... 46

Roger E. Schechter & John R. Thomas, Intellectual Property:  The Law of Copyrights,
Patents, and Trademarks 4 (1st ed. 2003) ....................................................... 46

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors"), submit this memorandum of law in support of the U.S. Debtors' Motion for Partial Summary Judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 (the "U.S. Debtors' Motion") and in opposition to Plaintiff's Motion for Partial Summary Judgment (Adv. D.I. 285, the "SNMP Research Motion") and accompanying brief (Adv. D.I. 286, the "SNMP Research Brief"), filed by the plaintiffs in the above-captioned adversary proceedings (collectively, "SNMP Research").  In support of the Summary Judgment Motion, and in response and opposition to the SNMP Research Motion, the U.S. Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The U.S. Debtors' Motion addresses SNMP Research's claims for "profits" from the sales of the Nortel business lines, which SNMP Research contends entitles it to more than $100 million in damages and are based on the theory that the purchasers paid Nortel for the ability to use SNMP Research's software.  Those claims simply cannot survive the plain terms of the Court's sale orders and the sale agreements, all of which made one point clear:  the purchasers were not receiving, or paying for, any right to use SNMP Research's intellectual property.

2.      To the contrary, the Court's orders and the sale agreements established a framework under which any purchaser that wished to receive and use SNMP Research's software would need to reach an agreement with SNMP Research and compensate SNMP Research to its satisfaction.   And, in fact, all the purchasers who wished to use SNMP Research's software entered into such agreements with it.  Because the Court's orders and the sale agreements foreclose any claim that the purchasers in the business line sales were acquiring

or paying for rights to intellectual property owned by SNMP Research, the Court should grant summary judgment denying SNMP Research's claim for profits-based damages in Count II, Count V, or any other cause of action asserted in the Second Amended Complaint.

3.    As to SNMP Research's own motion for partial summary judgment, that motion also acknowledges that the business line purchasers were not receiving (and thus were not paying for) any rights to intellectual property owned by SNMP Research.  Its motion asserts that the Court's sale orders did not "authorize[ ] the U.S. Debtors to sell or otherwise transfer intellectual property owned by SNMP Research in its orders approving the various business line sales," SNMP Research Br. at 1, and repeatedly relies on the same provisions of the sale orders and sale Agreements that are fatal to SNMP Research's claims for "profits" damages, id. at 6-29, because they make clear that the purchasers were not acquiring, or paying the selling Debtors for, any of SNMP Research's rights.

4.    To the extent SNMP Research's Motion simply asserts that the Court's sale orders and the sale agreements did not operate to convey its "intellectual property" (such as copyrights for software) or rights to its intellectual property to the business line purchasers, this is not a point in dispute – and in fact it is a basis for the U.S. Debtors' Motion.  In the absence of any actual controversy as to this issue, SNMP Research's Motion is moot.

5.    Alternatively, if SNMP Research instead suggests the sale orders actually addressed or affirmatively prohibited the delivery of its software code to purchasers, its Motion should be denied on the merits because it rests on a mischaracterization of the sale orders.  The sale orders, like the sale agreements, simply described what property of the Debtors was being conveyed in the sales.  These orders were not injunctions – they did not purport to enjoin the debtors from doing anything.  Rather, they simply approved the sale of the Debtors' property.

As set forth above, the sale orders – along with the sale agreements and the Court's orders concerning SNMP Research's objections – established a framework under which it was understood that purchasers who wished to use SNMP Research's software would need to enter into an agreement with SNMP Research to do so.  And, again, all the purchasers who wished to use SNMP Research's software did exactly that.

In sum, the sale orders and sale agreements made clear that purchasers were not receiving from Nortel – or paying Nortel for – the ability to use SNMP Research software. Instead, if the purchasers wished to use SNMP Research's software, they would need to negotiate with it – and pay it – for the right to do so.   SNMP Research's claim that it is entitled to profits from the business line sales therefore fails as a matter of law.

### NATURE AND STAGE OF THE U.S. AND CANADIAN PROCEEDINGS

6.    On January 14, 2009 (the "Petition Date"), the U.S. Debtors other than NN CALA filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2]  The U.S. Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    Also on the Petition Date, the U.S. Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies'

---

[2]    These cases are consolidated for procedural purposes only.  NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes. Order (D.I. 1098) (the captioned cases together, the "Chapter 11 Cases").

[3]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors. The

Canadian Court appointed Ernst & Young Inc. as the monitor of the Canadian Debtors (the

"Monitor"). Also on the Petition Date, the High Court of England and Wales placed 19 of

Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of

its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors")[4]

into administration under the control of court-appointed administrators and foreign

representatives (the "Joint Administrators").

    8.    Prior to the Petition Date, SNMP Research had entered into a licensing agreement

(the "License Agreement") with NNC, pursuant to which NNC and certain of its affiliates were

granted rights to use SNMP Research's software in various Nortel products.

    9.    On September 29, 2009, SNMP Research filed a proof of claim in the U.S.

Debtors' bankruptcy proceedings, asserting a claim for $22,000 for unpaid software licensing

royalties due under the License Agreement and accrued prior to the Petition Date. Claim No.

4625, Sept. 29, 2009, as later amended by Claim Nos. 7471, 7740, 7923, 8437 and 8795 (Ex. 8)

(the "Proof of Claim").[5] SMNP Research has since amended its Proof of Claim to include fees

for the alleged unauthorized use of copyrighted SNMP Research software by various Nortel

companies during the pre-petition period, and now seeks approximately $8.4 million. Claim No.

---

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[5]    SNMP Research also filed and similarly amended proofs of claim against the other U.S. Debtors in the Chapter 11 Cases, making the same allegations against them as against NNI in the Proof of Claim. See, e.g., Claim Nos. 4624, 4626-4639.

    Throughout this brief, references to "Ex." followed by a letter refer to the exhibits attached to the Cantwell Declaration in Support of the U.S. Debtors' Memorandum of Law. References to "Pl. Ex." followed by a number refer to the exhibits contained in the appendix to the plaintiff SNMP Research's brief.

8795, Oct, 7, 2015 (Ex. 33).[6] Of this amount, just $2.6 million purportedly represents actual license fees that SNMP Research claims ought to have been paid to it. Id. at 9. The remainder represents SNMP Research's claim for contractual prejudgment interest at a rate of 18 percent per annum.

10. On November 2, 2011, SNMP Research filed its complaint in this adversary proceeding, asserting post-petition claims against the U.S. Debtors and Canadian Debtors premised on, among other things, alleged copyright infringement, violations of Delaware trade secrets law and breach of contract. Compl. (D.I. 6707, Adv. D.I. 1) (the "Complaint"). First, the Complaint alleged a continuation of essentially the same course of conduct alleged in the pre-petition Proof of Claim – that after the petition date, the U.S. Debtors and Canadian Debtors continued to use SNMP Research's software without payment (the "Use Claims").[7] Second, the Complaint alleged that the U.S. Debtors and Canadian Debtors improperly transferred SNMP Research's software to various buyers in the course of the bankruptcy sales of Nortel's business lines (the "Business Line Sales") and thus SNMP Research was entitled to, among other things, a portion of the more than $3 billion in proceeds from those sales (the "Sale Claims").[8]

11. Whereas the amended Proof of Claim filed by SNMP Research based on alleged pre-petition conduct asserted a claim for just $2.6 million in unpaid license fees, plus interest, SNMP Research's Complaint based on the U.S. and Canadian Debtors' alleged post-petition conduct asserted that SNMP Research was entitled to no less than $86 million in damages. The Complaint also asserted related claims against certain of the purchasers in the Business Line

---

[6]     Most recently, SNMP Research filed its fifth amended proofs of claim on October 7, 2015. See Claim Nos. 8789–8803. The U.S. Debtors reserve all rights and defense with respect to these claims, including relating to the timeliness of the various amendments.

[7]     See Compl. ¶¶ 205-14, 273-286, 378-81, 383, 385, 387.

[8]     See Compl. ¶¶ 215-29, 287-308, 378-80, 382, 384, 386-87.

Sales, including Genband US LLC and GENBAND, Inc. (collectively, "GENBAND"),  Avaya

Inc. ("Avaya") and Radware Ltd. ("Radware").

12.     SNMP Research filed an Amended Complaint on December 27, 2013 (Adv. D.I.

115) asserting substantially the same causes of action, but removing GENBAND and certain

other parties as defendants.

13.     After a ruling on February 27, 2015 by the Canadian Court that SNMP Research's

claims against the Canadian Debtors would proceed in the Canadian Court rather than in this

Court, SNMP Research filed a Second Amended Complaint on March 24, 2015, further

narrowing the defendants in this adversary proceeding to the U.S. Debtors and Avaya.  Second

Am. Compl. (Adv. D.I. 160) (the "Second Amended Complaint") (Ex. 33).  The Second

Amended Complaint continues to assert the Use Claims[9] and the Sale Claims[10] against the U.S.

Debtors.[11]   The U.S. Debtors answered the Second Amended Complaint on April 23, 2015.

Answer to Second Am. Compl. (Adv. D.I. 180), (the "Answer").

**A.     SNMP Research's Claim for More than $100 Million in "Profits" From the Nortel Business Line Sales**

14.     In response to  a request from the U.S. Debtors that SNMP Research comply with

its initial disclosure obligations under Fed. R. Civ. P. 26 to provide a calculation of the basis for

its claimed $86 million in damages, on July 17, 2015, SNMP Research explained in a letter that

---

[9]     See Second Am. Compl. ¶¶ 234-44 (D.I. 160) (Ex. 33) (Count I, making copyright-based Use claims); id. ¶¶ 270-85 (Count IV, making trade secret-based Use claims); id. ¶¶ 323-332 (Count VII, making contract-based Use and Sale claims).

[10]     See id. ¶¶ 245-61 (Count II, making copyright-based Sale Claims); id. ¶¶ 286-306 (Count V, making trade secret-based Sale Claims); id. ¶¶ 323-332 (Count VII, making contract-based Use and Sale claims).

[11]     In addition, the Second Amended Complaint alleges that the U.S. Debtors are secondarily liable for damages from purported copyright infringement by Avaya, the buyer in one of the Business Line Sales, who SNMP Research alleges used its software without a license after acquiring it in the relevant sale.  See id. ¶¶ 269 (Count III).

the $86 million amount was based entirely upon the Sale Claims. Counsel to SNMP Research stated:

> In its Complaint, SNMP Research estimated that its damages were not less than $86,000,000. SNMP Research determined that figure by estimating the value of SNMP Research Software to each of the asset sales. SNMP Research then applied that value percentage to the estimated profits that Nortel received from its assets sold by Nortel.

Letter from SNMP Research to U.S. Debtors at 2, July 17, 2015 (Ex. 34) (emphasis omitted). The letter also asserted that SNMP Research now believed that its estimates had been too low, contending that SNMP Research's entitlement to "profits" damages, "as related solely to the asset sales, may be in excess of $100,000,000 and could be considerably greater." Id.

## B.    The Canadian Debtors' Motion

15.    SNMP Research's claims against the Canadian Debtors are proceeding separately before the Canadian Court (the "Canadian Proceedings"). On October 2, 2015, the Canadian Debtors and Monitor filed a Notice of Motion for an Order from the Canadian Court for partial summary judgment (the "Canadian Notice of Motion"), seeking, among other things, a ruling that SNMP Research was not entitled to any portion of the proceeds of the Business Line Sales. Can. Notice of Mot. at 5, Oct. 2, 2015 (Pl. Ex. 1). With respect to the Business Line Sales, the Canadian Notice of Motion stated, inter alia:

- That the Business Line Sales were conducted under the supervision of and approved by the U.S. Court and the Canadian Court;

- That SNMP Research objected to the Business Line Sales in the U.S. Court and those objections had been resolved on the basis that none of SNMP Research's rights were being transferred to the purchasers;

- That SNMP Research's corporate representative, Dr. Jeff Case, had acknowledged during his examination by the Canadian Debtors that, following the Business Line Sales, SNMP Research entered into license agreements with each of Ciena, GENBAND, and Ericsson (who were purchasers in 6 of the 9 Business Line Sales);

- That Dr. Case further testified that SNMP Research was compensated by Ciena, GENBAND and Ericsson on the same or more favorable terms than those in the License Agreement between SNMP Research and NNC; accordingly, SNMP Research suffered no economic loss as a result of those sales; and

- That, the Canadian Debtors also do not believe that SNMP Research suffered any economic loss in the Business Line Sales listed above or those involving Radware, Hitachi and Kapsch, as no evidence had been presented in the Canadian proceedings that SNMP Research software was provided to those entities or, alternatively, those entities were not believed to have made use of SNMP Research's software.

