## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.* | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| SNMP Research International, Inc. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SNMP Research, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 11-53454(KG) |
| | ) | |
| Nortel Networks Inc., et al., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Avaya Inc. | ) | **Re Dkt Nos. 285 & 300** |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

The dispute between Plaintiffs, SNMP Research International, Inc., and SNMP

Research, Inc. ("SNMP"), and Nortel Networks Inc. and affiliated debtors ("Nortel" or

"Debtors") results from Nortel's sale of their business lines (the "Business Line Sales") to

various entities.  The parties have cross-moved for summary judgment pursuant to Fed.

---

[1]  The Court's jurisdiction over the pending matter arises from the dispute between Plaintiffs and Debtors being a core proceeding.  28 U.S.C. §§ 157(a) and (b).  Earlier, SNMP had moved to withdraw the reference of this adversary proceeding.   The District Court denied withdrawal, permitting the Court to oversee pretrial matters and enter final judgment on SNMP's claims against Debtors.  *See SNMP Research Int'l, Inc. v. Nortel Networks, Inc.*, 539 B.R. 704, 712 (D. Del. 2015).

R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056. SNMP and Nortel fully briefed their motions and the Court heard argument on December 22, 2015. SNMP is "seeking a finding that the Court did not authorize the transfer of any intellectual property that is determined to be owned by [SNMP]." *Brief in Support of Plaintiffs' Motion for Partial Summary Judgment*, p. 2, n. 3 ("*Plaintiffs' Brief*"). Adv. D.I. 286. Nortel's motion "addresses [SNMP's] claims for 'profits' from sales of Nortel business lines . . . ." *U.S. Debtors' Memorandum of Law in Support of Their Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Debtors' Brief")*, p. 1. Adv. D.I. 301.

## FACTS

Debtors filed for relief under chapter 11 of the Bankruptcy Code on January 14, 2009 (the "Petition Date"). Prior to the Petition Date, SNMP and Nortel had entered into a licensing agreement whereby SNMP granted Nortel the right to use SNMP software in Nortel products.

On September 29, 2009, SNMP filed a proof of claim for $22,000 for unpaid software licensing royalties. SNMP thereafter amended its claim seeking $8.4 million. On November 2, 2011, SNMP filed its Complaint in the adversary proceeding alleging copyright infringement, violations of Delaware trade secrets law and breach of contract. SNMP estimated its damages at $86 million. The Complaint also asserted claims against purchasers in the Business Line Sales, including GENBAND, Inc., Avaya, Inc. and Radware, Inc. Thereafter, SNMP filed an Amended Complaint removing GENBAND

and others as defendants.  Then, on March 24, 2015, SNMP filed a Second Amended Complaint narrowing the defendants to Nortel and Avaya.

The Business Line Sales generated $3.285 billion.  The language from the Orders authorizing the sales (the "Sales Orders") follows.  SNMP objected to all but one of the Business Line Sales on the ground that Nortel could not sell SNMP's intellectual property.

### Radware Sale ("Radware Order")

On March 26, 2009, the Court entered the Radware Order authorizing the sale to Radware, Inc., of the "Layer 4-7," "Alteon load balancer," "Alteon Application Accelerator" business and related contracts.  Ch. 11 D.I. 539.  Included among the assets sold and which the Court approved were "the Intellectual Property Assets owned by [Nortel] . . . that are used in Products . . . ."  Radware Sale Agreement § 2.1(d).  Ch. 11 D.I. 353.  The SNMP software was not among the assets which the Radware Order authorized. SNMP did not object to the sale.

### Ericsson – CDMA LTE Sale ("Ericsson Order")

On July 28, 2009, the Court entered the Ericsson Order approving the sale of CDMA and LTE assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson").  The Ericsson Order provided that:  "This Order applies only to assets owned by [Nortel]." Ericsson Order, at ¶ 30.  Ch. 11 D.I. 1205.  SNMP objected, which the Court overruled with the inclusion of the following language in the Ericsson Order:

> This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of

3

entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities.

Ericsson Order, at ¶30.

