**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | 09-10138(KG) (Jointly Administered) |
| Debtors. | |
| SNMP Research International, Inc., and SNMP Research, Inc., | |
| Plaintiffs, | |
| v. | Adv. No. 11-53454(KG) |
| Nortel Networks Inc., *et al.*, and Avaya Inc., | **Re: D.I. 363** |
| Defendants. | |
| Nortel Networks, Inc., *et al.*, | |
| Third Party Plaintiffs, | |
| v. | |
| Nortel Networks UK Limited, *et al.*, | |
| Third Party Defendants. | |
| In re | Chapter 15 |
| Nortel Networks UK Limited, *et al.*, | 09-11972(KG) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |

**MEMORANDUM OPINION**

The court-appointed administrators and authorized foreign representatives (the "Joint Administrators")[1] for nineteen Nortel entities located in Europe, the Middle East and Africa (the "EMEA Debtors")[2] have moved (the "Motion") (Adv. D.I. 363) pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (made applicable in the adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure) for judgment on the pleadings and to dismiss with prejudice the U.S. Debtors'[3] Third-Party Complaint. Adv. D.I. 295. In the Motion, the EMEA Debtors assert that a settlement agreement the EMEA Debtors entered into with the U.S. Debtors bars the contribution claim against them which the U.S. Debtors seek in the Third-Party Complaint.

**FACTS**

The U.S. Debtors (other than NN CALA) filed voluntary petitions under chapter 11 of the Bankruptcy Code on January 14, 2009. On that date, Nortel Networks Limited

---

[1] The Joint Administrators for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited ("NNIR"), are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Joint Administrators for NNIR are: Alan Robert Bloom and David Martin Hughes. Stephen Taylor has been appointed as an additional administrator for Nortel Networks S.A. to act in relation to certain conflict matters.

[2] The EMEA Debtors are: Nortel Networks UK Limited ("NNUK"); NNSA; NNIR; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks Oy; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks s.r.o.

[3] Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc..

and Canadian affiliates (the "Canadian Debtors") commenced CCAA proceedings in Canada. The EMEA Debtors were thereafter placed into administration by the High Court of England and Wales. The Court entered orders recognizing the English administration proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code on June 26, 2009 (Nortel Networks UK Limited) and January 31, 2011 (the remaining EMEA Debtors). Ch. 15 D.I. 36 and 116.

In the bankruptcy cases, the U.S., Canadian and EMEA Debtors (the "Nortel Debtors") sold their assets related to their business lines (the "Business Line Sales") and their patent portfolio. The Nortel Debtors earned over $7 billion from the sales, but disputed the allocation of the sale proceeds. The Court and the Canadian Court therefore conducted a 21-day cross-border trial and thereafter, on May 21, 2015, issued an Opinion and Order, as modified, ruling on the allocation. The Court's decision is on appeal.

Before the trial, the U.S. Debtors and the EMEA Debtors entered into a settlement agreement (the "Settlement Agreement"). Ch. 11 D.I. 12618-3. The Settlement Agreement provided for the U.S. Debtors to pay $75 million to the EMEA Debtors and contained releases. The releases in the Settlement Agreement are as follows:

4. **RELEASES**

4.1 Nothing in this Settlement Agreement (in particular in Section 3, this Section 4, or Section 5) shall constitute a release or waiver or discharge (in whole or in part) of (i) the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation; (ii) any claims of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NNOCL against the current or former directors and officers (in their capacities as such) of the Canadian Debtors; (iii) any claims of the EMEA Debtors and/or EMEA Non-Filed Entities and/or NTF and/or NNOCL against the current or former directors and officers (in their capacities as such) of the EMEA Debtors or the EMEA Non-Filed Entities or NTF or NNOCL (including for the avoidance of any doubt any such directors or officers even if they were also directors or officers of any of the US Debtors or the Canadian Debtors); (iv) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (v) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute; or (vi) any claim of the UK Pension Parties against any of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator or any defence that the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator might have against any claim of the UK Pension Parties. Nothing in this Settlement Agreement shall prevent or in any way inhibit the EMEA Parties, the French Liquidator or the UK Pension Parties from making any arguments in respect of, or pursuing any appeal of any determinations of the Canadian and/or US Court with respect to the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation. Furthermore, nothing in this Settlement Agreement shall operate as or constitute any admission with respect to the merits of any allegations or arguments underlying the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or the Canadian Claims Litigation.