Id. at 5-7.

## C.    The SNMP Research Motion

16.    In response to the Canadian Debtors' Motion, on October 14, 2015, SNMP

Research filed the SNMP Research Motion in this Court, seeking a ruling that this Court

"determine that the Sale Orders . . . entered by this Court [in the Business Line Sales] did not

authorize the U.S. Debtors to sell or transfer [SNMP Research's] Software [] to any third party."

SNMP Research Mot. at 1-2.  According to SNMP Research, an expedited hearing on this issue

was required since the Canadian movants intended to "rely on [the U.S.] Court's Sale Orders, as

well as the resolution of SNMP Research's objections to the underlying sale motions, in an

apparent attempt to argue that this Court somehow authorized or sanctioned the U.S. Debtors'

transfer of SNMP Research's intellectual property."  Mot. for Expedited Hr'g at 2 (Adv. D.I.

288).

17.    However, the Canadian Debtors and Monitor have since made clear to SNMP

Research that they are "not seeking any interpretation of the U.S. sale orders or their effect under

U.S. law" by the Canadian Court and intend to rely on the U.S. sale orders and related transcripts

only to establish "[SNMP Research]'s complete participation in the U.S. sale approval process –

and corresponding notice of the Canadian sale approval process . . . for the purposes of, among

other things, issue estoppel or res judicata as it related to the Canadian approval and vesting

orders," and "[t]hat the parties and purchasers understood, on a factual basis, that the rights to

SNMPRI intellectual property were not being transferred to the purchasers."  Letter from Can.

Debtors to SNMP Research at 2, Oct. 19, 2015 (Ex. 37).  Following these clarifications, SNMP

Research and the U.S. Debtors stipulated to the current schedule for briefing the SNMP Research

Motion and the U.S. Debtors' Motion.

**D.      The U.S. Debtors' Motion**

18.      By the U.S. Debtors' Motion, the U.S. Debtors seek a ruling on a distinct issue

that will substantially narrow the dispute between the parties:  SNMP Research's claims for a

portion of the Business Line Sale proceeds, which depend on the premise that some portion of

the purchase price in the Business Line Sales was attributable to rights belonging to SNMP

Research.  The U.S. Debtors respectfully submit that any such claims cannot survive given (1)

the unambiguous terms of the sale orders issued by this Court in each Business Line Sale (the

"Sale Orders"), which provide that the purchasers were receiving no rights in SNMP Research

software (and thus paying for no rights in SNMP Research software); (2) the similar provisions

of the sale agreements approved by the Sale Orders (the "Sale Agreements"); (3) the record of

the Business Line Sales as a whole in which the parties, SNMP Research, and this Court made

clear that the purchasers would need to negotiate with SNMP Research for such rights; and (4)

the purchasers' actual, subsequent negotiation of license agreements with SNMP Research to pay

for rights in SNMP Research software, which would not have been necessary had the purchasers

believed that they had already acquired the necessary rights from the selling Nortel Debtors.

Accordingly, SNMP Research's claims for damages based on a portion of the sale proceeds,

whether under Count II (seeking such damages under the Copyright Act), Count V (seeking such

damages under the Delaware Uniform Trade Secrets Act), or any other count in the Second

Amended Complaint, must fail.

19.     Resolution of this question in the U.S. Debtors' favor would eliminate the entirety of SNMP Research's claimed $100 million-plus damages figure, which is based wholly on SNMP Research's purported claim to proceeds from the Business Line Sales, and may enable the parties to constructively discuss a resolution of this action.

## STATEMENT OF UNDISPUTED FACTS

20.     As the SNMP Research Brief acknowledges repeatedly, it is undisputed that no rights in SNMP Research's software were transferred to the purchasers in any of the Business Line Sales.  The plain language of each Sale Order signed by this Court and each associated Sale Agreement made clear that the purchaser was receiving only assets belonging to the Debtors in exchange for the consideration being paid.  In addition, SNMP Research appeared and objected in connection with each Business Line Sale beginning with the second sale (the CDMA/LTE sale to Ericsson), and the Ericsson-CDMA/LTE Sale Order and each one thereafter expressly listed SNMP Research as an entity whose rights are not being transferred, putting each purchaser on clear notice that it was neither receiving nor paying for such rights.  This Court afforded SNMP Research the same rights as other objecting parties, whose rights were preserved in similar fashion.

21.     Moreover, at the time of or subsequent to each Business Line Sale, the purchasers (save Kapsch, who SNMP Research does not believe received any SNMP Research software, and Hitachi, from whom SNMP Research has no evidence of infringement after inquiries with that buyer) each entered into negotiations with SNMP Research regarding agreements to license and pay for rights to use SNMP Research's software, reflecting the common understanding that no such rights had passed to the purchasers, and that such rights had not already been paid for in the Business Line Sales.  All told, four of the buyers – Radware, Ericsson, GENBAND, and

Ciena – who together were responsible for seven of the Business Line Sales, ultimately entered into licensing agreements and/or settlement agreements with SNMP Research.  Only Avaya was apparently unable to reach a lasting agreement with SNMP Research regarding the use of its software, and even in that case an accession agreement (extended seven times by addendum) permitted Avaya's interim use of SNMP Research's software for a period of roughly eleven months before ultimately expiring, according to SNMP Research, in February 2011.[12]

22.    Thus, as set forth in further detail below, the Business Line Sales process proceeded precisely as intended by the Court, the parties to the sales and the objectors thereto. SNMP Research's rights were preserved and neither transferred to, nor paid for by, the purchasers, who were expected to – and did – deal with SNMP Research during or after the Business Line Sales in order to pay for any software they wished to use.

**A.    The Business Line Sales and SNMP Research's Objections**

23.    In connection with their insolvency proceedings, from mid-2009 through the end of 2010, the U.S. Debtors, the Canadian Debtors, and certain of their affiliates entered into the Business Line Sales, selling certain business lines of the Nortel companies on a global basis.  All of these sales were overseen and approved by this Court and the Canadian Court.  The Business Line Sales included the following nine transactions:

- Radware-Layer 4-7 Sale.  On March 26, 2009, this Court approved by order the sale of the Layer 4-7 business and certain related U.S. contracts and assets, which were ultimately purchased by Radware, (D.I. 539, the "Radware-Layer 4-7 Sale Order") (Pl. Ex. 4), in response to the motion of the U.S. Debtors for approval of the sale dated February 20, 2009 (D.I. 353, the "Radware-Layer 4-7 Motion").

- Ericsson-CDMA/LTE Sale.  On July 28, 2009, this Court approved by order, the sale of "certain CDMA and LTE assets" to Telefonaktiebolaget LM Ericsson ("Ericsson") (D.I. 1205, the "Ericsson-CDMA/LTE Sale Order") (Pl. Ex. 6), in response to the motion of

---

[12]    See Second Am. Compl. ¶¶ 212-20 (Ex. 33).

the U.S. Debtors for approval of the sale dated June 19, 2009.  (D.I. 931, the "Ericsson-CDMA/LTE Motion").

- Avaya-Enterprise Sale. On September 16, 2009, this Court approved by order, the sale of "certain assets of, and equity interests in, the Debtors' Enterprise Solutions Business" to Avaya (D.I. 1514, the "Avaya-Enterprise Sale Order") (Pl. Ex. 9), in response to the motion of the U.S. Debtors for approval of the sale dated July 20, 2009.  (D.I. 1131, the "Avaya-Enterprise Motion").

- Hitachi-Next Generation Packet Core Sale.  On October 28, 2009,  this Court approved by order the sale of "the Debtors' right, title and interest in the Next Generation Packet Core network components" to Hitachi, Ltd. ("Hitachi") (D.I. 1760, the "Hitachi-Next Generation Sale Order") (Pl. Ex. 11), in response to the motion of the U.S. Debtors for approval of the sale dated September 21, 2009. (D.I. 1525, the "Hitachi-Next Generation Motion").

- Ericsson/Kapsch-First GSM Sale .  On December 2, 2009, this Court approved by order the  sale of the "Debtors' right, title and interest in the GSM/GSM-R Business" to Ericsson and Kapsch Carriercom AG ("Kapsch") (D.I. 2065, the "Ericsson/Kapsch-First GSM Sale Order") (Pl. Ex. 13), in response to the motion of the U.S. Debtors for approval of the sale dated September 30, 2009. (D.I. 1587, the "Ericsson/Kapsch-First GSM Sale Motion").

- Ciena-MEN Sale.  On December 3, 2009, this Court approved by order the sale of "certain assets of the Sellers' Metro Ethernet Network Business" to Ciena Corporation ("Ciena") (D.I. 2070, the "Ciena-MEN Sale Order") (Pl. Ex. 15), in response to the motion of the U.S. Debtors for approval of the sale dated October 7, 2009. (D.I. 1627, the "Ciena-MEN Sale Motion").

- GENBAND-CVAS Sale .  On March 4, 2010, this Court approved by order the sale of "certain assets of Debtors' Carrier Voice Over IP and Application Solutions business" (the "CVAS Business") to GENBAND Inc. ("GENBAND") (D.I. 2632, the "GENBAND-CVAS Sale Order") (Pl. Ex. 17),  in response to the motion of the U.S. Debtors for approval of the sale dated December 23, 2009.  (D.I. 2193, the "GENBAND-CVAS Sale Motion").

- Ericsson-Second GSM Sale.  On May 24, 2010, this Court approved by order the sale of "certain assets of the Debtors' GSM/GSM-R Business" (the "GSM Retained Assets") to Ericsson, (D.I. 3048, the "Ericsson-Second GSM Sale Order") (Pl. Ex. 20), in response to the motion of the U.S. Debtors for approval of the sale dated May 11, 2010. (D.I. 2962, the "Ericsson-Second GSM Sale Motion").

- Ericsson-MSS Sale.  On September 30, 2010, this Court approved by Order, the sale of "certain assets of Debtors' Multi-Service Switch business" (the "MSS Business") to Ericsson (D.I. 4054, the "Ericsson-MSS Sale Order") (Pl. Ex. 21), in response to the

motion of the U.S. Debtors for approval of the sale  dated August 27, 2010.  (D.I. 3832, the "Ericsson-MSS Sale Motion").

24.     None of the Business Line Sales involved a transfer of SNMP Research's rights in its software in exchange for the consideration paid in the sale.

### *The Radware-Layer 4-7 Sale*

25.     SNMP Research did not object to the Radware-Layer 4-7 Sale and it remains common ground that none of SNMP Research's rights were transferred in the sale.  As acknowledged by SNMP Research, see SNMP Research Br. at 6-7, the Radware-Layer 4-7 Sale Order specified that "[t]he sale of the Assets, pursuant to this Order will vest the Successful Bidder with all right, title and interest of the Debtors to the Assets . . . ," Radware-Layer 4-7 Sale Order ¶ 2 (Pl. Ex. 4) (emphasis added).  The Radware-Layer 4-7 Sale Order did not purport to transfer the rights of SNMP Research or any other party in exchange for the purchase price.

26.     The Radware-Layer 4-7 Sale Agreement approved by the Sale Order similarly specified that, "at the Closing . . . Buyer . . . shall purchase . . . all of Transferring Party's right, title, and interest in and to the . . . assets (but in all cases excluding the Excluded Assets) of Such Seller . . . ."  Radware Sale Agreement (D.I. 353 Ex. A) (the "Radware-Layer 4-7 Sale Agreement") § 2.1 (Ex. 1) (emphasis added).  The "Acquired Assets" being transferred included "(i) the Intellectual Property Assets owned by any Seller or an Affiliate of any Seller set forth on Schedule 2.1(d) and (ii) to the extent not covered by Section 2.1(d)(i), the Intellectual Property Assets owned by such Seller and/or its Affiliates that are [] used in Products . . . ," id. § 2.1(d) (emphasis added), but the agreement did not purport to transfer intellectual property owned by SNMP Research.  The agreement also expressly provided that the "Purchase Price" was being paid as "aggregate consideration for the Acquired Assets and the EMEA Acquired Assets," again, not for anything belonging to SNMP Research.  Id. § 3.1(a).  See also Second Am. Compl.