Avaya Sale ("Avaya Order")

On September 16, 2009, the Court entered the Avaya Order approving the sale of Enterprise Solutions Business to Avaya, Inc. The Avaya Order provided that "This Order applies only to the assets owned by the Debtors . . . ." Avaya Order, ¶ 29. Ch. 11 D.I. 1514. SNMP had objected to the sale, and the parties resolved the objection with the inclusion of the following language in the Avaya Order:

> Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the rights and obligations between the parties to the Agreement, nothing herein or in the Agreement shall affect the rights of any party regarding an Objecting Party Agreement, all of which such rights of the Objecting Parties are hereby preserved, including without limitation the right to seek, oppose or support (a) any assumption, assignment or rejection of an Objecting Party Agreement on any legal or factual basis, … [and] (d) the assumption by the Purchaser of all obligations and liabilities under any Objecting Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under Section 365 and other applicable law . . . .

*Id.*, at ¶ 27.

Hitachi Sale ("Hitachi Order")

On October 28, 2009, the Court entered an Order authorizing the sale of certain assets to Hitachi, Ltd. The Hitachi Order provided that: "The sale of the Purchased Assets pursuant to this Order will vest [Hitachi] . . . with all rights, title and interest of the Debtors to the Purchased Assets . . . ." Hitachi Order, at ¶ 4. D.I. 1760. SNMP's objection was resolved by including the following language in the Hitachi Order:

4

"Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any supply agreement, intellectual property or license agreement, (each, an 'Objecting Party Agreement') with. . . SNMP Research International, Inc. ([] an 'Objecting Party'). . . [and n]othing [in the Hitachi Order] or in the [Hitachi] Transaction Agreement shall affect the rights of any party regarding any Objecting Party Agreement . . . .

*Id.*

### Ericsson/Kapsch – First GSM Sale (the "Ericsson/Kapsch Order")

On December 2, 2009, the Court entered the Ericsson/Kapsch Order authorizing the sale of "Debtors' right, title and interest in the GSM/GSM-R Business" to Ericsson and Kapsch Carriercom AG. Ericsson/Kapsch Order, at ¶ Introductory Paragraph. Ch. 11 D.I. 2065. SNMP's objection to the sale was resolved by including the following language in the Ericsson/Kapsch Order:

Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the rights and obligations between the parties to the North American Purchase Agreement, nothing herein or in the Agreement shall affect the rights of any party regarding an Objecting Party Agreement, all of which such rights of the Objecting Parties are hereby preserved, including without limitation the right to seek, oppose or support (a) any assumption, assignment or rejection of an Objecting Party Agreement on any legal or factual basis,. . . [and] (d) the assumption by the Purchaser of all obligations and liabilities under any Objecting Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under Section 365 and other applicable law . . . .

Ericsson/Kapsch Order, at ¶ 39.

### Ciena Sale ("Ciena Order")

The Court entered the Ciena Order on December 3, 2009, authorizing the sale of the Metro Ethernet Networks business to Ciena Corporation. The Ciena Order provided

that "the transfer to [Ciena] of the Debtors' right, title and interest in the Assets pursuant

to the [Ciena APA] . . . vests with or will vest in [Ciena] all right, title and interest of the

Debtors in the Assets . . . ."  Ciena Order, at ¶ 8.  Ch. 11 D.I. 2070.  SNMP's objection was

resolved with the following language:

> [N]o intellectual property rights or intellectual property licensed via
> contracts with SNMP and Nortel are being conveyed or otherwise
> transferred by the Debtors pursuant to the Order, [the Ciena APA] or
> Ancillary Agreements. To the extent that the Purchaser elects to have
> the Debtors assign to the Purchaser any contract with or intellectual
> property right of SNMP relating to the Assets, the Debtors and Purchaser
> will do so in accordance with the terms of such contract or applicable
> license.

Ciena Order, at ¶ 34.

### GENBAND Sale ("GENBAND Order")

On March 4, 2010, the Court entered the GENBAND Order approving the sale of

the Carrier Voice Over IP and Application Solutions business to GENBAND.  The

GENBAND Order found that "[t]he Assets sought to be transferred and/or assigned by

the Debtors to [GENBAND] pursuant to the Sale Agreement (the 'Purchased Assets') are

property of the Debtors' estates and title thereto is vested in the Debtors' estates.

GENBAND Order, at ¶ G. Ch. 11 D.I. 2632.  Further the "Order applies only to assets

owned by the Debtors."  GENBAND Order, at ¶ 37.  SNMP's objection was resolved by

including the following language in the GENBAND Order:

> Nothing in this Order or in the [GENBAND APA] or Ancillary
> Agreements provides for the assumption and/or assignment by the
> Debtors of any contract or license with SNMP Research International,
> Inc. ("SNMP") under section 365 of the Bankruptcy Code. To the extent
> that the Purchaser elects to have the Debtors assign or sublicense to the
> Purchaser any contract with or license of SNMP relating to the Assets, the

Debtors and Purchaser will do so in the accordance with the terms of such contract or applicable license, which may include entering into a new license agreement.