4.2 For the avoidance of any doubt, nothing in this Settlement Agreement shall constitute a release or waiver or discharge of any rights created under this Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of this Settlement Agreement, nor shall this Settlement Agreement be used, referred to or contended by any Party to have any relevance or probative value in connection with any claims not released herein.

* * *

4.6 **US Interests**: Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the US Interests, and (to the extent under the control of the US Entities) their respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing release and forever discharge the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the UK Pension Parties, the Joint Administrators, the Liquidator, and the French Liquidator, in their respective representative capacities, and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which the US Interests now have, had, may have had or hereafter may have however so arising (the "US Releases," and together with the US EMEA Releases, the US UK Pension Releases and the US French Liquidator Releases, the "Releases").

On November 2, 2011, SNMP Research International, Inc. and SNMP Research Inc. (collectively, "SNMP") filed a complaint claiming that the U.S. Debtors and the Canadian

Debtors are liable for copyright infringement, breach of contract and violations of Delaware trade secrets law.[4] The Complaint did not raise claims against or relating to the EMEA Debtors.

Thereafter, SNMP filed an Amended Complaint (Adv. D.I. 115) and later a Second Amended Complaint. Adv. D.I. 160. The Amended Complaint narrowed the defendants to the U.S. Debtors and Avaya, Inc. ("Avaya") which was the purchaser of the Enterprise business. In the Second Amended Complaint, SNMP added a claim that the U.S. Debtors are liable for sales proceeds received by other Nortel entities.

It was after the filing of the Second Amended Complaint that the U.S. Debtors filed their motion seeking to bring a claim for contribution against the EMEA Debtors in response to the claims in the Second Amended Complaint. The Court granted the U.S. Debtors' impleader motion by Order, dated September 22, 2015. Adv. D.I. 277. The U.S. Debtors then filed their Third-Party Complaint in which they asserted a claim for contribution against the EMEA Debtors. In the Third-Party Complaint, the U.S. Debtors seek contribution from the EMEA Debtors for their share of damages that SNMP recovers.

[4] Prior to the Petition Date, SNMP licensed their software to Nortel entities. SNMP filed proofs of claim against the U.S. Debtors in which they claimed $22,281 for alleged unpaid royalties. SNMP have amended their claim demanding at least $8,414,695.

**STARDARD OF REVIEW**

The Court should grant judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure when the pleadings themselves demonstrate that there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *Bayer Chems. Corp. v. Albermarle Corp.*, 171 F.App'x 392, 297 (3d Cir. 2006). The Court must view all factual allegations and inferences to be drawn from the facts most favorably to the non-moving party. However, the Court should grant judgment when the terms of the contract are dispositive and the Court "need only consider the pleadings and the contract at issue." *CitiSteel USA Inc. v. Gen. Elec. Co.*, No. CIV. A. 99-810-GMS, 2001 WL 65740, at *1 (D. Del. Jan. 9, 2001).

**DISCUSSION**

The issue for the Court to resolve is whether the Settlement Agreement releases the EMEA Debtors from the liability for contribution the U.S. Debtors seek to impose. The Court previously faced the issue on the EMEA Debtors' motion to dismiss the Third-Party Complaint and to vacate the Impleader Order. Adv. D.I. 305, 306, 353 and 354. The Court at that time denied the motion to dismiss but told the EMEA Debtors they were free to file a motion for judgment on the pleadings or motion for summary judgment. The EMEA Debtors responded with the Motion. When it is all said and done, the answer to the above issue is that in the Settlement Agreement the U.S. Debtors released the EMEA Debtors from the claims in the Third-Party Complaint.

The Settlement Agreement is governed by New York law. Settlement Agreement, § 8.7. The Court must therefore look to the four corners of the Settlement Agreement to determine the parties' intent when the terms of the contract are clear and unambiguous. *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, 773 F.3d 110, 114 (2d Cir. 2014); *Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 120 F. Supp. 2d 273, 283 (S.D.N.Y. 2000). The U.S. Debtors state that the Settlement Agreement does not require them to "foot the bill for the EMEA Debtors share of any liability. . . ." on claims which arose after the Settlement Agreement. U.S. Debtors' Response to Joint Administrators' Motion for Judgment on the Pleadings, page 11.

The U.S. Debtors argue that the Settlement Agreement did not release their claim of contribution against the EMEA Debtors. They focus the Court on Sections 4.1 and 4.2 of the Settlement Agreement that, in their view, contravene Section 4.6 and its broad release language.