¶ 134 (Ex. 33)  (alleging that the "Asset Purchase Agreement between Nortel and Radware put Radware on notice that Radware would and did receive SNMP Software and could not use or disclose SNMP Software absent a separate license agreement with SNMPRI").

### The Ericsson-CDMA/LTE Sale

27.     In the remaining eight Business Line Sales, beginning with the Ericsson-CDMA/LTE Sale, SNMP Research filed an objection in this Court and requested clarification of the sellers' and purchasers' "intentions with respect to the License Agreement."  CDMA/LTE Sale Obj. ¶ 10 (D.I. 1128) (the "CDMA/LTE Sale Objection") Ex. 2.[13]  In the CDMA/LTE Sale Objection, SNMP Research indicated that it had been advised prior to the sale hearing "by certain employees of NNC . . .  that portions of the intellectual property licensed under the License agreement may be 'transferred' to Nokia Siemens Networks, one of the Purchasers."[14] Id.  ¶ 8.

28.     At the approval hearing for the Ericsson-CDMA/LTE Sale before this Court, counsel to SNMP Research made clear that SNMP Research did not "inten[d] to stand in the way of a $1.13 billion sale, but [] would just like a little bit more comfort that this order is not impacting our rights should there be an inadvertent transfer of our intellectual property." CDMA/LTE Hr'g. Tr. 26:16-19, July 28, 2009 (the "CDMA/LTE Sale Hearing Transcript") (Ex. 4).  The Court overruled SNMP Research's objection, concluding that SNMP Research's rights

---

[13]     See also Enterprise Sale Obj. ¶ 8 (D.I. 1434) (the "Enterprise Sale Objection") (Ex. 5); First GSM Sale Obj. ¶ 7 (D.I. 1887) (the "First GSM Sale Objection") (Ex. 13); MEN Sale Obj. ¶ 7 (D.I. 1846) (the "MEN Sale Objection") (Ex. 12); CVAS Sale Obj. ¶ 7 (D.I. 2433) (the "CVAS Sale Objection") (Ex. 18); Next Generation Sale Obj. ¶ 8 (D.I. 1706) (the "Next Generation Sale Objection") (Ex. 9); Second GSM Sale Obj. ¶ 6 (D.I. 2998) (the "Second GSM Sale Objection") (Ex. 23).  As described more fully below, in SNMP Research's objection to the final business line sale, the Ericsson-MSS Sale, rather than seeking clarification of the U.S. Debtors' intentions, SNMP Research demanded an audit.  See MSS Sale Obj. ¶ 10 (D.I. 3993) (the "MSS Sale Objection") (Ex. 25). The Court rejected this audit request.  See infra  ¶¶ 41–45.

[14]     Nokia Siemens Networks was the stalking horse for the sale contemplated by the Ericsson-CDMA/LTE Motion.  See Nokia Siemens CDMA/LTE Sale Agreement (D.I. 931 Ex. A) (the "Nokia Siemens-CDMA/LTE Sale Agreement").  Ericsson purchased the CDMA/LTE business at auction.

were adequately protected by the text of the sale order as drafted, which provided that neither the

sale order nor the sale agreement operated to convey rights or ownership of SNMP Research's

intellectual property to a purchaser:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides
> for the assumption and/or assignment, whether under section 365 of the
> Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP
> Research International, Inc. . . . and no intellectual property rights or intellectual
> property licensed via contracts with SNMP and Nortel are being conveyed or
> otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or
> Ancillary Agreements.

Ericsson-CDMA/LTE Sale Order ¶ 37 (Pl. Ex. 6).[15]  Ericsson, the ultimate purchaser of the

CDMA/LTE business line, was represented by counsel at the sale hearing, as were the purchasers

in each of the other sale hearings.[16]

29.    Consistent with this express exclusion of SNMP Research's intellectual property

rights from the assets being sold, the Ericsson-CDMA/LTE Sale Order elsewhere provided that

only the sellers' rights were being transferred as part of the exchange of consideration in the sale,

stating:

> This Order applies only to assets owned by the Debtors.  Consequently,
> notwithstanding any other provision of this Order or the Sale Agreement to the
> contrary, the portions of this Order that approve the transfer of assets to the
> Purchaser free and clear of all liens and other encumbrances, or that modify,
> enjoin, release or otherwise limit the rights of creditors of entities transferring

---

[15]    "Intellectual property" is not a defined term in the Ericsson-CDMA/LTE Sale Order, but the Ericsson-CDMA/LTE Sale Agreement approved by the order makes clear that the term refers to rights in software, and not the software itself, defining "Intellectual Property" as "any and all intellectual . . . property *rights*, whether protected or arising under the Laws of the United States, Canada or any other jurisdiction, including all intellectual . . . property rights in … (v) trade secrets, know-how and confidential information; . . . and (viii) Software." CDMA/LTE Sale Agreement §1.1 (D.I. 1205 Ex. A) (the "Ericsson-CDMA/LTE Sale Agreement") (Ex. 26) (emphasis added).

[16]    See Layer 4-7 Sale H'rg Tr. Mar. 26, 2009 at 9:2-3 (counsel for Radware); CDMA Sale H'rg Tr. July 28, 2009 at 17:23-24 (counsel for Ericsson); Enterprise Sale H'rg Tr. Sept. 16, 2009 at 2:10-12 (counsel for Avaya); Next Generation Sale H'rg Tr. Oct. 28, 2009 at 36:22-23 (counsel for Hitachi); MEN and First GSM Sale H'rg Tr. Dec. 2, 2009 at 78:2-3 (counsel for Ciena); id. at 234:4-5 (counsel for Ericsson); CVAS Sale H'rg Tr. Mar. 3, 2010 at 5:14-20 (counsel for GENBAND); Second GSM Sale H'rg Tr. May 24, 2010 at 2 (counsel for Ericsson); MSS Sale H'rg Tr. Sept. 30, 2010 at 3 (counsel for Ericsson).

assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities.

Id. ¶ 30 (emphasis added).[17]

30.　　Likewise, the sale agreement approved by the Court specified that the purchaser would not receive any rights in SNMP Research's Software as a result of the consideration paid in the transaction, stating that "at the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the assets  predominantly used or held for use in the conduct of the Business," Ericsson-CDMA/LTE Sale Agreement § 2.1.1 (Ex. 3) (emphasis added), and made clear that assets not belonging to the sellers, including the "Intellectual Property owned by a Third Party," were "Excluded Assets" except as provided therein, id. § 2.1.2(k).[18]  The agreement also provided  that the "Purchase Price" was being paid "in consideration of the sale of the Assets pursuant to the terms hereof," which "Assets" did not include anything belonging to SNMP Research.  Id. § 2.2.1 (emphasis added).

### *The Avaya-Enterprise Sale*

31.　　In its Enterprise Sale Objection, SNMP Research made the same objections as before, and added an additional demand:  that "if the parties to the Sale determine that the License Agreement will not be assumed and assigned," then the Debtors should include the

---

[17]　　In addition, ¶ G of the sale order provided that "[t]he Assets (as defined in the Sale Agreement) sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the 'Purchased Assets') *are property of the Debtors' estates* and title thereto is vested in the Debtors' estates" (emphasis added).  A similar provision appeared in the following Sale Orders:  Ericsson/Kapsch-First GSM Sale Order ¶ H (Pl. Ex. 13); Ciena-MEN Sale Order ¶ F (Pl. Ex. 15); GENBAND-CVAS Sale Order ¶ G (Pl. Ex. 17); Ericsson-Second GSM Sale Order ¶ G (Pl. Ex. 20); Ericsson-MSS Sale Order ¶ G (Pl. Ex. 21).

[18]　　Additionally, the "Assigned Intellectual Property as of the Closing Date" that was included among the assets being sold, Ericsson-CDMA/LTE Sale Agreement § 2.1.1(g) (Ex. 3), was limited to that owned by the Debtors, including, for example, "(iii) the Intellectual Property . . .  in the Software . . . predominantly used in the CDMA Products and in the Software predominantly used in the LTE Access Products, respectively, in each case listed on Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) any other Intellectual Property . . . *owned as of the Closing Date by any of the Sellers . . .* ," id. at 1.1.

following language in any draft order approving the sale, in addition to the language used in the

Ericsson-CDMA/LTE Sale Order:

> To the extent the Purchaser elects to have the Sellers assign to the Purchaser any
> contract with or intellectual property right of SNMP relating to the Assets, the
> Sellers and Purchaser will do so in accordance with the terms of such contract or
> applicable license, which terms may include, inter alia, the written consent of
> SNMP.  To the extent the Purchaser discovers they have received SNMP's
> intellectual property or intellectual property rights, the Purchaser will make
> reasonable efforts to enter into a new license agreement with SNMP within a
> reasonable time after such discovery.

Enterprise Sale Objection Ex. ¶ 8 (Ex. 5).

32.     The parties instead resolved SNMP Research's objection on a consent basis, with

the Sale Order making clear that Avaya was receiving no rights in SNMP Research's software as

a result of its purchase of the Enterprise business, providing that  "[n]othing in this Order

authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part,

of any Objecting Party Agreement," and defining such "Objecting Party Agreement[s]" to

expressly include "any written contract, agreement, license or any other document that creates

binding contractual obligations between [SNMP Research International Inc.] and one or more

Debtors."  Avaya-Enterprise Sale Order ¶ 27 (Pl. Ex. 9).

33.     As with the Ericsson-CDMA/LTE Sale Order, the Enterprise Sale Order

elsewhere provided that only the sellers' rights were being transferred as part of the exchange of

consideration in the sale, stating:

> This Order applies only to assets owned by the Debtors. . . . Consequently,
> notwithstanding any other provision of this Order or the Agreement to the
> contrary, the portions of this Order that approve the transfer of assets to the
> Purchaser free and clear of all liens and other encumbrances or that modify,
> enjoin, release or otherwise limit the rights of creditors of entities transferring
> assets, apply only to assets owned by the Debtors and do not apply to any assets
> owned by non-debtor entities, except to the extent otherwise agreed by such
> creditor in writing . . . .

Id. ¶ 29.

34.    And again, the sale agreement approved by the Enterprise Sale Order also made clear that the purchaser was not paying for any rights in SNMP Research's software, providing that "at the Closing, the Purchaser shall . . . purchase . . . from the relevant Sellers, and each Seller shall transfer . . . all of its right, title and interest in and to the . . . assets other than the Excluded Assets."  Avaya-Enterprise Sale Agreement § 2.1.1 (D.I. 1514 Ex. A) (the "<u>Avaya-Enterprise Sale Agreement</u>") (Ex. 6)  (emphasis added).  Such "Excluded Assets" covered "any rights to any Intellectual Property . . . of any Third Party, except to the extent licensed under an Assigned Contract."  <u>Id.</u> § 2.1.2(h).  The Enterprise Assets being sold, by contrast, included "the Transferred Intellectual Property as of the Closing Date," defined to include only the assets listed on certain schedules and "any Intellectual Property . . . owned by any of the Sellers that is used exclusively in connection with the Business . . . ."  <u>Id.</u> §§ 1.1, 2.1.1(f) (emphasis added).  The "Purchase Price" was being paid as "consideration of the sale of the Assets . . . pursuant to the terms hereto" and "the sale of the EMEA Assets pursuant to the EMEA Asset Sale Agreements," once again, not for SNMP Research's intellectual property.  <u>Id.</u> § 2.2.1.

### *The Hitachi-Next Generation Packet Core Sale, Ericsson/Kapsch-First GSM Sale, Ciena-MEN Sale, GENBAND-CVAS Sale, and Ericsson-Second GSM Sale*

35.    SNMP Research lodged substantially similar objections in the next five Business Line Sales, again seeking the inclusion of language that would  put parties on notice that:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI").  To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, inter alia, the written consent of SNMPRI.  To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

18

Next Generation Sale Obj. ¶ 8 (Ex. 9).[19]

36.    At the last of these five hearings, to approve the Ericsson-Second GSM Sale, SNMP's Counsel told the Court that "SNMP filed a preliminary objection to the sale motion, the purpose of which was to reserve any and all rights SNMP may have to object to the assumption or assignment of any of its contracts or intellectual property rights," explaining that it was "the understanding of SNMP [Research] that all substantive objections to the assumptions or assignment of any of its contracts or intellectual property rights are being preserved in connection with this sale motion, and SNMP . . . reserves all of its rights in connection with the assumption or assignment of its contract or intellectual property rights." Second GSM Sale Hr'g Tr. 12:20-24; 13:5-11, May 24, 2010 (the "Second GSM Sale Hearing Transcript") (Ex. 24). (emphasis added).