GENBAND Order, at ¶ 44.

### Ericsson – Second GSM Sale ("Ericsson II Order")

Here, the assets sold had not been sold pursuant to the Ericsson Order and consisted of assets in Asia, the Caribbean and Latin America.  On May 24, 2010, the Court entered the Ericsson II Order, which "applies only to assets owned by the Debtors." Ericsson II Order, at 18. Ch. 11 D.I. 3048.  SNMP's objection was resolved with the following language:

> Nothing in this Order or in the Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP") at this time, and no intellectual property rights or intellectual property licensed via contracts between SNMP and Norte[ are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Agreement or Ancillary Agreements at this time. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of this Order, including the assumption procedures described in the Motion and such contract or applicable license, as applicable, and which may include, inter alia, the written consent of SNMP.

Ericsson II Order, at ¶ 41.

### Ericsson – MSS Sale ("Ericsson III Order")

On September 30, 2010, the Court entered the Ericsson III Order, authorizing the sale to Ericsson of "debtors' right, title and interest in the Purchased Assets."  Ericsson III

Order, at ¶ 9.  Ch. 11 D.I. 4054.  The following language was included to address SNMP's

objection:

> Nothing in this Order provides for the assumption and assignment
> of any contract or license with . . . SNMP Research International, Inc.
> ["SNMP"] pursuant to section 365 of the Bankruptcy Code. If the
> Purchaser elects to have the Debtors assign to the Purchaser any
> contract or license with . . . [SNMP] relating to the Assets, in whole
> or in part, any rights. . . [SNMP] may have to object to such
> assignment are expressly preserved. Nothing in this Order or the Sale
> Agreement shall prejudice, estop, bar, impair or otherwise limit in
> any respect any party's rights under Section 365 of the Bankruptcy
> Code with respect to any contract or license between any of the
> Debtors and . . . [SNMP].

Ericsson III Order, at ¶ 44.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a) (made applicable to this proceeding pursuant to Fed. R.

Bankr. P. 7056).  The moving party bears the burden of establishing that no genuine issue

of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 242, 248

(1986).  While the non-moving party must itself come forward with facts showing that a

genuine issue exists, *Matsushita*, 475 U.S. at 587, courts will view all facts and draw all

reasonable inferences most favorably to the non-moving party.  *Pa. Coal Ass'n v. Babbit*,

63 F. 3d 231, 236 (3d Cir. 1995).  The "mere existence" of a factual dispute does not defeat

a properly supported motion for summary judgment.  The evidence must be significantly

probative.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  Where, as here,

there are cross-motions for summary judgment, the Court must ensure that the non-

moving party on each theory has the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion. *Matsushita*, 475 U.S. at 578-88.

## DISCUSSION

A.    SNMP's Motion

The Court reiterates what SNMP seeks by its motion for partial summary judgment: "a finding that this Court did not authorize the transfer of any intellectual property that is determined to be owned by [SNMP]." *Plaintiffs' Brief*, at p. 2, n. 3. Nortel agrees, and the Sale Orders referenced above certainly confirm that Nortel was authorized to sell only what it owned. The Sale Orders specifically did not authorize the sale or transfer of any assets owned by SNMP or other non-debtors.

Nortel agrees with this finding. Nortel wrote:

> To the extent [SNMP's] Motion simply asserts that the Court's sale orders and the sale agreements did not operate to convey its "intellectual property" (such as copyrights for software) or rights to its intellectual property to the business line purchasers, this is not a point in dispute – and in fact it is a basis for the U.S. Debtors' Motion. In the absence of any actual controversy as to this issue, [SNMP's] Motion is moot.

*Debtors' Brief*, at p. 2. Accordingly, it is clear from the Debtors' statement and, as well, from the Sale Orders and Debtors' statements at the hearings giving rise to the Sale Orders, that Debtors did not seek and the Court did not authorize the sale or transfer of SNMP's intellectual property rights or its intellectual property, including its software, to purchasers in the Business Line Sales. It is equally clear, however, that the Sale Orders approved the sales and did not enjoin Nortel from selling or transferring the SNMP

9

software.  Therefore, to the extent it is necessary, SNMP's motion for partial summary judgment is granted.