The U.S. Debtors assert that their contribution claim which would require the EMEA Debtors to disgorge their portion of proceeds from the Business Line Sales is a "claim . . . of a [ ] Party to Sale Proceeds in the Allocation Dispute." Settlement Agreement, § 4.1. The Court disagrees with the U.S. Debtors assertion. The "Sale Proceeds in the Allocation Dispute" means what is written, namely, what is established in the Allocation Dispute. The language relates solely to claims made in the Allocation Dispute, and the emphasis is on the "Allocation Dispute," not "Sale Proceeds."

The U.S. Debtors' argument on Section 4.2 is still weaker. Section 4.2, provides for timing – what occurred after the date of the Settlement Agreement is not released. But the Business Line Sales all happened before the Settlement Agreement, not after. Although the claim by SNMP giving rise to the Third-Party Complaint was brought after the Settlement Agreement, that which gave rise to the claim all took place before.

The U.S. Debtors also argue that if the Court does not agree with them that Sections 4.1 and 4.2 of the Settlement Agreement preserve the contribution claim, then the disagreement between the U.S. Debtors and the EMEA Debtors means that Section 4.1 is ambiguous. When the contract is ambiguous, the Court has a genuine issue of material fact. The ambiguity means the Court cannot grant a motion for judgment on the pleadings. *See CenturyLink, Inc. v. Dish Network, L.L.C.*, 554 F. App'x 51 (2d Cir. 2014).

The U.S. Debtors' arguments are unavailing. The limitations on the settlement with and releases of the EMEA Debtors are clearly and unambiguously to the Allocation Dispute. The U.S. Debtors were not seeking their contribution claim in the Allocation Dispute. The Sales Proceeds were what the Allocation Dispute involved, not the later filed contribution claim. Indeed, the release of the EMEA Debtors included claims "known or unknown, past or present . . . which the U.S. [Debtors] now have, had, or may have had or hereafter may have however so arising . . . ." The SNMP claim fits into those categories.

The Court is mindful that SNMP's claims arose well before the Settlement Agreement and it is of no moment that the U.S. Debtors did not know that SNMP's claims would extend to the profits of the Business Line Sales. What is significant is that the release of the EMEA Debtors extends to "known or unknown, past or present" incidents.

The U.S. Debtors make much of what they call "redundancy" between Section 4.1(iv) and (v). Those subsections provide that:

> Nothing in this Settlement Agreement . . . shall constitute a release or waiver or discharge (in whole or in part) of . . . (iv) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (v) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute . . . .

The subsections are not redundant and support the EMEA Debtors' release. Section 4.1.(iv) preserves the EMEA Debtors' rights to argue their entitlement to Sale Proceeds in the Allocation Dispute ("any right of any Party to assert or defend against any arguments as to entitlement to Sale Proceeds"). Section 4.1(v) preserves the EMEA Debtors' rights to assert claims of entitlement to Sale Proceeds ("any claim, right or entitlement of any Party to Sale Proceeds"). The repetition of "in the Allocation Dispute" reveals that the U.S. Debtors and the EMEA Debtors were in fact releasing all claims beyond the immediacy of the Allocation Dispute. Thus, the redundancy is deliberate and meaningful.

The Settlement Agreement is not ambiguous, and the conflicting interpretations do not make it so. *Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 755 (S.D.N.Y.

2012). The interpretation which the U.S. Debtors offer is contrary to the facts of the case. The Settlement Agreement resolved all claims between the U.S. Debtors and the EMEA Debtors, all claims "known or unknown, past or present." Sections 4.1 and 4.2 do not change the release language because they deal with positions to be taken in the Allocation Dispute (Section 4.1) or "for facts or events occurring or actions taken after the date of this Settlement Agreement . . . ." (Section 4.2). The Business Line Sales which gave rise to SNMP's claim occurred before the Settlement Agreement and is therefore covered by the release the U.S. Debtors provided to the EMEA Debtors.

## CONCLUSION

The Court holds that there are no issues of fact and the EMEA Debtors are entitled to judgment as a matter of law. The Settlement Agreement is unambiguous and provides for the release of the EMEA Debtors from the claims the U.S. Debtors asserted against them in the Third-Party Complaint. Accordingly, the Third-Party Complaint will be dismissed with prejudice.

Dated: May 2, 2016

KEVIN GROSS, U.S.B.J.