37.    In each case, SNMP Research's objection was resolved via language in the relevant order that put each buyer on notice that the order did not operate to convey rights in or ownership of SNMP Research's intellectual property:

- Hitachi-Next Generation Sale Order ¶ 24 (Pl. Ex. 11) ("Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any supply agreement, intellectual property or license agreement . . . [with] SNMP Research International Inc.");

- Ericsson/Kapsch-First GSM Sale Order ¶ 39 (Pl. Ex. 13) ("Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement.");[20]

- Ciena-MEN Sale Order ¶ 25 (Pl. Ex. 15) ("[N]o intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being

---

[19]    See also First GSM Sale Obj. ¶ 7 (Ex. 13); MEN Sale Obj. ¶ 7 (Ex. 12); CVAS Sale Obj. ¶ 7 (Ex. 18); Second GSM Sale Obj. ¶ 6 (Ex.23).

[20]    "Objecting Party Agreement" was defined as "any written contract agreement, license or any other document that creates binding contractual obligations between an Objecting Party and one or more Debtors," and the definition of "Objecting Party" included "SNMP Research International, Inc." Ericsson/Kapsch-First GSM Sale Order ¶ 39 (Pl. Ex. 13).

conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements.");[21]

- GENBAND-CVAS Sale Order ¶ 44 (Pl. Ex. 17) ("Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment by the Debtors of any contract or license with SNMP Research International, Inc. (SNMP) under section 365 of the Bankruptcy Code.  To the extent that the Purchaser elects to have the Debtors assign or sublicense to the Purchaser any contract with or license of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license, which may include entering into a new license agreement."); and

- Ericsson-Second GSM Sale Order ¶ 41 (Pl. Ex. 20) ("[N]o intellectual property rights or intellectual property licensed via contracts between SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to this Order, Agreement or Ancillary Agreements at this time.").[22]

38.    Each of these five Sale Orders also specified that only the Debtors' assets were being sold to the purchasers for the consideration provided in the respective Business Line Sales. The Hitachi-Next Generation Sale Order and the Ciena-MEN Sale Order stated that the purchaser would obtain only the "rights, title and interest of the Debtors," or "the Debtor's right, title and interest," respectively.[23]  The Ericsson/Kapsch-First GSM Sale Order, the GENBAND-CVAS Sale Order and the Ericsson-Second GSM Sale Order stated that they only applied to

---

[21]    "Intellectual property" is not a defined term in the Ciena-MEN Sale Order, but the Ciena-MEN Sale Agreement approved by such order defines intellectual property as "any and all intellectual property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual property *rights* [with] respect [to] . . . (e) trade secrets, know-how and confidential technical or business information; . . . and (g) any Software and technology." Ciena-MEN Sale Agreement § 1.1 (Ex. 14) (emphasis added).

[22]    "Intellectual property" is not a defined term in the Ericsson-Second GSM Sale Order, but the Ericsson-Second GSM Sale Agreement approved by the order makes clear that the term refers to rights in the software, not the software itself, defining intellectual property as "all intellectual and industrial property *rights* and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions . . . including rights in or to any of the following: . . . (e) trade secrets, know-how and confidential technical or business information; [and] (f) Software." Ericsson-Second GSM Sale Agreement § 1.1 (Ex. 22) (emphasis added).

[23]    Hitachi-Next Generation Sale Order ¶ 4 (Pl. Ex. 11); Ciena-MEN Sale Order ¶ 8 (Pl. Ex. 15).

assets owned by the Debtors and that any provision of the documentation effecting any transfer of assets only applied to assets owned by the Debtors.[24]

39.     And, as with the previous three Business Line Sales, the Sale Agreements approved by these five Sale Orders specified that the purchasers were not, by their payments to the Debtors, acquiring the right to use any SNMP Research software, and instead were paying only for the right, title, and interest of the selling Debtors:

- Hitachi-Next Generation Sale Agreement § 2.1 (D.I. 1760 Ex. A) (the "Hitachi-Next Generation Sale Agreement") (Ex. 10) ("At the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the assets described in clauses (a) through (e) of this Section (such assets, the 'Assets')") (emphasis added);[25]

- Ericsson/Kapsch-First GSM Sale Agreement § 2.1 (D.I. 2018 Ex. A) (the "Ericsson/Kapsch-First GSM Sale Agreement") (Ex. 15) ("At the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the assets predominantly . . . used or held for use in the conduct of Business (such assets, excluding the Excluded Assets, the 'Assets')") (emphasis added);[26]

- Ciena-MEN Amended Sale Agreement § 2.1 (D.I. 1969 Ex. A) (the "Ciena-MEN Sale Agreement") (Ex. 14) ("At the Closing, the Purchaser shall . . . purchase . . . from the relevant Sellers . . . , and each Seller shall

---

[24]     See, e.g., Ericsson/Kapsch-First GSM Sale Order ¶ 29 (Pl. Ex. 13); GENBAND-CVAS Sale Order ¶ 37 (Pl. Ex. 17); Ericsson-Second GSM Sale Order ¶ 27 (Pl. Ex. 20).

[25]     The "Assets" included "the Assigned Intellectual Property as of the Closing Date . . . ," Hitachi-Next Generation Sale Agreement § 2.1.1(b) (Ex. 10), defined to include only "Intellectual Property . . . *owned by the Sellers* as of the Closing date," id. § 1.1 (emphasis added), and made clear that the "Purchase Price" was being paid as "aggregate *consideration for the Assets*," not SNMP Research's intellectual property, id. § 2.2.

[26]     The "Assets" covered by the Ericsson/Kapsch-First GSM Sale included "the Transferred Intellectual Property as of the Closing Date . . . ." Ericsson/Kapsch-First GSM Sale Agreement § 2.1.1(f) (Ex. 13). "Transferred Intellectual Property" was defined in relevant part to include only that set forth in the agreement and "any other Intellectual Property . . . *owned by any of the Sellers*" and exclusively used in the business, id. § 1.1 (emphasis added), and the "Purchase Price" was being paid "*in consideration of the sale, transfer and assignment of the Assets.*" id. § 2.2.1. Moreover, the Ericsson/Kapsch-First GSM Sale Agreement stated: "[N]othing herein shall be deemed to sell, transfer, assign or convey . . . the following assets to the Purchaser[:] . . . Intellectual Property owned by a Third Party." Ericsson/Kapsch-First GSM Sale Agreement § 2.1.2 (Ex. 13).

transfer . . . all of its right, title and interest in and to the . . . assets other than the Excluded Assets.") (emphasis added);[27]

- GENBAND-CVAS Sale Agreement § 2.1 (D.I. 2632 Ex. A) (the "GENBAND-CVAS Sale Agreement") (Ex. 17) ("At the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the . . . assets (such assets, excluding the Excluded Assets, the 'Assets')") (emphasis added);[28] and

- Ericsson-Second GSM Sale Agreement § 2.1 (D.I. 2962 Ex. A) (the "Ericsson-Second GSM Sale Agreement") (Ex. 22) ("At the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the following assets.") (emphasis added).[29]

40.    In none of these five sales – nor in connection with any of the previous three sales – did SNMP Research object that it believed the purchasers were paying the selling Debtors for rights in or ownership of SNMP Research software or suggest that the selling Debtors would owe SNMP Research tens of millions of dollars from the sale proceeds.

---

[27]    The "Assets" transferred under the agreement included "the Transferred Intellectual Property as of the Closing Date," Ciena-MEN Amended Sale Agreement  § 2.1.1(e) (Ex. 14), defined in relevant part as "the Intellectual Property . . . *owned by any of the Sellers*." Id. § 1.1 (emphasis added).  The agreement also expressly provided that the "Purchase Price" was being paid "*in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets . . .*," and not anything belonging to SNMP Research." Id. § 2.2.1.  Moreover, the Ciena-MEN Sale Agreement stated that "[T]he Purchaser . . . shall have no rights with respect to the right, title and interest of the Sellers in and to[] the following assets (collectively, the 'Excluded Assets'): . . . Intellectual Property owned by a Third Party." Id.  § 2.1.2.

[28]    The "Assets" being transferred included "the Transferred Intellectual Property as of the Closing Date . . . ," CVAS GENBAND-CVAS Sale Agreement § 2.1.2(h) (Ex. 17), defined in relevant part to include only "any Intellectual Property . . . *owned by any of the Sellers*," id. § 1.1 (emphasis added), and the "Purchase Price" was paid as "*consideration of . . . the Sellers' and EMEA Sellers' right, title, and interest in, to and under the Assets and the EMEA Assets respectively*," id. § 2.2.1(h).  The Excluded Assets included "any right to any Intellectual Property . . . of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c), 5.4(d) or 5.15(c)." Id. § 2.1.2(g).

[29]    The "Assets" being transferred again did not include anything belonging to SNMP Research and the "Purchase Price" was being paid "*in consideration of the sale of the Assets* pursuant to the terms hereof."  Ericsson-Second GSM Sale Agreement (Ex. 22) § 2. 2. Section 2.1.2 of the Second GSM Sale Agreement further defined "Excluded Assets" to include "Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract." Id. § 2.1.2(i).

*The Ericsson-MSS Sale*

41.     SNMP Research's objection to the final Business Line Sale, the Ericsson-MSS Sale, alleged that "[a]s a result of the Previous Sales, the Debtors transferred SNMPRI intellectual property licensed to the Debtors under the License Agreement to the purchasers . . . in the Previous Sales" including during the CVAS sale to GENBAND, though it also noted that "[s]imultaneously with the Previous Sales, SNMP[ Research] has entered into a temporary license agreement with most of the Previous Purchasers."  MSS Sale Obj. ¶ 7 (Pl. Ex. 21) . SNMPRI demanded that "as a condition of the sale" for the MSS business line, the Debtors perform an audit "to determine if SNMPRI intellectual property will be transferred to the purchaser as part of the sale."  Id. ¶ 10.

42.     At the hearing on the Ericsson-MSS Sale, SNMP Research explained for the first time that, in its view, "SNMP intellectual property . . . consists of software code" and that SNMP Research believed the U.S. Debtors had agreed to provisions "in prior orders regarding these types of sales" stating that they, the sellers, would not transfer such software code to purchasers. MSS Hr'g Tr. 52:5-17, Sept. 30, 2010 (the "MSS Sale Hearing Transcript") (Ex. 27).

43.     The U.S. Debtors (through their counsel, Mr. Bromley) disagreed with this characterization:

> MR. BROMLEY:  When I look at the objection it says SNMPRI requests that the debtors perform an audit as a condition of the sale to determine if SNMPRI intellectual property will be transferred to the purchaser as part of the sale.  Now, this is where we get a little metaphysical about what intellectual property is and what code is, all right.  Mr. Ralston is describing it as if it's a Lego block that we can simply remove and put on a shelf someplace.  Intellectual property is, in this particular case, not something that is physical, right?  And it's manifested by a license.

Id.  56:8-17.

44.    SNMP Research argued in response that, "[i]f I have Microsoft Word, whether it's under a license or whether it's not under a license on my computer, and I'm not authorized by law to convey that package of software to another person, and I sell my computer without taking the software off, then that's – I'm essentially transferring what is not rightfully mine to transfer. . . . I shouldn't give it to another person unless I'm permitted to do so, and that essentially is all we're asking." Id. 59:7-16.  But this Court agreed with the U.S. Debtors that the structure of the Business Line Sales overseen by the Court had ensured that SNMP Research's rights would be protected by the provisions in the prior orders, making clear that none of SNMP Research's rights were being sold to the purchasers, and contemplated that the purchasers would be responsible for negotiating license agreements with SNMP Research and paying SNMP Research if they wished to use SNMP Research software:

> MR. BROMLEY:  So what we're saying is that we have a license to use this intellectual property it relates to the business. We have told [counsel to SNMP Research] now that two of the licenses do relate to this business. We have told Ericsson, as the purchaser, that these two licenses relate to the business, along with others that are on that list, and that they need to deal with it, all right.  So it would seem to me –
>
> THE COURT:  That you're not assigning those licenses.
>
> MR. BROMLEY:  I'm not assigning those licenses. Now I'm not hearing from [counsel to SNMP Research] that there's a – so I'm not giving them those licenses. So post-closing, Ericsson will not have a right to use those licenses. Right? And as I said, they're worldwide licenses, right, so it's not simply an issue for us here in Delaware, it's an issue for the EMEA debtors, it's an issue for the Canadian debtors, it's an issue anywhere this business is operating. What we're trying to do though is identify, right, what Ericsson needs to do in order to operate the business; we have done that.
>
> THE COURT:  Right.
>
> MR. BROMLEY:  So and I'm – so he's saying what intellectual property is being transferred? The intellectual property, in my mind, is the license agreement; we are not transferring the license

agreement. We are telling Ericsson we're not transferring it, because we can't transfer it without SNMP's consent. We know that. So what Ericsson and what SNMP need to do is to go in and actually work on getting a new agreement, all right. And if Ericsson uses SNMP intellectual property after the closing and they're not allowed to, Ericsson is not supposed to do that, and they would have a claim against Ericsson.