A.      Profits - Nortel's Motion

In its Second Amended Complaint in the adversary proceeding, SNMP charges Nortel with copyright infringement, violations of Delaware trade secrets law (the Delaware Uniform Trade Secrets Act) and breach of contract. Adv. D.I. 160.  SNMP alleges that Nortel did not pay SNMP for its continued use of the software after the Petition Date and, further, that Nortel unlawfully transferred SNMP's software in the Business Line Sales.  Therefore, under Section 504(b) of the Copyright Act, SNMP seeks a portion of Nortel's profits from the $3.285 billion which Nortel accumulated in the Business Line Sales ("Profits Claim").  SNMP estimates the portion to be $86 to $100 million.

Nortel argues that SNMP's Profits Claim fails because (1) the Sale Orders in each of the Business Line Sales provide that the purchasers were receiving no rights in SNMP software; (2) the Asset Purchase Agreements have similar provisions; (3) Nortel and the Sale Orders indicated that the purchasers had to negotiate with SNMP for rights to software; and (4) purchasers later negotiated license agreements with SNMP.

Although the Court discussed the Sale Orders above, the Court provides further details below:

1.      The Radware Order

The Radware Order authorized the sale by Nortel of "all right, title and interest of the Debtors" to assets being sold.  Radware Order, at ¶ 2.  The Radware Sale Agreement

included "the Intellectual Property Assets owned by any Seller . . . ."  Radware Sale Agreement, at ¶ 2.1(d).  Adv. D.I. 353.  The Radware Sale Agreement did not include SNMP's intellectual property.

### 2.   The Ericsson Order

The Ericsson Order "applie[d] only to assets owned by the Debtors."  Ericsson Order, at ¶ 30.  It further provided that "no intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements."  *Id.*, at ¶ 37.

### 3.   The Avaya Order

The Avaya Order for the sale of CDMA/LTE assets also provided that it applied "only to assets owned by the Debtors."  Avaya Order, at ¶ 219.  The purchase price was for the assets being sold.  The Avaya Order did not authorize Nortel to sell the SNMP property or rights.

### 4.   HITACHI Order, Ericsson/Kapsch Order, Ciena Order, GENBAND Order, Ericsson II Order, Ericsson III Order

SNMP's objections to the sales giving rise to the above Sale Orders were reflected as follows:

- Hitachi Order, at ¶ 24.  "Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any supply agreement, intellectual property or license agreement . . . [with] SNMP Research International Inc."

- Ericsson/Kapsch Order, at ¶ 13.  "Nothing in this Order authorizes or otherwise provides for the assumption assignment or rejection, in whole or in part, of any Objecting Party Agreement."

- Ciena Order, at ¶ 25. "[N]o intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements."

- GENBAND Order, at ¶ 44. "At the closing, the Purchaser shall . . . purchase . . . all of such Seller's right, title and interest in and to the . . . assets (such assets, excluding the Excluded Assets, the 'Assets')")."

- Ericsson II Order, at ¶ 41. [N]o intellectual property rights or intellectual property licensed via contracts between SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to this Order, Agreement or Ancillary Agreements at this time."

- Ericsson III Order, at ¶ 44. "[N]othing in this Order provides for the assumption and assignment of any contract or license with . . . [SNMP] pursuant to section 365 of the Bankruptcy Code."

The Sale Orders show that Nortel was not authorized by the Court to sell or transfer the SNMP intellectual property, nor did the Sale Order enjoin the sale or transfer. The Court authorized Nortel only to sell or transfer what Nortel owned, and Nortel did not own the SNMP intellectual property. The problem, however, is that in some circumstances Nortel did in fact transfer to purchasers the SNMP intellectual property, specifically SNMP software. The transfers were followed by certain purchasers entering into their own licenses with SNMP, and this fact may certainly reduce significantly, or perhaps entirely, SNMP's recovery. Nonetheless, at the summary judgment stage, without full discovery, it is not possible to know the particulars of the agreements and what SNMP's recovery should be or if there should be any recovery at all.