THE COURT: Correct.

MR. BROMLEY: Not against us.

THE COURT: Correct.

MSS Sale Hr'g Tr. 56:18-58:3 (Ex. 27) (emphasis added).

45.     Following these exchanges, the Court overruled SNMPRI's objection, concluding that the language that would be inserted in the sale order – providing that "[n]othing in this Order provides for the assumption and assignment of any contract or license with . . . SNMP Research International, Inc. pursuant to section 365 of the Bankruptcy Code." Ericsson-MSS Sale Order ¶ 44 – was sufficient to resolve the issue. The Court further stated that, "to the extent that SNMP is unable to reach agreement with Ericsson they can bring the matter back before me," MSS Hr'g Tr. 60:14-16 (Ex. 27) (emphasis added), clearly contemplating that Ericsson might receive SNMP Research Software, but also making clear that Ericsson would not have the right to use that software without first entering into an agreement with SNMP Research.

**B.     The Buyers' Negotiations with SNMP Research for Continued Use of SNMP Research Software**

46.     As contemplated by the structure put in place by this Court for the Business Line Sales, and by the language of the Sale Orders and the Sale Agreements, the purchasers of the various business lines entered into negotiations with SNMP Research for the purchasers' licensed use of SNMP Research software relating to the business lines acquired from the U.S. Debtors and other selling Debtors – negotiations that would have been unnecessary had the

purchasers expected that they received such rights in the Business Line Sales.  The exceptions

were Radware, which, as discussed below, signed a settlement agreement making clear that it

had not used SNMP Research's software at all and did not intend to do so; Kapsch, who Dr. Case

has testified is not believed to have obtained SNMP Research software in connection with the

Business Line Sales; and Hitachi, from whom SNMP Research has no evidence of infringement

after making inquiries with that buyer.[30]

47.    As noted, on July 17, 2014, Radware entered into a settlement agreement with

SNMP Research regarding 

Under the Radware Settlement Agreement, Radware agreed to

Dr. Case has testified that SNMP Research

This Court had previously granted Radware's

motion to dismiss (without prejudice) in this litigation, finding that SNMP Research's allegations

---

[30]    Despite detailing the Hitachi-Next Generation Sale at length in the SNMP Research Brief, see SNMP Research Br. at 13-16,

SNMP Research has never named Hitachi as a defendant in this litigation.  Dr. Case testified that

Similarly, Dr. Case confirmed

Again, SNMP Research has never named Kapsch as a defendant in this litigation.

in the original Complaint did "not contain the factual content that allows the court to draw the reasonable inference that Radware is liable" for copyright infringement, that the Complaint did "not come close to meeting the pleading requirements" with respect to SNMP Research's claims for misappropriation of its trade secrets, and that SNMP Research's remaining claims for unjust enrichment and conversion were likewise inadequately pled.  Op. re Radware Ltd.'s Mot. to Dismiss at 13-14 (D.I. 113).  Following the dismissal of these claims, SNMP Research and Radware entered into the settlement agreement described above.

48.     As discussed, all of the Business Line purchasers who wished to use SNMP Research's software entered into agreements to obtain the right to do so and to compensate SNMP Research to its satisfaction.  The details of those license agreements are set forth below.

49.     Ericsson Inc. entered into a license agreement with SNMP Research on ████████ ███████████████████████████████████████████████████████ ████████████████████████████████████ (the "<u>Ericsson Inc. License Agreement</u>") (Ex. 29).  The Ericsson Inc. License Agreement included a provision requiring ████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████ SNMP NCA 00007915 (Ex. 29).  During his examination, Dr. Case testified that █████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████ (Ex. 35).

50.    Ciena entered into an accession agreement with SNMP Research on March 17, 2010, two days before the closing date of the Ciena-MEN Sale (the "Ciena Accession Agreement") (Ex. 21).    The Ciena Accession Agreement became effective April 7, 2010, the date of the first purchase order issued by Ciena to SNMP.  Id.  The agreement ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Id.  Ciena also subsequently entered into another license agreement with SNMP Research on December 3, 2010, which ████████████████████████████████████ (the "Ciena License Agreement"). Ciena License Agreement at SNMP NCA 00000836 (Ex. 28). ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ Presumably, for the same reason, SNMP Research is not asserting any continuing claims against the U.S. Debtors either.

51.    GENBAND entered into a Memorandum of Understanding ("MOU") (Ex. 30) dated January 25, 2012 with SNMP Research, which ████████████████████████████████

████████████████████████████████ The MOU stated that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ MOU at SNMP NCA 00001935 (Ex. 30).  On February 15, 2012, GENBAND and SNMPRI entered into such a license agreement (the "GENBAND License Agreement") (Ex.

31), which Dr. Case testified contains 

52.        Avaya entered into an accession agreement with SNMP Research on March 3, 2010,

However, SNMP Research and Avaya were unable to reach consensus on a lasting license agreement.[31]

<u>**ARGUMENT**</u>

53.        By their motion for partial summary judgment, the U.S. Debtors seek judgment with respect to SNMP Research's claims for a share of the Business Line Sale proceeds, which SNMP Research contends would entitle them to more than $100 million in damages.  SNMP Research's claim depends on the premise that some portion of the purchase price in the Business Line Sales was attributable to rights to use SNMP Research's software.  But any such claims

---

[31]        Avaya has represented that even since the expiration of the Avaya Accession Agreement, "Avaya and SNMP have continued attempts to negotiate a license agreement," but "denies that SNMP has negotiated in good faith."  Answer to Second Am. Compl. ¶ 226 (D.I. 177).

cannot survive the plain terms of the Sale Orders and Sale Agreements that make clear that no such rights were being provided to the buyers.  Instead, the Sale Orders, Sale Agreements, and this Court's resolution of SNMP Research's objections make clear that any buyer that wished to use SNMP Research software would need to negotiate and reach terms with SNMP Research for doing so.  All such buyers who SNMP Research contends used SNMP Research software entered into such negotiations, confirming all parties' expectations and understandings regarding the Business Line Sales.  Accordingly, SNMP Research's theory that the purchasers paid the U.S. Debtors any amount – much less $100 million –  for rights belonging to SNMP Research must fail.  The Court therefore should grant summary judgment in the U.S. Debtors' favor and foreclose SNMP Research from pursuing the profits-based damages it seeks in Count II, Count V, or any other cause of action asserted in the Second Amended Complaint.

54.    SNMP Research's own motion for partial summary judgment itself asserts that the purchasers in the Business Line Sales were plainly not receiving – and thus plainly not paying for – any rights to intellectual property owned by SNMP Research.  Its motion asserts that this Court's Sale Orders did not "authorize[ ] the U.S. Debtors to sell or otherwise transfer intellectual property owned by SNMP Research in its orders approving the various business line sales," SNMP Research Br. at 1, and repeatedly relies on the same provisions of the Sale Orders and Sale Agreements that are fatal to SNMP Research's claims for "profits" damages, id. at 6-29, making clear that the purchasers were not paying the selling Debtors for any of SNMP Research's rights.

55.    To the extent SNMP Research's Motion simply asserts that the Sale Orders and Sale Agreements did not operate to convey its "intellectual property" (such as copyrights for software) or rights to its intellectual property to the Business Line purchasers, this is undisputed.

To the extent SNMP Research instead suggests the Sale Orders addressed or affirmatively prohibited the delivery of its software code to purchasers, that is wrong. The Sale Orders, like the Sale Agreements, simply described what property of the Debtors was being conveyed in the sales. These were not injunctions – they did not purport to enjoin the debtors from doing anything. Rather, they simply approved the sale of the Debtor's property. And, as set forth above, the Sale Orders – along with the Sale Agreements and the Court's orders concerning SNMP Research's objections – established a framework under which it was understood that purchasers who wished to use SNMP Research's software would need to enter into an agreement with SNMP Research to do so. And, again, all the purchasers who wished to use SNMP Research's software did exactly that.

56.    In sum, the Sale Orders and Sale Agreements made clear that purchasers were not receiving from Nortel – or paying Nortel for – the ability to use SNMP Research software. Instead, if the purchasers wished to use SNMP Research's software, they would need to negotiate with it – and pay it – for the right to do so.   Thus, the premise of SNMP Research's profits claim – that purchasers paid money to Nortel for the ability to use SNMP Research software – simply cannot survive in light of the plain terms of the Sale Orders and Sale Agreements.

\*    \*    \*

57.    The Court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), incorporated by Fed. R. Bankr. P. 7056. See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chorman v. Foamex Int'l, Inc. (In re Foamex Int'l Inc.), 491 B.R. 100, 105 (Bankr. D. Del. 2013). "The movant bears the burden of establishing

that no genuine dispute as to any material fact exists." Varela v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.), 522 B.R. 62, 66 (Bankr. D. Del. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986)).  "Once the moving party has established its prima facie case, the party opposing summary judgment must go beyond the pleadings and point to specific facts showing there is a genuine issue of fact for trial." Joseph v. Feit (In re Liberty Brands, LLC), 476 B.R. 443, 449 (Bankr. D. Del. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Matsushita, 475 U.S. at 585–86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir.2000); Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir.1999).

## I.  SNMP RESEARCH HAS NO BASIS TO CLAIM PROFITS FROM THE SALE OF THE BUSINESS LINES BECAUSE NO RIGHTS IN SNMP RESEARCH SOFTWARE WERE TRANSFERRED TO PURCHASERS IN THE BUSINESS LINE SALES

58.    SNMP Research wants to have it both ways.  The SNMP Research Brief goes to great lengths to show that this Court's entry of unambiguous sale orders approving unambiguous sale agreements made clear that no Business Line Sale authorized the transfer of SNMP Research's rights to a buyer, yet its entire claim for profits damages – $100 million – rests on the premise that the purchasers in those same Business Line Sales nonetheless paid value to the U.S. Debtors and their selling affiliates for the very thing they were not receiving.

59.    Two counts of the Second Amended Claim focus on SNMP Research's purported entitlement to profits from the Business Line Sales.  Count II seeks to recover a percentage of any "profits" the U.S. Debtors earned from the Business Line Sales on the basis of copyright law.  See Second Am. Compl. ¶ 246 (Ex. 33) (as to the Ericsson-CDMA/LTE Sale); id. ¶ 248 (as to the Avaya-Enterprise Sale); id. ¶ 250-51 (as to the GENBAND-CVAS Sale); id. ¶ 253 (as to

other Business Line Sales); id. ¶ 258.[32]  Count V claims that under the Delaware Uniform  Trade

Secrets Act, the U.S. Debtors were "unjustly enriched" in the Business Line Sales, id. ¶ 305,

implying a claim for a portion of the Business Line Sale proceeds under that theory as well.  But

no claim by SNMP Research that rests on the premise that a portion of the purchase price paid in

any Business Line Sale is attributable to SNMP Research's assets can withstand the

unambiguous terms of the Sale Orders and the Sale Agreements this Court approved.

       60.     As a matter of law, any claim for profits from the Business Line Sales would

require establishing that those profits were attributable to SNMP Research's intellectual property

rights.  Section 504(b) of the Copyright Act permits an owner of a copyright to recover profits of

an alleged infringer only if they "are attributable to the infringement."  17 U.S.C. § 504(b)

(emphasis added).  SNMP Research must therefore "show a causal nexus between the

infringement and the [infringer's] gross revenue."  William A. Graham Co. v. Haughey, 568 F.3d

425, 442 (3d Cir. 2009).  Further, "[u]niformly, courts have agreed that a plaintiff must do more

than simply identify the allegedly infringing company's total . . . gross revenue . . . implicated by

the infringement allegations; instead, the plaintiff must also put forward some evidence

indicating that the revenues in question were, at least in part, caused by the alleged

infringement."  Leonard v. Stemtech Health Sciences, Inc., Civ. Action No. 08-067-LPS-CJ,

2011 WL 6046701, at *19 (D. Del. Dec. 5, 2011) (emphasis added), report and recommendation

adopted, No. CA 08-067-LPS-CJB, 2012 WL 1133185 (D. Del. Mar. 28, 2012) (citing Taylor v.

Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983)).[33]

---

[32]     See Second Am. Compl. ¶ 247 (Ex. 33) (asserting gross revenues of $1.13 billion for the Ericsson-
CDMA/LTE Sale); 249 (asserting gross revenues of $900 million for the Avaya-Enterprise Sale); id. ¶ 252
(asserting gross revenues of $157.7 million for the GENBAND-CVAS Sale); id. ¶ 254 (asserting gross revenues of
$848.7 million for other business line sales).

[33]     See also Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004) ("When an infringer's
profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright

61.     As discussed, SNMP Research cannot possibly meet that burden here, because the buyers were on notice that they were receiving no rights in SNMP Research software and would have to compensate SNMP Research, not the U.S. Debtors or their affiliates, for its use.  In addition, even if SNMP Research could show a "causal nexus" between the Business Line Sale proceeds and its software – which it cannot – it still would not be entitled to claim "profits" from the Business Line Sales, because the Copyright Act permits the alleged infringer to "apportion[] the profits that were not the result of infringement." William A. Graham Co., 568 F.3d at 442. Because the Sale Orders and Sale Agreements expressly excluded SNMP Research's intellectual property rights (including any copyrights) from the sales, the entirety of the purchase price must be apportioned to something else – namely, the property of the Debtors that the purchasers were actually acquiring.

62.     Similarly, while the Delaware Uniform Trade Secrets Act ("DUTSA") permits damages for "the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss," Del. Code Ann. tit. 6, § 2003, unjust enrichment requires "a relation between [defendant's] enrichment and [plaintiff's] impoverishment," Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1056 (Del. Super. Ct. 2001) (emphasis added) (quoting Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch.1993)); see also Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1063 (Del. 1988) ("An accounting for profits is a means of measuring the benefits bestowed on an unjustly enriched defendant. Accordingly, an unjustly enriched defendant may be ordered to turn over to the plaintiff the profits earned through the use or possession of the plaintiff's property.").  For the same reason that SNMP Research cannot

---

owner.") (quoting 4 Nimmer on Copyright § 14.03 at 14-34); TD Bank, N.A. v. Hill, Civil No. 12-7188 (RBK/JS), 2015 WL 4523570, at *23 (D.N.J. July 27, 2015) ("[T]he plaintiff must show a nexus between the profits and the infringement.").

establish a "nexus" for Copyright damages purposes, it cannot show a "relation" between its

software and the proceeds from Business Line Sales for DUTSA purposes.[34]

**A.    According to the Plain Terms of the Sale Orders and Asset Purchase Agreements, No Business Line Sale Purchaser Obtained or Paid the U.S. Debtors for Rights to Use SNMP Research Software**

63.    SNMP Research cannot show the nexus or relation between the allegedly

infringing transfer of SNMP Research software to the purchasers of the Business Line Sales and

any profits generated in those sales.  The record – including the Sale Orders, the Sale

Agreements and the Business Line Sale hearings – makes clear that no portion of revenues

generated by the business line sales was attributable to the alleged transfer of SNMP Research

software.

64.    The Sale Orders and Sale Agreements must be interpreted according to their plain

meaning.  See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 150-51 (2009) ("If it is black-letter

law that the terms of an unambiguous private contract must be enforced irrespective of the

parties' subjective intent, it is all the clearer that a court should enforce a court order, a public

governmental act, according to its unambiguous terms.") (citation omitted).  The plain text of

every Sale Order made clear that purchasers were not receiving or paying for rights to use any

SNMP Research software, as those rights were expressly excluded:

- Radware-Layer 4-7 Sale Order ¶ 6 (Pl. Ex. 4) (only "transferring all of the Debtors' right, title and interest (including common law rights) to all of their intangible property included in the Assets pursuant to the Purchase Agreement") (emphasis added).

- Ericsson-CDMA/LTE Sale Order ¶ 37 (Pl. Ex. 6) ("[N]o intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred . . . .") (emphasis added);

---

[34]    The U.S. Debtors reserve their rights concerning whether the Delaware Uniform Trade Secrets Act is applicable to this action.  For present purposes, the point is that while SNMP Research invokes that Act as the basis for its claim, it has no viable basis for demanding profits from the Business Line Sales under the Act in light of the terms of the Sale Orders and Sale Agreements here.

- Avaya-Enterprise Sale Order ¶ 27 (Pl. Ex. 9) ("Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement.") (emphasis added);[35]

- Hitachi-Next Generation Sale Order ¶ 24 (Pl. Ex. 11) ("Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part of any . . . intellectual property or license agreement with . . . SNMP Research International, Inc.") (emphasis added);

- Ericsson/Kapsch-First GSM Sale Order ¶ 39 (Pl. Ex. 13) ("Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement.") (emphasis added);[36]

- Ciena-MEN Sale Order ¶ 25 (Pl. Ex. 15) ("[N]o intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred. . . .") (emphasis added);

- GENBAND-CVAS Sale Order ¶ 44 (Pl. Ex. 17) ("Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment by the Debtors of any contract or license with SNMP Research International, Inc. (SNMP) under section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign or sublicense to the Purchaser any contract with or license of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license, which may include entering into a new license agreement.") (emphasis added);

- Ericsson-Second GSM Sale Order ¶ 41 (Pl. Ex. 20) ("[N]o intellectual property rights or intellectual property licensed via contracts between SNMP and Nortel are being conveyed or otherwise transferred . . . .") (emphasis added); and

- Ericsson-MSS Sale Order ¶ 44 (Pl. Ex. 21) ("Nothing in this Order provides for the assumption and assignment of any contract or license with . . . SNMP Research International, Inc. pursuant to section 365 of the Bankruptcy Code.") (emphasis added).

---

[35]    In the Avaya-Enterprise Sale Order, "Objecting Party Agreement" was defined as "any written contract agreement, license or any other document that creates binding contractual obligations between an Objecting Party and one or more Debtors," and "Objecting Party" included "SNMP Research International, Inc." Avaya-Enterprise Sale Order ¶ 27 (Pl. Ex. 9).

[36]    In the Ericsson/Kapsch-First GSM Sale Order, "Objecting Party Agreement" similarly was defined as "any written contract agreement, license or any other document that creates binding contractual obligations between an Objecting Party and one or more Debtors," and "Objecting Party" included "SNMP Research International, Inc." Ericsson/Kapsch-First GSM Sale Order ¶ 39 (Pl. Ex. 13).

65.   Similarly, the Sale Orders made clear that the U.S. Debtors only sold the U.S.

Debtors' rights and assets in each Business Line Sale to the purchasers:

- Radware-Layer 4-7 Sale Order ¶ 2 (Pl. Ex. 4) ("The sale of the Assets, pursuant to this Order will vest the Successful Bidder with all right, title and interest of the Debtors to the Assets . . . .") (emphasis added);

- Ericsson-CDMA/LTE Sale Order ¶ 30 (Pl. Ex. 6) ("This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances or that modify, enjoy release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities.") (emphasis added);

- Avaya-Enterprise Sale Order ¶ 29 (Pl. Ex. 9) ("This Order applies only to assets owned by the Debtors, including, without limitation, all of the Debtors' equity interests in Nortel Government Solutions Incorporated and DiamondWare, Ltd. Consequently, notwithstanding any other provision of this Order or the Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of any creditor of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities, except to the extent otherwise agreed to such creditor in writing.") (emphasis added);

- Hitachi-Next Generation Sale Order ¶ 4 (Pl. Ex. 11) ("The Sale of the Purchased Assets pursuant to this Order will vest the Purchaser . . . with all rights, title and interest of the Debtors to the Purchased Assets . . . .") (emphasis added);

- Ericsson/Kapsch-First GSM Sale Order ¶ 29 (Pl. Ex. 13) ("This Order applies only to assets owned by the Debtors.  Consequently, notwithstanding any other provision of this Order or the North American Purchase Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities except to the extent otherwise agreed by such creditor in writing.") (emphasis added);

- Ciena-MEN Sale Order ¶ 8 (Pl. Ex. 15) ("The transfer to the Purchaser of the Debtors' right, title and interest in the Assets pursuant to the Sale Agreement shall be, and hereby is deemed to . . . . vest in the Purchaser all right, title and interest of the Debtors in the Assets. . . .") (emphasis added);

- GENBAND-CVAS Sale Order ¶ 37 (Pl. Ex. 17) ("This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order

37

or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors and do not apply to any Purchased Assets owned by non-debtor entities.") (emphasis added);

- Ericsson-Second GSM Sale Order ¶ 27 (Pl. Ex. 20) ("This Order applies only to assets owned by the Debtors.  Consequently, notwithstanding any other provision of this Order or the Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to the assets owned by non-debtor entities except to the extent otherwise agreed by such creditor in writing") (emphasis added); and

- Ericsson-MSS Sale Order ¶ 39 (Pl. Ex. 21) ("This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release, or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors and do not apply to any Purchased Assets owned by non-debtor entities.") (emphasis added).

66.    The Sale Agreements approved by the Sale Orders likewise provided that the

purchasers in the Business Line Sales were not acquiring the right to use SNMP Research

software, and instead were acquiring only the right, title, and interest of the debtor-sellers in the

assets sold in the Business Line Sale:

- Radware-Layer 4-7 Sale Agreement § 2.1 (Ex. 1) ("<u>Sale and Transfer of Assets</u> . . . . [A]t the Closing, Buyer . . . shall purchase . . . all of Transferring Party's right, title and interest in and to the . . . assets (but in all cases excluding the Excluded Assets) of such Seller. . .") (emphasis added).[37]

- Ericsson-CDMA/LTE Sale Agreement § 2.1 (Ex. 3) (<u>Purchase and Sale</u>. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in

---

[37]    As discussed above in Paragraph 26, the Radware Assets included "(i) the Intellectual Property Assets *owned by any Seller* or an Affiliate of any Seller set forth on Schedule 2.1(d) and (ii) to the extent not covered by <u>Section 2.1(d)(i)</u>, the Intellectual Property Assets *owned by such Seller and/or its Affiliates* that are used in Products." Radware-Layer 4-7 Sale Agreement § 2.1(d) (Ex. 1) (emphasis added). Thus, the only transfer of intellectual property was that owned by one of the Sellers or its Affiliates.

and to the assets "Assets" predominantly used or held for use in the conduct of Business (such assets, excluding the Excluded Assets, the "Assets").") (emphasis added);[38]

- Avaya-Enterprise Sale Agreement § 2.1 (Ex. 6) ("Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . from the relevant Sellers, and each Seller shall transfer . . . all of its right, title and interest in and to the . . . assets other than the Excluded Assets.") (emphasis added); [39]

- Hitachi Next Generation Sale Agreement § 2.1 (Ex. 10) ("Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the assets described in clauses (a) through (e) of this Section (such assets, the "Assets").") (emphasis added);[40]

- Ericsson/Kapsch First GSM Sale Agreement § 2.1(Ex. 13)  (Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the assets predominantly used or held for use in the conduct of Business (such assets, excluding the Excluded Assets, the "Assets").") (emphasis added);[41]

- Ciena-MEN Amended Sale Agreement § 2.1 (Ex. 14) ("Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . from the relevant Sellers, and each Seller shall transfer . . . all of its right, title and interest in and to the . . . assets other than the Excluded Assets.") (emphasis added); [42]

---

[38]    The Excluded Assets included "Intellectual Property owned by a Third Party, except to the extent licensed under a Contract that is an Assumed and Assigned Contract or a Designated non-365 Contract." Ericsson-CDMA/LTE Sale Agreement § 2.1.2(k) (Ex. 3).  Additionally, the CDMA Assets included the "Assigned Intellectual Property as of the Closing Date." Id. § 2.1.1(g). "Assigned Intellectual Property" was defined in relevant part as "any other Intellectual Property . . . *owned as of the Closing Date by any of the Sellers*." Id. § 1.1. These definitions make clear that the only intellectual property actually transferred under the agreement was that owned by one of the Sellers.