The fact that the transfers of SNMP intellectual property occurred is noted by declarations which SNMP submitted in opposition to Nortel's motion for partial summary judgment. In his declaration, Dr. Jeffrey D. Chase ("Dr. Chase") recounts the

transfers ("Chase Dec."). Dr. Chase is a co-author of the SNMP software. He declared that:

1.    The SNMP "intellectual property" included software, and not just the right to use the software. Chase Dec., ¶ 9-11.

2.    In the Radware Sale, the Hitachi Sale, the Ericsson/Kapsch Sale, the GENBAND Sale, and the Avaya Sale, Nortel transferred SNMP software. Chase Dec., ¶¶ 12-23.

3.    Discovery remains outstanding. Chase Dec. ¶¶ 17, 24, 27, 28-29.

Kevin Chisolm ("Chisolm") was an employee of Nortel for 25 years in Technical Management positions. Chisolm Declaration ("Chisolm Dec."), ¶ 3. Chisolm identified SNMP software transferred by Nortel to purchasers. Chisolm Dec., ¶¶ 6, 10, 15, 33.

Martin Gascon ("Gascon") was employed by Nortel for 25 years. Gascon Declaration ("Gascon Dec."), ¶ 3. Gascon also declared that Nortel transferred SNMP software. Gascon Dec., ¶¶ 12, 15.

The declarations make it clear for purposes of Nortel's partial summary judgment motion that Nortel did transfer the SNMP software to purchasers. Such transfers constitute infringement under the Copyright Act, as (1) SNMP owned the software and (2) Nortel copied or transferred it (or allowed it to be copied or transferred). The Court did not authorize or enjoin such transfers.

Section 504(b) of the Copyright Act

Direct Profits

Nortel's transfer of SNMP software was not approved by the Sale Orders. The injury to SNMP, if any, must, however, be offset by the fact that all or nearly all of the purchasers from Nortel who wished to use the SNMP software entered into license agreements with SNMP. In other words, the purchasers compensated SNMP for the software. The purchasers' payments to SNMP may refute SNMP's claim that a portion of the sales price which purchasers paid Nortel in the Business Line Sales is attributable to the SNMP software. Otherwise, the purchasers would have paid twice for the right to use the SNMP software – once to Nortel upon the purchase and again to SNMP upon payment of the license.

The purchase price which purchasers paid to Nortel pursuant to the Sale Orders was for assets which the Court authorized be sold in the Sale Orders. Nortel therefore asserts that:

1.    The purchase price which purchasers paid Nortel in the Business Line Sales was only for the specified assets sold.

2.    The assets Nortel sold were assets which Nortel owned.

3.    Nortel conveyed no rights to SNMP software.

*U.S. Debtors' Reply Memorandum of Law in Further Support of Their Motion for Partial Summary Judgment* ("*Debtors' Reply Brief*), at p. 6.

The Sale Orders plainly establish that Nortel was not authorized to sell SNMP property to purchasers, and therefore Nortel should have received no funds for SNMP

property.  If that is the case, then the purchase price in each sale cannot be attributed to SNMP property, including the SNMP software.

According to SNMP, the transfers by Nortel are a "direct profits" situation.  Direct profits are "[g]enerated by selling an infringing product."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F. 3d 700, 710 (9th Cir. 2004).  In a "direct profits" case a party sells the copyrighted material.  *Id.*  It appears but is not certain that Nortel did not sell SNMP's software, that it did not charge purchasers for the software as the Sale Orders make plain.  Instead it appears that the purchasers, or at least most of them, paid SNMP for the right to use its software.

It is SNMP's burden to show there is a causal nexus between the purchases from Nortel (i.e., the profits from the sales) and the infringement.  It is only upon showing the nexus that the burden would shift to Nortel to apportion the profits.  *TD Bank, N.A. v. Hill*, 2015 WL 4523570, at *23 (D.N.J. July 27, 2015).  *See also Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) (The burden is on the owner of a copyright to demonstrate a causal link between the infringement and the profits before 17 U.S.C. § 504's burden-shifting provisions apply).  *Andreas v. Volkswagen of Am., Inc.*, 336 F. 3d 789, 796 (8th Cir. 2003) ("The nexus requirement exists in both direct and indirect profits cases.")  In the absence of profits to Nortel from the sales, SNMP would bear the burden under section 504(b) of the Copyright Act of proving its actual damages from the transfers, a difficult task when most of the purchasers ultimately paid SNMP for the licenses to the SNMP software.  17 U.S.C. § 504(b).