[39]    The Excluded Assets included "any rights to any Intellectual Property . . . of any Third Party, except to the extent licensed under an Assigned Contract." Avaya-Enterprise Sale Agreement § 2.1.2(h) (Ex. 6).  Additionally, the Enterprise Assets included "the Transferred Intellectual Property as of the Closing Date."  Id. § 2.1.1(f). "Transferred Intellectual Property" was defined in relevant part as "any Intellectual Property . . . owned by any of the Sellers." Id. § 1.1.

[40]    The Next Generation Assets included "the Assigned Intellectual Property as of the Closing Date…" Hitachi-Next Generation Sale Agreement § 2.1.1(b) (Ex. 10). "Assigned Intellectual Property" was defined in relevant part as "the Intellectual Property owned by the Sellers as of the Closing date." Id. § 1.1.

[41]    The First GSM Assets included "the Transferred Intellectual Property as of the Closing Date." Kapsch-GSM/GSM-R EMEA Sale Agreement § 2.1.1(f) (Ex. 13).  "Transferred Intellectual Property" was defined in relevant part as "any other Intellectual Property . . . owned by any of the Sellers…" Id. § 1.1.

[42]    The Excluded Assets included "Intellectual Property owned by a Third Party." Ciena-MEN Sale Agreement § 2.1.2(h).  Additionally, the MEN Assets included "the Transferred Intellectual Property as of the Closing Date." Ciena-MEN Amended Sale Agreement § 2.1.1(e) (Ex. 14). "Transferred Intellectual Property" was defined in relevant part as "the Intellectual Property . . . owned by any of the Sellers." Id. § 1.1.

- GENBAND-CVAS Sale Agreement § 2.1 (Ex. 17) (Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the . . . assets (such assets, excluding the Excluded Assets, the "Assets")" (emphasis added))[43]

- Ericsson-Second GSM Sale Agreement § 2.1 (Ex. 22) ((Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the following assets.") (emphasis added);[44]

- Ericsson-MSS Sale Agreement § 2.1 (Ex. 26) ("Purchase and Sale. . . . [A]t the Closing, the Purchaser shall . . . purchase . . . from the relevant Sellers, and each Seller shall transfer . . . all of its right, title and interest in and to the . . . assets other than the Excluded Assets." (emphasis added))[45]

67.     Thus, the plain terms of the Sale Orders and Sale Agreements made clear that no purchasers in the Business Line sales were obtaining or paying for the right to use SNMP Research's software, and all purchasers were on notice of that fact.  SNMP therefore cannot establish the requisite causal connection between its intellectual property rights and the profits it seeks from the Business Line Sales.  Leonard, 2011 WL 6046701, at *18 ("Plaintiff's claim to . . . profits fails because Plaintiff cannot establish the requisite causal connection between the alleged infringement and the profits he seeks."); see also Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522-23 (4th Cir. 2003) (no profits copyright damages where there exists no connection between the alleged infringement and the revenues in question); Vichi v.

---

[43]     The Excluded Assets included "any right to any Intellectual Property... of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c), 5.4(d) or 5.15(c)." CVAS GENBAND-CVAS Sale Agreement § 2.1.2(g) (Ex. 17).  Additionally, the GENBAND Assets included "the Transferred Intellectual Property as of the Closing Date." Id. § 2.1.1(h). "Transferred Intellectual Property" was defined in relevant part as "any Intellectual Property . . . owned by any of the Sellers." Id. § 1.1.

[44]     Section 2.1.2 of the Second GSM Sale Agreement defined "Excluded Assets" to include "Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract." Ericsson-Second GSM Sale Agreement § 2.1.2(i) (Ex. 22).

[45]     The Excluded Assets included "any right to any Intellectual Property . . . of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c)." Ericsson MSS Sale Agreement § 2.12(g) (Ex. 26). Additionally, the MSS Assets included "the Transferred Intellectual Property as of the Closing Date..." Id. § 2.1.1(f). "Transferred Intellectual Property" is defined in part as "any Intellectual Property . . . owned by any of the Sellers." Id. § 1.1.

Koninklijke Philips Elecs. N.V., 62 A.3d 26, 59-61 (Del. Ch. 2012) (holding unjust enrichment unavailable as a matter of Delaware law where purported enrichment did not involve and was not predicated upon alleged impoverishment).  No nexus or relation exists between the consideration paid by the purchasers in the Business Line Sales – which was solely for the assets belonging to the U.S. Debtors or their selling affiliates – and any rights owned by SNMP Research.

**B.    The Course of the Sale Hearings and the Court's Resolution of SNMP Research's Objections to the Sales Also Made Clear That the Purchasers Would Instead Have to Pay SNMP Research for the Right to Use SNMP Research Software**

68.    Though the terms of the Sale Orders and Sale Agreements standing alone mandate the grant of summary judgment on SNMP Research's profits claims, the course of the Sale Hearings and the resolution of SNMP Research's objections to the Business Line Sales reinforce that conclusion.  The proceedings made clear that the purchasers – whose counsel were present at each sale hearing[46] – were receiving no rights to use SNMP Research's software and hence would need to negotiate with (and pay) SNMP Research if they wished to obtain those rights.

69.    At the first sale hearing at which SNMP Research appeared (the Ericsson-CDMA/LTE Sale), the U.S. Debtors stated that the Sale Order made clear "that no intellectual property rights or intellectual property license through contracts with SNMP and Nortel are being conveyed."  CDMA/LTE Sale Hr'g Tr. 23:23-25 (Ex. 4): see generally id. 23:10-24:21, 26:21-27:23.  This Court accepted that representation, rejecting the notion that any further language was needed to preserve SNMP Research's rights, including its ability to demand full compensation for any future use of its intellectual property.  Id. 29:2-7.

70.    After the CDMA/LTE Sale Hearing, SNMP Research objected to each subsequent Business Line Sale, each time putting all parties to the sale on notice that its rights in SNMP

---

[46]    See Paragraph 28 & n.16, above.

Research software were not being transferred, and accordingly that compensation for the future use, if any, of SNMP Research's software by the buyers would be required.  As discussed in greater detail above in Paragraphs 36–40, until the final sale hearing, SNMP Research's objections were resolved by the language in the Sale Orders making clear that no assumption or assignment of any of SNMP's intellectual property rights or contracts was occurring in the Business Line Sales.[47]

71.     At the final sale hearing (the Ericsson-MSS Sale), SNMP Research requested additional comfort from the Court, including a requirement that an audit of software for the MSS business line be conducted prior to any sale.  This Court denied that request, indicating that its order stating that "[n]othing in this Order provides for the assumption and assignment of any contract or license with . . . SNMP Research International, Inc. pursuant to section 365 of the Bankruptcy Code," Ericsson-MSS Sale Order ¶ 44 (Pl. Ex. 21), was sufficient to protect SNMP Research's rights in any software transferred to the buyers, who would have to agree to a license with SNMP in order to make use of the software.  MSS Sale Hr'g Tr. 60:10-18 (Ex. 27).  As the Court stated, "to the extent that SNMP is unable to reach agreement with Ericsson they can bring the matter back before me."  Id. 14-18.

## C.     In Connection With the Business Line Sales, the Purchasers Turned to SNMP Research to Obtain and Pay for the Right to Use SNMP Research Software

72.     Although the language of the Sale Orders and Sale Agreements standing alone is dispositive, that the Business Line Sale purchasers understood they were not receiving – and hence not paying for – any rights in SNMP Research software is underscored by their conduct in

---

[47]     Nowhere in the hearing transcripts for the Avaya-Enterprise Sale, the Hitachi-Next Generation Sale, the Ericsson/Kapsch-First GSM and Ciena-MEN Sales, the GENBAND-CVAS Sale, or the Ericsson-Second GSM Sale did SNMP Research appear and indicate that the language in these respective sale orders failed to resolve its objections.  Enterprise Sale Hr'g Tr. (Ex. 7); Next Generation Sale Hr'g Tr. (Ex. 11); MEN and First GSM Sales Hr'g Tr. (Ex. 16); CVAS Sale Hr'g Tr. (Ex. 19); Second GSM Sale Hr'g Tr. (Ex. 24).

connection with the sales, again confirming the lack of any "nexus" between proceeds paid in the

Business Line Sales and any SNMP Research software allegedly transferred in the sales.  Each

purchaser that SNMP Research claims it has reason to believe received its software[48] negotiated

an accession agreement, license agreement or settlement agreement with SNMP Research to

allow the purchaser in question to pay SNMP Research for the right to use SNMP Research

software associated with the Business Line Sales (or, in Radware's case, making clear that

Radware had no intention to use any such software).  These agreements obviously would have

been unnecessary had the purchasers believed they already had paid Nortel to acquire such right

as part of the Business Line Sales.[49]

*   *   *

73.      Accordingly, SNMP Research cannot "show a causal nexus between the [transfer

of SNMP Research Software] and [the U.S. Debtors'] gross revenue" in the Business Line Sales.

William A. Graham Co., 568 F.3d at 442.  The unambiguous record, including the Sale Orders,

the Sale Agreements, the sale hearings, and the purchasers' conduct in approaching SNMP

Research for licenses, forecloses that "the revenues in question were, at least in part, caused by

the alleged infringement" (i.e., the transfer of SNMP Research Software),  Leonard, 2011 WL

6046701, at *19, or that the U.S. Debtors were enriched at SNMP Research's expense, Total

Care Physicians, 798 A.2d at 1056.  SNMP Research's overreaching and baseless claim for $100

million in proceeds from the Business Line Sale proceeds must be rejected.

---

[48]      Dr. Case testified that SNMP Research ████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

[49]      See Paragraphs 46–52, above.  As also noted above, ████████████████████
████████████████████████████████████████████████████

## II.    SNMP RESEARCH'S MOTION FOR PARTIAL SUMMARY JUDGMENT MUST BE DENIED

74.    As a threshold matter, as discussed above, SNMP Research was prompted to file its motion by a mistaken belief that the Canadian Debtors intended to rely on this Court's Sale Orders in a manner that, as the Canadian Debtors subsequently clarified, was not their intent. Thus, it is not clear why (or whether) SNMP Research intends to pursue its motion.  To the extent SNMP Research does pursue the Motion, it should be denied as moot to the extent it addresses an issue that is not actually in dispute and it should be denied on the merits to the extent it seeks to mischaracterize the Court's Sale Orders.

75.    SNMP Research's motion asserts that the purchasers in the Business Line Sales did not acquire any intellectual property owned by it – in other words, that this Court's sale orders did not "authorize[ ] the U.S. Debtors to sell or otherwise transfer intellectual property owned by SNMP Research in its orders approving the various business line sales."  SNMP Research Br. at 1.  In so asserting, SNMP Research repeatedly relies on the same provisions of the Sale Orders and Sale Agreements that are fatal to SNMP Research's claims for "profits" damages, id. at 6-29, because they make clear that the purchasers were not acquiring, or paying the selling Debtors for, any of SNMP Research's rights.

76.    To the extent SNMP Research's Motion simply asserts that the Court's sale orders and the sale agreements did not operate to convey its "intellectual property" (such as copyrights for software) or rights to its intellectual property to the business line purchasers, this is not a point in dispute – and in fact it is a basis for the U.S. Debtor's Motion.  In the absence of any actual controversy as to this issue, SNMP Research's Motion is moot.

77.    Alternatively, if SNMP Research instead suggests the Sale Orders actually addressed or affirmatively prohibited the delivery of its software code to purchasers, its Motion

should be denied on the merits because it rests on a mischaracterization of the Sale Orders. The Sale Orders, like the Sale Agreements, simply described what property of the Debtors was being conveyed in the sales. These were not injunctions – they did not purport to enjoin the debtors from doing anything. Rather, they simply approved the sale of the Debtors' property. And, as set forth above, the Sale Orders – along with the sale agreements and the Court's orders concerning SNMP Research's objections – established a framework under which it was understood that purchasers who wished to use SNMP Research's software would need to enter into an agreement with SNMP Research to do so. And, again, all the purchasers who wished to use SNMP Research's software did exactly that.