Cases such as *TD Bank* and *Bonner* undermine SNMP's argument that its case against Nortel is a "direct profits" case. Indeed, the section of the Copyrights Act upon which SNMP relies, 17 U.S.C. § 504(b), provides that a copyright owner may recover the "profits of the infringer that are attributed to the infringement and are not taken into account in computing the actual damages." This truth is borne by cases to which SNMP cites. In *Bonner*, the court ruled that the copyright owner had the burden to show a causal link between the infringement and profits before section 504(b)'s burden-shifting provisions apply. 404 F.3d, at 294. The copyright owner met this burden because the defendant used the owner's copyrighted design to construct a building that generated rental income. Similarly, in *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983), where the defendant sold duplicates of the copyrighted maps, the court held that it was insufficient to show the alleged infringer's gross revenues from the total sales. SNMP's argument that this is a "direct profits" case does not save it from showing a causal nexus between infringement and the profits.

SNMP relies heavily on three cases in support of its "direct profits" argument: *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916 (N.D. Ill. 2009); *X-It Prods., L.L.C. v. Walter Kiddie Portable Equip., Inc.*, 155 F. Supp. 2d 577 (E.D. Va. 2001); and *Taylor v. Meirick*, 712 F. 2d 1112 (7th Cir. 1983). In *Taylor*, the infringer sold maps. The court held that the copyright owner "could have made out a *prima facia* case for an award of the infringer's profits by showing [the infringer's] gross revenues from the sale of the infringing maps. It was not enough to show [the infringer's] gross revenues from the sale of everything he sold . . . ." *Taylor*, 712 F.2d, at 1122. In *X-It*, the infringer sold ladders using the copyright

owner's photograph on its packaging.  The court concluded that the copyright owner "may still be entitled to recover [the infringer's] profits that are attributable to the infringement . . . ."  *X-It*, 155 F. Supp. 2d at 617.  It was the "attributable to the infringement" that the copyright owner was entitled to recover.  Once again, the infringer sold product.  Lastly, in *Bergt*, the copyright owner of a painting sued the alleged infringer for including a picture of the painting in its book.  The alleged infringer sold books containing the photograph.  The court found on cross-motions for summary judgment that the copyright owner established "a causal nexus between [the infringer's] printing of the textbook that contained his painting and the revenue [the infringer] earned from printing the textbook."  *Bergt*, 661 F. Supp. 2d, at 930.  The court concluded that the copyright owner had met its burden leaving the infringer "to demonstrate that all of its revenue is attributable to factors besides the inclusion of the painting . . . ." thereby shifting the burden under Section 504(b).  The court further explained that the copyright owner "has the burden of establishing that a causal nexus exists between the alleged infringing activity . . . and [the infringer's] revenue stream from the printing."  *Id.*, at 929, n. 10.

If Nortel did not sell the licensed product it did not generate profit from the transfer of the SNMP software.  It is equally obvious, however, that Nortel did transfer the software to purchasers.  Nortel in its motion fails to account for the transfers of the software.  Similarly, SNMP fails to show the nexus between the transfers and Nortel's profits.  Nortel cannot simply avoid damages to SNMP from the transfers.  At the same time, it is not sufficient for SNMP merely to allege that the transfers occurred and that it

is now Nortel's burden to prove what portion of the $3.84 billion it raised in the Business Line Sales is attributable to the SNMP software. Instead, it will be SNMP's burden to prove that the transfer of SNMP software were sales, i.e., generated income. If SNMP can prove the sales occurred, then the burden will shift to Nortel to prove what portion of the money it received is attributable to the SNMP software. If SNMP cannot establish that Nortel profited from the transfers, then the burden will remain with SNMP to prove its actual damages.

<u>Economic Realities</u>

In an attempt to bolster its contention that the software transfers were actually sales, SNMP argues that Nortel included SNMP's software in the Business Line Sales, and therefore no matter how Nortel characterizes the software transfers, the "Economic Reality" is that this is a case involving "direct profits." If so, SNMP has met its burden to demonstrate a causal nexus, the causation standard under section 504(b) of the Copyright Act.