**A.    This Court's Orders Did Not Operate to Sell or Transfer Rights in SNMP Research Software – Which is Why No Purchasers Paid for Such Rights – And Did Not Address Transfer of the Software Itself**

78.    The Sale Orders properly focused on preserving SNMP Research's rights in its software. As SNMP Research acknowledges, five of the orders speak exclusively in terms of rights and state simply that the U.S. Debtors are not granting the purchasers "right[s] to use or copy" the software. See SNMP Research Br. at 34 (citing Avaya-Enterprise Sale Order ¶ 27 (Pl. Ex. 9); Ericsson/Kapsch-First GSM Sale Order ¶ 39 (Pl. Ex. 13); GENBAND-CVAS Sale Order ¶ 44 (Pl. Ex. 17); Ericsson-MSS Sale Order ¶ 44 (Pl. Ex. 21)).

79.    However, SNMP Research argues that three of the sale orders accomplish something the other five orders did not: an affirmative prohibition on transfer of software. Specifically, SNMP Research argues that the phrase "intellectual property" in three of the sale orders must refer to copies of software because those orders state that no "intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed." SNMP Research Br. 33-34 (quoting CDMA/LTE Sale Order ¶ 37 (Pl. Ex. 6); citing Ciena-MEN Sale Order ¶ 25 (Pl. Ex. 15); Second GSM Sale Order ¶ 41 (Pl. Ex. 20)).

80.     As an initial matter, to the extent SNMP Research equates the language regarding what assets "are being conveyed" with a prohibition on the transfer of anything, that is plainly wrong.  Again, these are Sale Orders, not injunctions.  The Sales Orders simply describe what assets are (and are not) being conveyed to purchasers by operation of the order; they do not purport to enjoin any conduct in relation to the Business Line Sales.

81.     In addition to this threshold defect, SNMP Research's argument also fails because the orders SNMP Research relies upon, just like the other five orders, addressed the transfer of legal rights, not transfer of software itself.  SNMP Research contends that "intellectual property" means a physical thing, such as software code, rather than a legal right.  But it is well-established that "intellectual property" means intangible rights in a work – not physical copies of a work.  Black's Law Dictionary 930 (10th ed. 2014) (defining intellectual property primarily as "[a] category of intangible rights protecting commercially valuable products of the human intellect" (emphasis added)); Ballentine's Law Dictionary 645 (3d ed. 1969) (defining intellectual property as "those property rights which result from the physical manifestation of original thought." (emphasis added));[50]  "Intellectual property is not tangible," Peter F. Alces & Harold F. See, The Commercial Law of Intellectual Property 8 (1st ed. 1994), and "intellectual property law does not address the tangible, material object in which the creation of the mind has been embodied," Roger E. Schechter & John R. Thomas, Intellectual Property:  The Law of Copyrights, Patents, and Trademarks 4 (1st ed. 2003).

---

[50]     Black's further explains that the transfer of a physical embodiment of such a product does not convey the intellectual property attaching thereto, and instead the intellectual property continues to be held by the owner of those rights:  "While there is a close relationship between intangible property and the tangible objects in which they are embodied, intellectual property rights are distinct and separate from property rights in tangible goods.  For example, when a person posts a letter to someone, the personal property in the ink and parchment is transferred to the recipient . . . [T]he sender (as author) retains intellectual property rights in the letter."  Black's Law Dictionary 930 (10th ed. 2014) (quoting Lionel Bently & Brad Sherman, Intellectual Property Law 1-2 (2001)).

82.    Thus, SNMP Research's argument that its software is a "good" and is "fixed in a tangible medium," SNMP Research Br. at 36, is an admission that its software is not intellectual property.  See Sys. Unlimited, Inc. v. Cisco Sys., Inc., 228 F. App'x 854, 858 (11th Cir. 2007) (contract for sale of all "intellectual property of a kind associated with any software, code or data" did not require delivery of software because contract was for sale of intellectual property in the software, not the software itself); see also 17 U.S.C. § 202.  ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").

83.    Moreover, the orders must be read in light of the agreements to which they give effect, see, e.g. Atwood Mobile Prods., LLC v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc., Bank No. 06-11202(KJC), 2010 WL 180249, at *4 (D. Del. Jan. 19, 2010) (interpreting sale order and asset purchase agreement in concert), and each of the asset purchase agreements approved by the three Sale Orders to which SNMP Research points reflects the understanding that "intellectual property" means "intellectual property rights," rather than referring to the software code itself.  Ericsson-CDMA/LTE Sale Agreement § 1.1 (Ex. 3) (defining "Intellectual Property" as "intellectual . . . property rights . . . including rights in Software" (emphasis added)); Ericsson-Second GSM Sale Agreement § 1.1 (Ex. 22) (same); see also Ciena-MEN Amended Sale Agreement § 1.1 (Ex. 14) (Intellectual Property "includ[es] all intellectual property rights in respect of  . . . Software.") (emphasis added).

84.    Finally, in a colloquy addressing one of SNMP Research's sale objections, SNMP Research insisted that the very language on which it now relies did not address transfer of software.  Specifically, at the hearing concerning the Ericsson-CDMA/LTE Sale, the U.S. Debtors' counsel stated that, in the order "[w]e also make clear in here that no intellectual

property rights or intellectual property license through contracts with SNMP and Nortel are

being conveyed," Ericsson-CDMA/LTE  Sale Hr'g Tr. 23:23-25 (Ex. 4); but SNMP Research's

counsel suggested that the order was insufficient because it did not contain protections for its

software, see id. 25:10-11 (expressing concern over "transfer [of] source code"), 26:17-19

(requesting "more comfort"). Nevertheless, the Court declined to modify the order to address this

issue, id. 29:2-7; see also infra Part II.B (citing, among other things, second colloquy during the

Ericsson-MSS Sale hearing, with same result).  Even absent this colloquy, there is no reason to

believe that this Court intended to deal with software in a few of the sale orders but to deal only

with rights in all of the orders entered prior to, in between, and after the three orders on which

SNMP Research focuses.

85.     In sum, the U.S. Debtors agree that the sale orders did not authorize transfer of

any of SNMP Research's intellectual property rights – which is precisely why no purchaser paid

the U.S. Debtors for such intellectual property (rights).  The Sale Orders did not purport to

address or enjoin the transfer of software itself.

**B.      The Sale Orders, Sale Agreements, and Sale Hearings Established a Framework in Which Any Purchaser Who Received SNMP Research Software Would Need to Negotiate with SNMP Research to Obtain Rights to Use the Software and Compensate SNMP Research for That Use**

86.     The Sale Orders, Sale Agreements, and Sale Hearings established a framework in

which it was understood that any Purchaser who wished to receive SNMP Research software

would need to negotiate with SNMP Research to obtain and pay for rights to use the software.

The issue thus was addressed not in terms of a physical copy of software, which would have no

value if it cannot be used, but rather in terms of the rights to use software to the extent the

software is protected by copyright or any other intellectual property right.

87.     As set forth above, the Sale Orders, Sale Agreements, and Sale Hearings made clear that the purchasers were not receiving (or paying for) rights to use SNMP Research software.  Purchasers obviously understood this, as they were party to the Sale Agreements and were present (through counsel) at the Sale Hearings in which SNMP Research's objections were raised and resolved and the Sale Orders were finalized and approved.   And of course SNMP Research participated in the Sale Hearings that addressed and resolved its objections.  Further, the parties' understanding of the framework established by the Sale Orders, Sale Agreements, and Sale Hearings is confirmed by the fact that every purchaser who wished to use SNMP Research's software executed an agreement with SNMP Research to obtain that right, and to compensate SNMP Research to its satisfaction.

88.     As noted, this framework was expressly discussed at the sales hearing on the MSS Business Line sale, as follows:

> MR. BROMLEY:  When I look at the objection it says SNMP R[esearch] requests that the debtors perform an audit as a condition of the sale to determine if SNMP R[esearch] intellectual property will be transferred to the purchaser as part of the sale.  Now, this is where we get a little metaphysical about what intellectual property is and what code is, all right.  Mr. Ralston is describing it as if it's a Lego block that we can simply remove and put on a shelf someplace.  Intellectual property is, in this particular case, not something that is physical, right?  And it's manifested by a license.
>
> So what we're saying is that we have a license to use this intellectual property as it relates to the business.  We have told [counsel to SNMP Research] now that two of the licenses do relate to this business.  We have told Ericsson, as the purchaser, that these two licenses relate to the business, along with others that are on that list, and that they need to deal with it, all right.  So it would seem to me –
>
> THE COURT:  That you're not assigning those licenses.
>
> MR. BROMLEY:  I'm not assigning those licenses.  Now I'm not hearing from [counsel to SNMP Research] that there's a – so I'm not giving them those licenses.  So post-closing, Ericsson will not have a right to use those licenses.  Right?  And as I said, they're worldwide licenses, right, so it's not simply an issue for us here in Delaware, it's an issue for the EMEA debtors, it's an issue for the Canadian debtors, it's an issue anywhere this business is operating.  What we're trying to do though is

identify, right, what Ericsson needs to do in order to operate the business; we have done that.

THE COURT:  Right.

MR. BROMLEY:  So and I'm – so he's saying what intellectual property is being transferred? The intellectual property, in my mind, is the license agreement; we are not transferring the license agreement.  We are telling Ericsson we're not transferring it, because we can't transfer it without SNMP's consent.  We know that.  So what Ericsson and what SNMP need to do is to go in and actually work on getting a new agreement, all right.  And if Ericsson uses SNMP intellectual property after the closing and they're not allowed to, Ericsson is not supposed to do that, and they would have a claim against Ericsson.

THE COURT:  Correct.

MR. BROMLEY:  Not against us.

THE COURT: Correct.

Ericsson-MSS Sale Hr'g Tr. 56:8-58:3 (Ex. 27) (emphasis added).

89.    SNMP Research's counsel had specifically requested that the order include a separate provision addressing, as he described it, "transfer [of] SNMP intellectual property, which consists of software code." Id. 52:5-6.  But the Court overruled SNMP Research's objection and instead ruled that the Sale Order should contain what became paragraph 44 of the MSS Sale Order, namely, a provision that nothing in the order provided for the assumption or assignment of any contract or license with SNMP Research.  Ericsson-MSS Sale Order ¶ 44 (Pl. Ex. 21);[51] see Ericsson-MSS Sale Hr'g Tr. 60:10-18 (Ex. 27).  At the same time, the Court made clear that "to the extent that SNMP is unable to reach agreement with Ericsson they can bring the

---

[51]      See Ericsson-MSS Sale Order ¶ 44 (Pl. Ex. 21) ("Nothing in this Order provides for the assumption and assignment of any contract or license with . . . SNMP Research International, Inc. ("SNMPRI") pursuant to section 365 of the Bankruptcy Code.  If the purchaser elects to have the Debtors assign to the Purchaser any contract or license with . . . SNMPRI relating to the Assets, in whole or in part, any rights . . . SNMPRI may have to object to such assignment are expressly preserved.  Nothing in this Order or the Sale Agreement shall prejudice, estop, bar, impair or otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to any contract or license between any of the Debtors and . . . SNMPRI.").

matter back before me," Id. 60:14-18, a statement that would have been unnecessary if it had not been contemplated that Ericsson may receive SNMP Research software code.

90.     Thus, from the beginning of the sale process to the end, the Court correctly focused on making clear to all purchasers that they were not purchasing or obtaining any rights in third-party software unless expressly provided, and supervised a sale structure under which the purchasers would be responsible for obtaining any rights they needed to utilize such software, with the Court retaining jurisdiction to ensure that they did so.

*   *   *

91.     In sum, this Court's Sale Orders, the Sale Agreements they approved and SNMP Research's own objections focused on making clear to the Business Line Sale purchasers that they were not acquiring or paying for rights to use SNMP Research software, and that it would be the purchasers' responsibility to deal with SNMP Research to obtain and pay for such rights. Given that it was understood that purchasers who wished to use SNMP Research software would need to pay SNMP Research for that right (and in fact the purchasers did just that), it makes no sense for SNMP Research to contend the purchasers also paid money to Nortel – according to SNMP Research, more than $100 million – for the same thing.   Because there is no reasonable basis for SNMP Research's profits claim, in light of the plain terms of the Sale Orders and Sale Agreements, that claim should be dismissed as a matter of law.

## **CONCLUSION**

The U.S. Debtors respectfully request that this Court (i) grant the Summary Judgment

Motion; (ii) deny the SNMP Research Motion; and (iii) grant such other and further relief as it

deems just and proper.


Dated:  November 6, 2015          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

Lisa M. Schweitzer (admitted pro hac vice)
David H. Herrington (admitted pro hac vice)
Matthew Gurgel (admitted pro hac vice)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Andrew R. Remming*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*