The problem with SNMP's "economic realities" argument is that it requires the Court to assume that the purchasers in the Business Line Sales paid twice for the SNMP software: first when they purchased – paid for – Nortel's property; and second, when they paid SNMP for the right to use the SNMP software. The Court is unwilling to make such an unrealistic economic assumption. Again, most if not all of the Business Line Sales purchasers who wanted to use the SNMP software paid SNMP for the use. Moreover, the cases SNMP cites are not like the situation present here, in which the Sale Orders provide that Nortel was not selling SNMP software. The SNMP cases all involve

18

privately negotiated agreements without court oversight.  These cases are *Merck & Co., Inc. v. United States*, 652 F.3d 475 (3d Cir. 2011) (interest rate swap held to be loan from subsidiary); *In re Fleming Co., Inc.*, 308 B.R. 693 (Bankr. D. Del. 2004) (normal lease was disguised security agreement); *In re Montgomery Ward, LLC*, 469 B.R. 522 (Bankr. D. Del. 2012) (normal lease determined to be secured financing); *Duke Energy Royal v. Pillowtex Co. (In re Pillowtex Inc.)*, 349 F.3d 711 (3d Cir. 2003) (lease a secured financing); *Sleiman v. Comm'r of Internal Revenue*, 187 F. 3d 1352 (11th Cir. 1999) (tax commissioner rejected purchase price allocation.)

The "economic reality" of the Business Line Sales is that the purchasers were on clear notice that they were required to buy the SNMP software from SNMP.  Although Nortel might have transferred the software to the purchasers, either inadvertently or with purpose, the purchasers appear not to have paid Nortel for the software.  If so, the transfers of SNMP software were not used to generate income.  Without demonstrating sales of the SNMP software, SNMP is unlikely to prevail on its Profits Claim under Section 504(b) of the Copyright Act.[2]

### Section 2003(a) of the Delaware Uniform Trade Secrets Act ("DUTSA")

Under the DUTSA a court may award damages for "the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  6 Del. C. §

---

[2] As SNMP argues, "indirect profits" cases are likely inapplicable to the facts here.  *Brief in Opposition to U.S. Debtors' Motion for Partial Summary Judgment and in Further Support of Plaintiffs' Motion for Partial Summary Judgment*, at 24-27, 32-35, Adv. D.I. 312.  In contrast to "direct profits" cases, where profits are generated from sales containing the infringing work (as SNMP alleges is the case here), in "indirect profits" cases the profits are generated by use of the infringing work to profit from the sale of other non-infringing items.

2003.  The plaintiff bears the burden of demonstrating that defendant's misappropriation proximately caused its unjust enrichment.  *Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *2 (Del. Supr. July 10, 2003) ("Although the causation element is not defined further in the [DUTSA], and case law on the subject is sparse, statutory construction and deductive reasoning lead to the clear conclusion that causation referred to in the Act is proximate causation. . . .Our time honored definition of proximate cause. . .is that direct cause without which [an injury]  would have not occurred" (internal quotations and citations omitted)).  The case SNMP cites in support of its DUTSA claim bears this out.  In *Agilent Tech. v. Kirkland*, 2010 WL 610725 (Del. Ch. Feb. 18, 2010), plaintiff presented by a preponderance of evidence that "[b]ut for [plaintiff's] trade secrets, the defendants would not have had Halo on the market as early as October 2006, and would likely not have developed a product as successful as Halo…..[B]ecause [defendant] relies on the use of Agilent's trade secrets, [plaintiff] is entitled to the net profits that [defendant] gained at [plaintiff's] expense." 2010 WL 610725, at *30. SNMP bears the burden of showing that but for the Debtors' alleged misappropriation of SNMP's trade secrets, the Debtors would not have achieved the profits they did through the Business Line Sales.  SNMP has not yet met this burden.

## CONCLUSION

The Court has concluded that:  (1) Nortel was not authorized by the Court to sell or transfer the SNMP software, (2) Nortel did transfer the SNMP software for which it may or may not have received remuneration, (3) under Section 504(b) of the Copyright Act, it is SNMP's burden to prove Nortel received payment for the SNMP software it transferred and, depending on whether SNMP meets this burden, (4) it is either (a) Nortel's burden to prove what portion of the sales are attributable to the SNMP software, or (b) SNMP's burden to establish its actual damages from the transfers, taking into account that the purchasers in the Business Line Sales paid SNMP for the license to use the SNMP software.

Accordingly, SNMP's motion for partial summary judgment is granted; and Nortel's motion for partial summary judgment is denied.  The Court will issue an Order in conformity with this Memorandum Opinion.


Dated:  February 8, 2016

KEVIN GROSS, U.S.B.J.