# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.* | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Re Dkt. No. 18210** |
| SNMP Research International, Inc. and | ) | |
| SNMP Research, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 11-53454(KG) |
| | ) | |
| Nortel Networks Inc., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **Re Dkt. No. 585** |

## OPINION

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott, Esquire
Andrew R. Remming, Esquire
Tamara K. Minott, Esquire
Andrew J. Roth-Moore, Esquire
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Lisa M. Schweitzer, Esquire
David H. Herrington, Esquire
One Liberty Plaza
New York, New York 10006

*- Counsel for Debtors and Debtors in Possession –*

COLE SCHOTZ P.C.
Norman L. Pernick, Esquire
Nicholas J. Brannick, Esquire
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801

KING & BALLOW LAW OFFICES
Richard S. Busch, Esquire
315 Union Street, Suite 1100
Nashville, TN 37201

COLE SCHOTZ P.C.
G. David Dean, Esquire
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202

EGERTON, MCAFEE, ARMISTEAD
& DAVIS, P.C.
John L. Wood, Esq.
900 S. Gay Street
Knoxville, TN 37902

*- Counsel for SNMP Research, Inc. and SNMP Research International, Inc. -*

# I. __INTRODUCTION__[1]

The litigants in the adversary proceeding are plaintiffs SNMP Research International, Inc. ("SNMPRI") and SNMP Research, Inc. ("SNMPR") (collectively, "SNMP") and the defendants, Nortel Networks Inc. and affiliated entities ("Nortel"). The Court held a two-day trial on May 11 and 12, 2017 (the "Trial") to determine whether certain software was licensed for use or distribution by Nortel with respect to products after June 20, 2003. Adv. D.I. 540.

The issue which the Court is addressing is narrow but the parties presented considerable evidence at the Trial. The issue (the "Schedule 1 Issue") is "whether the SNMP software was licensed for use or distribution under Schedule 1A of the Nortel License . . . with respect to any products after June 20, 2003."[2] Scheduling Order Concerning Motion to Amend Proofs of Claim and Schedule 1 Issue. D.I. 18020, Adv. D.I. 540.

The Court has subject matter jurisdiction to consider the Schedule 1 Issue and the issues tried during the May 11-12 hearing pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The matters addressed during the Trial are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

---

[1] The Court is utilizing the findings of fact and conclusions of law which the parties submitted. The Court has carefully reviewed the record citations and legal citations to determine their accuracy and applicability.

[2] Schedule 1 and Schedule 1A are the same and the Court will refer to "Schedule 1."

1

# FINDINGS OF FACT[3]

## II.    THE PARTIES' DISPUTE AND THE EVIDENCE PRESENTED

### A.    Background of SNMP Research

Dr. Jeffrey Case ("Case") is the founder, owner, and Chief Technical Officer of SNMPR, Trial Tr. at 214:2-9, and co-creator of the SNMP protocol. Trial Tr. at 217:12-218:11. Case's wife, Mary Case, is the owner and CEO of SNMPRI. Trial Tr. at 214:10-14. Mrs. Case and Case are the only individuals who have authority to enter into contracts on behalf of SNMP.   Trial Tr. at 267:6-15.   Case is the owner of SNMPR, a separate company from SNMPRI. Trial Tr. 214:7-9. Neither Case nor SNMPR is a party to Schedule 1 or the master license agreement.  Ex. D-7C at 2 and Ex. D-6A at 14. Case does not own any part of SNMPRI and is not an employee of SNMPRI. Trial Tr. 214:10-14, 216:1-9.

SNMPR is in the business of creating and producing software for Internet management based upon the Internet Standard Management Framework and the Simple Network Management Protocol.  Trial Tr. at 215:13-19.  SNMPRI is involved in licensing SNMPRI software to customers, focusing on sales, marketing, and distribution. Trial Tr. at 215:13-24.

At all relevant times, Case was heavily involved with both SNMPR and SNMPRI on a day-to-day basis. Trial Tr. at 100:11-15. Before retiring in September of 2015 after

---

[3]  This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law.  To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

approximately 25 years at SNMPRI, Mr. John Southwood ("Southwood") was the Vice President of sales for SNMPRI. Trial Tr. at 96:17-97-7. Southwood would go to Case for approval if a particular negotiation involved matters that were out of the ordinary. Trial Tr. at 98:18-22; 237:15-238:3.

SNMPRI's customers include a number of original equipment manufacturers such as Nortel and its former competitors, Cisco, Hewlett-Packard, IBM, and others, as well as a number of end-user customers, including large companies and various agencies, bureaus, departments, and offices of the United States government. Trial Tr. at 221:2-22. SNMPRI has more than seven hundred (700) customers. Trial Tr. at 221:223-222:2.

SNMPR provides customers with an implementation of the protocol to perform SNMP management. Trial Tr. at 218:17-22. SNMPRI's business is the creation and the licensing of its software to customers. Trial Tr. at 215:13-24; 261:22-262:24.

### B.    Background of Bay Networks License

In 1994, SNMPRI licensed portions of its software to a company by the name of SynOptics, which later merged with a company known as Wellfleet, to form Bay Networks ("Bay Networks" or "Bay"). Trial Tr. at 303:22-304:1. Some of SNMPRI's earlier licenses, such as the one with SynOptics, were location-based, meaning that they granted development rights at a particular location(s). Trial Tr. at 104:3-8.

SNMPRI consented to the transfer of the SynOptics agreement to Bay Networks following the merger. Ex. P-22. Bay Networks was a customer of SNMPRI that, *inter alia*, manufactured switches and routers. Trial Tr. at 101:7-14. Pursuant to Amendment 2 to

3

the Bay Networks License, the parties confirmed the transfer of rights and responsibilities as licensor from SNMPR to SNMPRI, and the transfer of rights and responsibilities as licensee from SynOptics to Bay Networks. Ex. P-22. Bay thus succeeded to the rights and obligations contained in the SynOptics license agreement dated June 27, 1994, as amended (hereinafter, the "Bay Networks License"). Ex. P-20; P-21; P-22; Trial Tr. at 102:12-103:3.

Under the Bay Networks License, SNMPRI granted to Bay Networks non-exclusive, non- transferable (Trial Tr. at 105:23-106:5), worldwide, limited licenses to, among other things, use and distribute the software, subject to certain restrictions. Ex. P-20 at ¶¶ 2-3. The Bay Networks License was broad and allowed for the use and distribution of certain software in certain Bay Networks products developed at a given location, provided for a license fee, and contained royalty provisions. Trial Tr. at 104:3-15; 105:23-106:4; 106:10-107:6; 225:14- 226:5; Ex. P-20, Attachment A and C.

SNMPRI licenses two main types of products to its customers: (1) manager components (for the purposes of this dispute, primarily portions of the Asynchronous Request Library family of products ("ARL")); and (2) an agent component (for the purposes of this dispute, primarily portions of an SNMPRI product family called EMANATE). Trial Tr. at 105:1-3; 226:6-227:11; 310:23-311:1. SNMPRI sometimes provided customers separate options to buy-out future royalty payments for each of the separate components. Trial Tr. at 251:19-252:7. In the case of Bay Networks, the buyout for the EMANATE products was exercised and paid for, Trial Tr. at 310:4-11, and annual royalty

4

lease payments were being made on the ARL products. Trial Tr. at 138:3-11; 251:19-252:22; Ex. P-22.  The Bay Networks License was governed by California law. Ex. P-20 at ¶ 26.

### C.    Software Service Agreements with SynOptics and Bay

SNMPRI's software service agreements ("SSAs") grant maintenance services on the software, including providing upgrades, answering technical questions, and other support. Trial Tr. at 207:10-16. SNMPRI and SynOptics had previously entered into an SSA effective June 27, 1994 ("1994 SSA").  Ex. P-23. The 1994 SSA remained in effect for a term of one year from the effective date and was "evergreen" in the sense that it automatically extended each year for a one-year term unless terminated by the parties. Ex. P-23 at ¶ 1; Trial Tr. at 269:9-270:18.

In 1997, SNMPRI and Bay Networks entered into a separate SSA ("1997 SSA"). Trial Tr. at 229:16-23; Ex. P-24. The 1994 SSA was for certain agent software licensed under the Bay Networks License. Exs. P-20, P-24. The 1997 SSA was for certain manager software licensed under Amendment 2 to the Bay Networks License. Exs. P-22, P-24.

SNMPRI's SSAs do not grant any license rights. Trial Tr. at 230:7- 231:10; Exs. P-20 at ¶ 4; P-23 at ¶ 5; P-24 at ¶ 5; P-30 at ¶ 8, Schedule B (example); P-30.03 at ¶ 2. According to the terms and conditions of the SSA, use of the updates, improvements, and enhancements is "governed by the terms and conditions of the License Agreement with the Customer."  Ex. P-23 at ¶ 5.

### D.    Nortel's Acquisition of Bay Networks

In September 1998, Northern Telecom acquired Bay Networks. Trial Tr. at 109:1-6.

The acquisition took the form of a reverse triangular merger. See Ex. P-71 (Schedule 14A Definite Proxy Statement Filed by Bay Networks, Inc. with Securities and Exchange Commission, p. 4 (Filed as of July 27, 1998)).

### E.   The Parties' Dispute

The parties' dispute concerns Schedule 1, an agreement between SNMPRI and Nortel. Schedule 1 refers to and incorporates terms of an earlier license between SNMPRI and Bay Networks.

The Bay Networks License provided for a royalty buy out on all Bay Networks products. It permitted the use of the designated SNMPRI software for the entire life of any product line created by Bay Networks. Schedule 1 applies to "[a]ll products of units and projects originating from what was Bay Networks," and serves to incorporate terms of the Bay Networks License into the master license agreement between Nortel and SNMPRI. Schedule 1 incorporates its license to the designated Software and its royalty provisions. Schedule 1 also includes language providing that it has a three-year term.

Nortel proposes that Schedule 1 confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" in existence during its three-year term. Existing products and development projects originating from Bay Networks that emerged during the three-year term would receive the royalty buy out. Schedule 1 would not cover development projects that were started after the three year termination event. Any new development projects started after the three years would have to address royalties on their own.

6

SNMPRI and SNMPR contend that the three-year term of Schedule 1 means not only that development projects begun after the three-year term would not be covered, but also that any existing products and projects that had been covered by the Bay Networks License and Schedule 1 would lose their right to use the designated SNMPRI software at the three-year mark, thereby becoming infringing after that date. SNMPRI also contends that Nortel could obtain the lifetime royalty buy out for products covered by Schedule 1, but would need to execute another schedule to obtain that benefit. SNMPRI maintains that if Nortel failed to enter into a new schedule, then products covered by the Bay Networks License and Schedule 1, including the BayStack/ES/ERS[4] switches would become unlicensed and infringing at the end of the three-year term which ended on June 20, 2003.

There is a related dispute. New York law provides that parties who continue to operate on the basis that a contract is still operative after its nominal termination date create an implied-in-fact agreement that continues in effect. Nortel argues that even if Schedule 1 could be read as SNMPRI now proposes, the parties' actions established an implied-in-fact contract confirming Nortel's ongoing right to use the Schedule 1 software beyond the end of Schedule 1's three-year term. SNMPRI argues otherwise.

### F.    The Evidence

The Court heard and is considering two types of evidence. First, there is the written

---

[4]    These switches originally were sold under the "BayStack" name and in 2004 were rebranded with the "ES" and "ERS" names. Ex. D-89. Accordingly, the Court will refer to them here as the "BayStack/ES/ERS" switches. Ex. D-89; Mead Dep. 183:6-187:4.

record of the parties' negotiations concerning Schedule 1, and the written record of the parties' conduct and statements concerning Schedule 1 after it was signed. Schedule 1 was negotiated and finalized more than 17 years ago and therefore the contemporaneous nature of the evidence is helpful. Also, the written record happened before the current litigation arose.

Second, there is the oral testimony principally of two individuals. Southwood was SNMPRI's point person for the negotiation of Schedule 1. Case was an employee and owner of SNMPR. Nortel contends, and the Court agrees, that testimony many years after events is not as reliable as the contemporaneous documentary record of parties' actions and statements.

It is possible that SNMPR, SNMPRI, Case and Southwood forgot the facts that follow. The facts clearly show that SNMPRI's allegations with respect to Schedule 1 are wrong. Instead, the Court believes that whether deliberate or not they are seeking to take advantage of Nortel's bankruptcy trouble. The facts overwhelmingly support the Court's view.

### III.    THE TERMS OF SCHEDULE 1 AND THE PARTIES' STATEMENTS AND ACTIONS[5]

#### A.    The Purpose of Schedule 1

The terms and the relevant evidence concerning Schedule 1 establish that Schedule 1 confers the royalty buy out of the Bay Networks License on "[a]ll products of units and

---

[5] New York law governs the Schedule 1 Issue. Exs. P-30 at ¶ 9.11; P-30.08.

8

projects originating from what was Bay Networks" in existence during its three-year term. Ex. D-7C at 1. The parties' statements and actions concerning Schedule 1, both before and after it was executed, are consistent with this meaning and effect.

The Bay Networks License provided for a royalty buy out for SNMPRI's "EMANATE" software for $100,000 and a royalty buy out for SNMPRI's ARL for $86,668. Ex. D-2 at 15, 19; Ex. D-4 at 1-2. Bay Networks purchased the royalty buy out for EMANATE, which was used in an Ethernet switch product that was known as "BayStack" at Bay Networks and which Nortel continued to sell after it acquired Bay Networks in 1998. Ex. D-2 at 19; Ex. D-79A at 2; Trial Tr. 298:19-299:10; 315:19-22; Mead Dep. 173:23-177:20; 183:6-187:4; 191:22-192:25. The EMANATE software was used to assist in developing a software agent for the BayStack/ES/ERS switches that enabled it to function compliant with the SNMP Protocol. Trial Tr. 310:12-311:11; Mead Dep. 220:15-223:25.

Bay Networks used the ARL software in a set of products called "Optivity" that Bay Networks developed and sold and Nortel continued to sell after it acquired Bay Networks. Trial Tr. 315:23-316:5; Case Dep. 67:21-69:15. Nortel completed the purchase of the royalty buy out for ARL in February 2000, more than a year after it had acquired Bay Networks. Ex. D-4 at 2-3; Ex. D-80 at 1; Ex. D-79A at 2, 8. Bay Networks' purchase of the royalty buy outs allowed it and later Nortel to "distribute in perpetuity an unlimited number of binary copies" of the designated SNMPRI software. Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.

9

Nortel signed Schedule 1 on December 20, 1999, and SNMPRI signed it on June 20, 2000. Ex. D-7C at 2.  Schedule 1 is a schedule to the master license agreement that Nortel and SNMPRI executed on December 23, 1999. Ex. D-6A.

Schedule 1 incorporates the Bay Networks License and its royalty buy out in several key provisions.  First, the "Specified Product or Project" section identifies the products and projects to be covered by Schedule 1, which is: "All products of units and projects originating from what was Bay Networks."  Ex. D-7C at 1.  Second, the "Development Software" and "Run-Time Software" sections refer to the Bay Networks License to identify the specific SNMPRI software that was covered by the royalty buy out under the Bay Networks License and would likewise be covered by Schedule 1, including EMANATE and ARL. *Id.*  Third, the "Royalties" section refers to and incorporates the royalty provisions of the Bay Networks License, stating: "As described in the agreements and amendments thereto between SNMPRI and Bay Networks and its predecessor entities." *Id.* As noted, the Bay Networks License provided for a royalty buy out for the designated SNMPRI software, EMANATE and ARL.  Schedule 1 also includes the following language in a section titled "Additional Conditions" so as to provide for a three-year term:

> This Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities as referenced above, and all such agreements are hereby terminated by execution of this Schedule.
>
> This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below.

Ex. D-7C at 2.

Schedule 1 identifies the products and projects to be covered; it refers to and incorporates the Bay Networks License with respect to the SNMPRI software to be covered and the royalty buy out that is to be conferred; and it provides that it will terminate after three years.  Thus, the provisions of Schedule 1, taken as a whole, provide that "[a]ll products of units and projects originating from what was Bay Networks" in existence during the three-year term will receive a lifetime royalty buy out in accordance with the Bay Networks License.

The Court has already ruled that Schedule 1 is ambiguous because it is is capable of being construed in more than one way.  Order re Motion to Exclude, May 4, 2017 (Adv. D.I. 560); May 2 Tr. 120:1-130:16. The appropriate reading of Schedule 1, giving effect to all of its provisions, is that it confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" in existence during its three-year term.  Schedule 1's three-year term means that any existing products and any development projects originating from Bay Networks that emerged during those three years would have the lifetime royalty buy out until the products aged out of the marketplace. Conversely, new products or projects brought on line after the three-year termination date would not receive the royalty buy out.

**B.      Confirmation That Schedule 1 Would Confer The Royalty Buy Out On All Products And Projects In Existence During Its Three-Year Term**

Southwood confirmed that Schedule 1 provides that all Bay Networks "products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace." Ex. D-76C at 1;

11

Trial Tr. 510:2-6.   Southwood did so in a November 16, 1999 email to Nortel's lead

negotiator, Dave Hyslop ("Hyslop").   Southwood sent his email in response to a request

from Hyslop to review and approve a memo that would be sent to various constituents at

Nortel.   Southwood made clear in providing his comments that he understood

"everyone's expectations are [being] fixed for all time."   Ex. D-76C at 1.   Southwood

understood that what he was writing was very important.

> Referring to Schedule 1, Southwood stated as follows:
>
> I told [the lawyer preparing Schedule 1] that the royalty buy out would
> expire in three years. . . . By expire I mean that new products/projects
> brought on line after three years would address royalties on their own merit.
> Current Bay Networks products and development projects for the next three
> years will take advantage of the lifetime royalty buy out until their products
> have aged out of the marketplace.

Ex. D-76C at 1.

There is no question that Southwood's email is referring to Schedule 1, which he

describes as the "final Bay [Networks] transfer to Nortel." *Id.*   A few days earlier,

Southwood stated that "we are going to use Schedule 1A as the permanent Bay

[Networks] to Nortel license transfer." Ex. D-182.   When Southwood sent Nortel the draft

of Schedule 1 on November 18, 1999, he again called Schedule 1 "the permanent Bay

[Networks] to Nortel transfer." Ex. D-183.01; Ex. D-183.02.

Southwood's email reflects that, in negotiating Schedule 1, the parties were focused

on the royalty buy out that it would confer. In discussing Schedule 1, the language from

Southwood's email quoted above refers to the "royalty buy out" and explains what it

means is to provide that the "royalty buy out" would expire in three years. Ex. D-76C at 1.

Southwood's email thus explained:

(1)     "Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace," and

(2)     "[N]ew products/projects brought on line after three years would address royalties on their own merit" — that is, they would not receive the benefit of Schedule 1's lifetime royalty buy out. *Id.*

Southwood's written explanation of the expiration or termination of Schedule 1 is the same as Nortel's understanding.  The explanation is directly contrary to SNMPRI's position that products and projects covered by Schedule 1 would lose their right to use the SNMPRI software at the end of Schedule 1's three-year term.

Schedule 1 confers a "royalty buy out" on the products it covers.  Southwood's November 16 email confirms this. The Bay Networks License, incorporated into Schedule 1, indicates that a royalty buy out confers the right to "distribute in perpetuity an unlimited number of binary copies" of the designated SNMPRI software.  Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.  Southwood's email confirms that a royalty buy out means that a product line will have a "lifetime" right to use the software, which will remain in place until the product line has "aged out of the marketplace." Ex. D-76C at 1.

The purpose of providing that Schedule 1 would terminate after three years was to define which products and projects would receive the royalty buy out.  Product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not, which Southwood's November 16, 1999 email confirms. Ex. D-76C at 1.

13

Southwood's email noted that he had communicated the same understanding of Schedule 1 to SNMPRI's counsel, Rick Barnes, who was "crafting" the schedule's text. Ex. D-76C at 1. Less than 48 hours later, on November 18, 1999, Southwood sent Hyslop the draft of Schedule 1 with exactly the same content as the final signed version. Ex. D-183.01; Ex. D-183.02.

### C.    The Contemporaneous Email From Case

The meaning of Schedule 1 outlined above is confirmed in an email that Case sent in May 2000 to James Reeves ("Reeves"), who had been in charge of the BayStack group at Bay Networks and continued to be in charge of the same group at Nortel. Ex. D-77A. Reeves had been responsible for originally incorporating SNMPRI's software into the BayStack/ES/ERS switches at Bay Networks, and he and Case had worked together in that context, becoming friendly in the process. Trial Tr. 298:19-299:11; 300:2-18; 310:12-22; Case Dep. 56:8-59:2; 59:23-60:23; 433:3-14.

In his email to Reeves, Case refers to "Schedule 1 [as] the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assures him "I was correct when I told you the cost is $0." *Id.* Case's description is consistent with the reading of Schedule 1 outlined above: that it "grandfathers the Bay [Networks] licenses over to the new Nortel master agreement," so that the BayStack/ES/ERS switches for which Reeves was responsible would be able to continue using the SNMPRI software, at no additional cost. Nothing in the email suggests that the BayStack/ES/ERS switches would be stripped of the right to use the SNMPRI software after three years, and that

14

Nortel's cost of obtaining a new license would be tens of millions of dollars.

Case met with Reeves and the BayStack group in April 2003, just before the end of Schedule 1's three-year term. Case described SNMPRI in the meeting invitation as the group's "supplier of source code for SNMP-based network management." Ex. D-243. Case did not say anything to Reeves or anyone else to suggest that in June 2003 Nortel would lose the right to use the SNMPRI software, or that the BayStack/ES/ERS switches would become infringing. The absence of any comment from Case that Nortel would be infringing is an important consideration for the Court.

Now, SNMPRI claims that Nortel "denied" that SNMPRI Software was in the products after June 2003. The only evidence of any denial was the testimony of Case. Trial Tr. at 261:22-262:24. There is no evidence that Nortel ever denied that is used the SNMPRI software.

### D. Renewal of The Software Service Agreement

Following the termination date (June 20, 2003), SNMPRI repeatedly confirmed Nortel's ongoing right to use the software covered by Schedule 1 by renewing an annual SSA with Nortel covering the software licensed under Schedule 1. Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1. Under the SSA, SNMPRI provided updated versions of the Schedule 1 software and support for that software to the Nortel group responsible for the BayStack/ES/ERS switches. Nortel paid SNMPRI thousands of dollars in payments in return. *Id.*; Trial Tr. 513:19-514:4. The renewal of the SSA for the Schedule 1 software after

June 2003 confirmed that Nortel continued to have the right to use the Schedule 1 software in the BayStack/ES/ERS switches after Schedule 1's three-year term.

The Court does not accept SNMPRI's claim that it was a "mistake" to repeatedly renew the SSA after June 2003.  Trial Tr. 269:22-270:1 (Case contending that "we shouldn't have done it. That was a mistake.").  SNMPRI's renewal of the SSA is consistent with the terms of Schedule 1, with Southwood's explanation of Schedule 1's meaning, with Case's description of Schedule 1, and with other evidence, including Southwood's express statement in a formal letter in January 2006—years after June 20, 2003—that Nortel continued to have the right to use the software covered by Schedule 1.

SNMPRI speculated at Trial that the SNMPRI employees responsible for the SSA may not have been aware of the terms of Schedule 1 or of the connection between the SSA and Schedule 1.  This speculation was not corroborated by any objective or contemporaneous evidence or by any testimony from these individuals. There is no dispute that the SSA that was repeatedly renewed after June 2003 was for the same EMANATE software covered by Schedule 1.  *Compare* Ex. D-7A with Ex. D-81; Ex. D-95, Ex. D-96, Ex. D-97 at 1, Ex. D-98, Ex. D-99, Ex. D-83 at 2, Ex. D-101 at 1, Ex. D-100 at 1. Southwood's testimony confirmed that the SSA applied to the software covered by Schedule 1:

> Q.    [T]he software covered by this SSA is the same software covered under Schedule 1; correct?
>
> A.    It was actually the same software covered under the Bay license.
>
> Q.    Exactly.

16

A.      But at this point it was under Schedule 1.

Q.      Exactly. It was incorporated into the Nortel agreement under Schedule 1.

A.      Yes.

Trial Tr. 512:11-21.

SNMPRI's records confirm that the SSA was for the software covered by Schedule 1 and was associated with Schedule 1. Each invoice under the SSA had the Customer ID "Bay" and was directed to "Nortel (was Bay)." Ex. D-81; Ex. D-95; Ex. D- 96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1.

### E.      Nortel "Has" A Royalty Buy Out After The Three-Year Term

In August 2003, after Schedule 1's three-year term, SNMPRI confirmed in writing that Nortel "has" a royalty buy out under Schedule 1. This confirmation came as part of an email exchange beginning in July 2003 between Pierre Tremblay ("Tremblay"), a Nortel employee who was just becoming involved in the relationship with SNMPRI, and SNMPRI employees Southwood and Martha Hopper ("Hopper"). Ex. D-158.01; Ex. 158.02. Tremblay was reviewing the license agreement between Nortel and SNMPRI and its various schedules and seeking to learn about their status. Trial Tr. 190:1-9; Tremblay Dep. 90:18-91:1.

Hopper made the following statement about Schedule 1 in an email to Tremblay: "According To John [Southwood], as I understood him, BAY [Networks] has a Royalty-BuyOut on EMANATE Sources on WinNT, Solaris, and VxWorks as well as Asynchronous Request Libraries on Solaris, HP-UX, AIX and WinNT." Ex. D-158.02 at 1.

17

Hopper's statement came months after the end of Schedule 1's three-year term. The reference to Schedule 1 as continuing to provide a royalty buy out is directly contrary to SNMPRI's argument that the royalty buy out was extinguished in June 2003 and any existing products and projects covered by Schedule 1 were stripped of their right to use the Schedule 1 software.

Southwood tried to dismiss this statement as yet another "mistake." He claimed that Hopper did not "understand [him] correctly." Trial Tr. 195:11- 196:1. There was, however, no record of any attempt by Southwood to retract or correct this statement concerning Schedule 1.

### F.    Confirmation In 2006 of Nortel's Ongoing Right

In January 2006, SNMPRI expressly confirmed, in a formal letter from Southwood, that Nortel had an ongoing right to use the software covered by Schedule 1. Ex. D-78A at 3. SNMPRI's letter affirmed that "Nortel has a license" to the software covered by Schedule 1 and that Schedule 1 "incorporates the paid-up royalties' license previously established by Bay Networks." *Id.* In an email exchange leading up to the letter, Southwood likewise confirmed that he was "pleased" that the BayStack group at Nortel was operating under "the 'old Bay license' incorporated into the Nortel license" through Schedule 1. Ex. D-85 at 1. La-Anyane of the BayStack group sent an email to Southwood, noting that the group was using SNMPRI software and requesting a letter confirming its license to do so. Ex. D-84. The BayStack group intended to provide the letter to another licensee, called Trapeze Networks, so that they could begin a new development project

together. *Id.* La-Anyane's email stated that the BayStack group "recently struck a partnership with Trapeze Networks. They are using the SNMPRI Research engine in their code, and so are we." *Id.* at 1.  In a subsequent email in the exchange, Gregory Foster, a colleague of La-Anyane, noted again that the BayStack group at Nortel was using SNMPRI's software. Ex. D-85 at 1.

Southwood wrote that he was "pleased" that "it was the 'old Bay license' incorporated into the Nortel license" that the BayStack group was operating under. *Id.* at 1. Southwood also noted that before making his comments, he had conducted "research" on the various schedules executed between Nortel and SNMPRI. *Id.* Southwood then issued a formal letter on behalf of SNMPRI confirming Nortel's ongoing right to use the software covered by Schedule 1:

> Nortel Networks has a license with SNMP Research SNMPRI for EMANATE® sources running on Windows, Solaris, and VxWorks as referenced under Nortel Schedule 1. That schedule incorporates the paid-up royalties' license previously established by Bay Networks.

Ex. D-78A at 3.  The Court does not accept SNMPRI's explanation that the letter was a mistake.

After the Nortel BayStack group made clear that it was already using the software covered by Schedule 1, Southwood responded that he was "pleased" that it was operating under "the 'old Bay license' incorporated into the Nortel license" via Schedule 1 (Ex. D-85 at 1).  He then confirmed Nortel's ongoing right to use the Schedule 1 software in his formal letter. Ex. D-78A at 2.  Southwood not only didn't say that Nortel lost its right to use the Schedule 1 software at the end of Schedule 1's three-year term, he said the

19

opposite.  Southwood confirmed Nortel's ongoing right to use the Schedule 1 software.

### G.    No Suggestion That Nortel Would Lose Rights

SNMPRI never said or suggested to Nortel what it is contending now: that Nortel would lose the right to use the Schedule 1 software in existing products and projects at the end of Schedule 1's three-year term, and that the BayStack/ES/ERS switches would then become infringing.  The facts show that both Southwood and case never contended that Nortel would or did lose its rights under the license.

The record demonstrates that Case actually met with Reeves and the BayStack team in April 2003, just before the end of Schedule 1's three-year term, and Case described SNMPRI in the meeting invitation as the BayStack group's "supplier of source code for SNMP-based network management."  Ex. D-243.  Case did not say anything to Reeves or anyone else to suggest that in two months Nortel would lose the right to use the SNMP software, such that BayStack/ES/ERS switches would become infringing.  Nor did anyone else at SNMPRI or SNMPR say any such thing to anyone at Nortel.

The following facts are significant:

1.    Case knew that the BayStack/ES/ERS switches were using the Schedule 1 software and were covered by Schedule 1 when it was signed. Trial Tr. 315:9-316:5, 354:2-7; Case Dep. 408:14-17.

2.    The BayStack/ES/ERS switches were continuing to use the Schedule 1 software as of the end of Schedule 1's three-year term in June 2003 and beyond.  Ex. D-71 at 5 (SNMPRI's Second Amended Proof of Claim stating that "[i]n 2004 the Debtors used

the SNMP-Bay Software in all of the 20 different product lines then produced as part of the Bay Stack product lines."); *id.* at 58.

3.      Case had a friendly relationship with Reeves who was responsible for the BayStack/ES/ERS switches both at Bay Networks and at Nortel— including in the period leading up to the end of Schedule 1's three-year term in June 2003 and through 2004. Trial Tr. 298:19-299:11, 299:18-300:1, 300:2-18, 310:12-22; Case Dep. 56:8- 59:2, 59:23-60:23, 433:3-14; Ex. D-71 at 57-58; Ex. D-77A; Ex. D-215; Ex. D-220; Ex. D-240; Ex. D-242.  Case himself was involved in the efforts by Reeves and his team to incorporate SNMPRI software into the BayStack/ES/ERS switches at Bay Networks, and described pulling "all-nighters" at the Great America Parkway offices where the BayStack group was located.  Trial Tr. 299:5-17; Case Dep. 60:4-9.

4.      Case also was familiar with, and had contacts with, other members of the BayStack team, including Mead, La-Anyane and Seligson.  Trial Tr. 310:12- 313:24; Case Dep. 59:23-60:23, 182:2-183:3; Mead Dep. 193:2-14; D-232; D-233; D-234; D- 235; D-237.

5.      Case met with Reeves and with the BayStack team in person in April 2003, just before the end of Schedule 1's three-year term in June 2003. The meeting resulted from an invitation that La-Anyane, at the request of Reeves and Mead, extended to Case to make a presentation to the "Nortel-BayStack Team." Ex. D-243.  In accepting the invitation, Case suggested language to describe his presentation that expressly confirmed that SNMPRI continued to be the BayStack team's "supplier of source code for SNMP-based network management."  Ex. D-243; Trial Tr. 324:6-325:20.  When Case returned to

21

his office, he reported on his visit to Nortel and Nortel's continued use of SNMP software, describing Nortel's celebration of the 50 millionth Ethernet port sold during the Interop trade show he attended. Ex. D-221.

Case never said anything to suggest that Nortel would lose the right to use the Schedule 1 software or that they would become infringing after June 2003. Case's attempt to explain away the fact that he did not do so shifted over time. In his deposition, he claimed that in the 2003 time frame he had lost touch with Reeves and the BayStack group. He asserted that Reeves purportedly had left Nortel; that the BayStack switches were no longer being sold under the "BayStack" name; that he had stopped going to trade shows where he would have encountered Nortel and the BayStack switches; and that "it all went dark" at the Great America Parkway office where Reeves and the BayStack team were located. Trial Tr. 320:19-321:23, 322:4-13.

None of this was true. Reeves was still with Nortel and responsible for the BayStack team throughout 2003 and 2004. Trial Tr. 321:20-23; see also Ex. D-71 at 57. SNMPRI submitted a declaration from Reeves in which he affirmed that he was employed by Nortel and responsible for the BayStack/ES/ERS switches through 2004, and that the BayStack/ES/ERS switches continued to use SNMPRI's software during this entire period. Ex. D-71 at 57-58. The rebranding of the BayStack/ES/ERS switches did not occur until late 2004. Mead Dep. 183:23- 185:3; Ex. D-89.

Case's claim that his contacts with the BayStack group's offices at Great America Parkway "all went dark" in 2003 was likewise untrue. As noted, in April 2003 Case in fact

met with Reeves and gave a presentation to the Nortel-BayStack team. Trial Tr. 323:4-10; Ex. D- 243; Ex. D-138.  And Case himself prepared an invitation for the meeting that identified SNMPRI as the supplier of SNMPRI software to this team:

> Case from SNMP Research will be here on _____ fill in date, place, time _____. SNMP Research continues to be our supplier of source code for SNMP-based network management. …

Ex. D-243 (emphasis supplied); Trial Tr. 324:6-325:20.

Case's draft email invitation thus confirmed that he understood that SNMPRI continued to be the BayStack group's "supplier of source code for SNMP-based network management" as of April 2003.  Ex. D-243.  Case's presentation also demonstrated the length and importance to SNMPRI of its relationship with Nortel and Bay Networks.  Ex. D-138 at 3; see also Trial Tr. 327:12-329:8.

Case's claim that he had stopped attending trade shows in 2003 misses the point. After presenting to the BayStack group, Case traveled to the Interop convention in Las Vegas, where he observed Nortel celebrating the 50 millionth Ethernet port sold.  Trial Tr. 330:21-331:11; Ex. D-221 at 2. Case admitted that he was with Reeves in the Nortel booth and that the celebration involved the BayStack/ES/ERS switches.  Trial Tr. 332:7-9, 340:20-24, 342:2-5, 332:7-12.  And, again, when Case returned to SNMP after his trip, he reported to his team on his meetings with Nortel and his observation of their celebration at the Interop trade show.  Ex. D-221.  The meeting minutes state:

> [Case] also met with . . . Nortel in CA.  Nortel had just celebrated the first profitable quarter in some time.  . . .  Nortel was also celebrating the 50 millionth ethernet port sold during Interop.  They are all managed by SNMP.

23

*Id.* at 2.

At the Trial, Case no longer claimed that he had lost touch with Reeves and the BayStack group and Nortel in 2003. Instead, he claimed he had formed the belief as of the spring of 2003 that Reeves and the BayStack group had removed the SNMP software from the BayStack/ES/ERS switches. Trial Tr. 268:8-13. The contemporaneous record contradicts Case's claim that he believed in the spring of 2003 that Nortel had removed the SNMP software from the BayStack/ES/ERS switches. For example, the contemporaneous record demonstrates that Case was invited to give a presentation to the "Nortel-BayStack team" in April 2003, and the language that Case himself proposed for the invite stated: "SNMP Research continues to be our supplier of source code for SNMP-based network management." Ex. D- 243 (emphasis supplied); Trial Tr. 324:6-325:20. Thus, Case's claim that he believed the BayStack/ES/ERS switches no longer used the SNMPRI software is contradicted by the record. And, Case never told Nortel that the license was expiring or had expired.

Case's testimony concerning his purported belief that Nortel was no longer using SNMPRI software in the BayStack/ES/ERS switches as of spring 2003 is simply not credible. In response to his counsel's question, he testified as follows:

> Q. In the 2003 timeframe, after the expiration of Schedule 1A, did you know whether Nortel was shipping BayStack products with SNMP Research software in them?
>
> A. I not only didn't know that they were; I was told that they weren't.

Trial Tr. 268:8-13. Case did not identify who supposedly told him this; nor did his counsel

ask. Instead, they simply represented to the Court that someone at Nortel had told Case that the BayStack/ES/ERS switches were not using SNMP software.

On cross-examination, Case claimed he was referring to an email exchange in August 2003 between Tremblay of Nortel and Southwood and Hopper of SNMPRI. Trial Tr. 292:2-20; Ex. D-158.01; Ex. D-158.02 at 1. Tremblay, who was an employee of Nortel Canada and was based in Brampton, Ontario, was just getting involved in the relationship between Nortel and SNMPRI at the time. Tremblay Dep. 7:20-25; Ex. D-132 at 4. He had not had any involvement in Schedule 1, or with the Bay Networks License, or with the BayStack group, which was located in Santa Clara, California. In the email exchange that Case admitted on cross-examination he was referring to, Tremblay was reviewing the various schedules to the master license agreement between Nortel and SNMPRI and asking Southwood and Hopper questions about them. Ex. D-158.02 at 1. The email exchange did not involve Case. Case was not included or involved in the email exchange at all. Case also erred on what Tremblay said. In reference to Schedule 1, Tremblay merely remarked: "Schedule 1A covers 'All products of units and projects originating from what was Bay Networks.' I still haven't found anything that fits this description but to be honest, I have not yet looked very hard." Ex. D-158.02 at 1.

If Case actually had held the interpretation of Schedule 1 that he proffers now, which would mean the BayStack/ES/ERS switches were about to become infringing when he met with Reeves and the BayStack team in April 2003, that would have been the time to say something. The fact that he said no such thing contradicts his claim that he

actually held such an understanding.

## IV.   CONDUCT CONCERNING OPTIVITY

Nortel's use of SNMPRI's ARL software in the Optivity products is similar to the use of EMANATE.  The ARL software further confirms the same meaning and effect of Schedule 1, namely, that products and projects covered by Schedule 1 would receive a royalty buy out for the life of the product line.

As noted above, the Bay Networks License covered two SNMPRI software products: EMANATE and ARL.  Ex. D-2 at 15; Ex. D-4 at 1. Bay Networks used EMANATE in the BayStack/ES/ERS switches, and it used ARL in a set of products called "Optivity."  Trial Tr. 310:12-311:11, 315:23-316:5; Mead Dep. 220:15-223:25; Case Dep. 67:21-69:15. The Bay Networks License provided for a royalty buy out for both EMANATE and ARL, which was exercised and purchased. Ex. D-2; Ex. D-4; Ex. D-79A at 2; Ex. D-80.  As noted, Nortel paid the final amounts due on the ARL royalty buy out after it purchased Bay Networks.  Ex. D-4; Ex. D-79A at 2; Ex. D-80. Schedule 1 in turn incorporated the Bay Networks License and royalty buy out for EMANATE and ARL. Ex. D-7C.

During the 1999-2000 period, when Nortel and SNMPRI were negotiating and eventually executing Schedule 1 and the master license agreement, the Optivity group's use of ARL was included on a list of items to be covered by the parties. The parties initially considered executing an additional schedule (which was to be Schedule 16) for the use of ARL in the Optivity products, but then they recognized that this was already

covered by Schedule 1. Accordingly, they agreed Optivity's use of ARL would be covered going forward under Schedule 1, and that no new schedule was needed.

In addition, the parties had occasion to revisit Optivity's coverage under Schedule 1 in April 2004, nearly a year after the end of Schedule 1's three-year term. The Optivity group contacted Southwood at SNMPRI to request an additional software feature for ARL: compatibility with a protocol called IPv6. In addressing that request, Southwood confirmed after the end of Schedule 1's three-year term, that Optivity's use of the ARL product continued to be covered by Schedule 1. Southwood expressly stated that Nortel had a license to ARL "under the old Bay [Networks] license completed before Nortel purchased Bay [Networks]" and that "the old license is incorporated into the current license under [S]chedule 1." Ex. D-271 at 2.  The record concerning the use of ARL in the Optivity products confirms the meaning and effect of Schedule 1 and refutes the new interpretation of Schedule 1 that SNMPRI is proposing now.

### A.     Nortel Did Not Need A New Schedule

Nortel and SNMPRI discussed in 1999 and 2000 whether the Optivity group needed to execute a new schedule in order to continue using and distributing ARL software and ultimately concluded that this was not necessary in light of the rights granted with respect to ARL under the Bay Networks License and Schedule 1.  The relevant communications began on November 3, 1999 when Hyslop (of Nortel) sent Southwood (of SNMPRI) an email attaching a spreadsheet of projects and products that were using or proposed to use SNMPRI software. Ex. D-159.01; Ex. D-159.02. The

spreadsheet identified each project/product as either "Bay" or "NT" (i.e., Nortel). One of the products identified as "Bay" was the "Optivity Suite of Products," which used ARL on the Solaris, Windows NT, HP-UX and AIX operating systems. Ex. D-159.02.

Later that month, Southwood sent Hyslop a draft of Schedule 16, which would have covered the use in the "Optivity Suite of products" of ARL on the Solaris, Windows NT, HP-UX and AIX operating systems. Ex. D-256.06; Ex. D-256.07. The draft schedule included a provision stating, "The Per-Copy royalties are waived under the royalty buy out option previously paid by Bay." Ex. D-256.07 at 2.

On March 8, 2000, Southwood discussed the proposed Schedule 16 with Vicky Allen ("Allen"), a Nortel employee, and they recognized that Schedule 16 was not needed. Southwood wrote an email to Allen the same day memorializing the conversation:

> It was good to speak to you today. We determined that the current Schedule 16 issued for ARL duplicates the transaction completed in 1997 between Bay and SNMPRI. And so, we concluded that this Schedule 16 should be retired.

Ex. D-258 at 4; see also Trial Tr. 456:17-458:9. Allen also wrote an email memorializing what she and Southwood had discussed and agreed upon. Ex. D-257. She sent her email to Hyslop and others at Nortel, and Hyslop forwarded it to Southwood with his comments. *Id.*

Allen first summarized her confirmation with Southwood that Optivity was covered by Schedule 1: "Per the new agreement between Nortel and SNMP, which was signed at the end of 1999, there is a Schedule 1 which covers all previous Bay [Networks]

agreements. With this, our separate Bay [Networks] agreement with SNMP for Optivity products is covered here." *Id.* at 1.   Hyslop agreed: "Yes that is true." *Id.*   Allen summarized her confirmation with Southwood that no new schedule was needed for Optivity:   "Per the Schedule 16A and B, these are not needed per above, as we have already paid the dev/runtime fees for the SNMP ARL product back in 97." *Id.*  Hyslop agreed and confirmed to Southwood that Schedule 16 could be used for another transaction because it was not needed for Optivity:   "OK, John lets therefore have Schedule 16 marked as 'available for re-use.'" *Id.*

Allen recounted her discussion with Southwood that "[p]er the ARL product, we have completed the royalty buy out," and noted further that "I'm having legal send SNMP a letter stating this, and requesting that SNMP acknowledge in writing."  Ex. D-257 at 1. Nortel sent this letter to SNMPRI on March 17, 2000, which stated in relevant part (Ex. D-161.10):

> On February 17, 2000, Nortel Networks submitted a check in the amount of $22,624 made payable to SNMP Research SNMPRI, Inc. ("SNMP").  This amount constituted the full and complete satisfaction on any amounts owed by Nortel Networks to SNMP, including any and all royalties, past, present or future, in connection with the SNMP software licensed by Nortel Networks, as set forth in the software license agreement entered into between the parties on June 20, 1994, including the amendments thereto.

Allen summarized her confirmation with Southwood that the Optivity group would continue with the maintenance agreement, i.e., the SSA which was already in place under the Bay Networks License. She stated: "As we will continue to use the SNMP ARL product, we will continue to pay maintenance, per the $9,600/year fee stated in the Bay

[Networks] agreement."    Ex. D-257 at 1. The SSA for ARL that SNMPRI and Bay

Networks had executed in 1997, provided for software upgrades and service.  Ex. D-251.

Like the SSA for the EMANATE software used in the BayStack/ES/ERS switches as

discussed above, it was renewable on an annual basis. *Id.* These payments were, like

Nortel's payments to renew the EMANATE SSA, tracked by SNMP under the "Bay

[Networks]" Customer ID.  Ex. D-79A at 8-9; Ex. D-175; Ex. D-176; Ex. D-177; Ex. D-178;

Ex. D-179.  Thus, the SSA for ARL was handled in the same way as the SSA for the

EMANATE software used in the BayStack/ES/ERS switches.

Southwood's "Sales & Marketing Phone Call Notes" from his phone call with

Allen on March 8, 2000, which he made in real time during the conversation, also confirm

the substance of their conversation. Ex. D-195; Trial Tr. 468:6-21; 472:5-16. Consistent with

his and Allen's emails, Southwood wrote "kill schedule 16A + B / Already finished in

transaction in 1997" and "Licensed ARL previously."  Ex. D-195.

In addition to their discussion of ARL's coverage under Schedule 1, Allen and

Southwood also discussed the possibility of the Optivity group licensing another

SNMPRI product, called BRASS.  Ex. D-195; Ex. D-257; Ex. D-258; Trial Tr. 743:18-22.

Allen asked Southwood to present a proposal for the potential addition of BRASS.  Ex.

D-257 at 1. Southwood then prepared a quote and a revised version of Schedule 16 that

would have covered BRASS.  Ex. D-258 at 4; Ex. D-256.02; Ex. D-256.03.  After receiving

the quote, the Optivity group decided not to license BRASS and to continue with ARL

instead, as Allen informed Southwood:  "I just received word from our Optivity

30

engineering group that we have changed our minds [with regards to] our interest in licensing the BRASS libraries.  Therefore, there is no need to add this info to a new schedule within the current Nortel/SNMP contract. We will be staying with the ARL product." Ex. D-259.  The parties never executed any version of Schedule 16 for Optivity's use of ARL, and instead they agreed that Optivity's use of ARL would continue under Schedule 1. Trial Tr. 473:23-474:15; Ex. D-259.  SNMPRI never suggested to Nortel that a new schedule would be necessary for the Optivity group to continue using ARL after the end of Schedule 1's three-year term.  Trial Tr. 461:17-24, 475:17-476:1.

Southwood admitted that he had not been shown the documentary record concerning Optivity's use of ARL when he was being prepared to testify for trial. Trial Tr. 456:17-457:13.  He could not reconcile the clear record with SNMPRI's argument that a new schedule was needed in order to receive the royalty buy out benefit of Schedule 1. Southwood testified that he was "mystified."  Trial Tr. 500:18-501:7.

SNMPRI's counsel suggested that his agreement that no new schedule was needed for Optivity's use of ARL was based on the fact that the Optivity group had requested a proposal for BRASS. Trial Tr. 529:13-532:3. The contemporaneous record refutes any such argument.  The email exchanges discussed above show that Southwood confirmed the Optivity group's right to use ARL under Schedule 1 and that no new schedule was needed, regardless of anything to do with BRASS. Ex. D-258 at 4; Ex. D-257.  When the Optivity group notified Southwood that it decided to continue with ARL and not add BRASS, Southwood made no suggestion whatsoever that anything had changed from his

31

earlier confirmation that ARL was covered by Schedule 1 and no new schedule was needed. Ex. D-259.

## B.     The Optivity Group Continued To Have The Right To Use ARL

In April 2004, nearly a year after the end of Schedule 1's three-year term, SNMPRI again confirmed that the Optivity group had the ongoing right to use the ARL software under Schedule 1.  The discussion in April 2004 arose when the Optivity group asked SNMPRI about adding an additional discrete feature: support for the newest version of an internet communications standard called the Internet Protocol ("IP"), referred to as IPv6, which expanded the number of addresses that could be assigned to networked devices. Ex. D-271; Trial Tr. 477:4-478:13.  The group had been using IPv4, the previous version of the protocol, and wanted to check on adding compatibility with IPv6 to the ARL software incorporated into Optivity. Ex. D-271 at 2.

In the email exchanges concerning this issue, Tremblay of Nortel, who became involved in the relationship with SNMPRI in the 2003 timeframe and so was not involved with Schedule 1 or the earlier discussions about Optivity's use of ARL, raised a question as to which schedule covered the use of ARL in the Optivity products. *Id.* Southwood explained that it was covered by Schedule 1. In doing so he noted that he had reviewed the license and various schedules, and stated with respect to the Optivity group's license to ARL:

> [W]here is the ARL?  We found it under the old Bay [Networks] license completed before Nortel purchased Bay [Networks], but the old license is incorporated into the current license under schedule 1.

32

*Id.* at 2.

Southwood's statement in April 2004, nearly a year after the end of Schedule 1's three-year term, that Nortel had a license to ARL "under the old Bay [Networks] license completed before Nortel purchased Bay [Networks]" and that "the old license is incorporated into the current license under Schedule 1" confirms Nortel's understanding of Schedule 1.  A product or project covered by Schedule 1, such as the BayStack/ES/ERS switches and the Optivity products, received a lifetime royalty buy out right to use the Schedule 1 software. *Id.*  Southwood's written confirmation, nearly a year after the end of Schedule 1's three-year term, of Optivity's ongoing right to use the SNMPRI ARL software covered by Schedule 1 matches his express written confirmation in his formal letter from January 2006 of Nortel's ongoing right to use the SNMPRI EMANATE software in the BayStack/ES/ERS switches. *Id.*; Ex. 78A at 3. Southwood's statement about Optivity in April 2004 is important because he does not say that since Schedule 1 "terminated" nearly a year earlier in June 2003, the Optivity group's use of ARL is unlicensed and infringing.  To the contrary, he confirms the existing license to ARL under Schedule 1.

SNMPRI's counsel and Southwood suggested that SNMPRI may have accepted Optivity's use of ARL only because the Optivity group was considering executing a new schedule that would add the feature of IPv6 compatibility. Trial Tr. 199:10-200:23. But the written record says no such thing.  Southwood's April 2004 email expressly stated that Nortel has a license to ARL "under the old Bay [Networks] license completed before

33

Nortel purchased Bay [Networks]" and that "the old license is incorporated into the current license under Schedule 1." Ex. D-271 at 2.  Southwood did not say or suggest that Nortel's right to use ARL ended in June 2003 or that Optivity would need a new schedule for its ongoing use of ARL.

Southwood also stated that "[t]here is a separate licensing fee since IPv6 is considered optional." *Id.*  When Southwood prepared Schedule 60 covering ARL "with IPv6," the only charge was for the "License Fee for development tools" of $27,000 to account for the addition of optional IPv6 support. Ex. D-52 at 1; Trial Tr. 486:21-487:3.

Still further, Southwood's emails concerning the Optivity group's potential addition of IPv6 support, including his emails to Case, specifically stated that the Optivity group already had a license for ARL. In an April 15, 2004 email to Case, for example, he noted that "[t]hey already have licensed ARL/Solaris."  Ex. D-272 at 1. The same email stated that Nortel has a license for ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under Schedule 1." *Id.* at 2.  Case never registered any disagreement with this statement. Similarly, in a later email to Case, after the parties had executed Schedule 60, Southwood reported that he had "sold a license to Nortel to add IPv6 to previously licensed ARL (old Bay license) on three operating systems." Ex. D-283.  Thus, the record makes clear that Nortel's ongoing right to use ARL under Schedule 1 plainly did not depend on whether it ultimately chose to execute another schedule for the optional IPv6 feature.

## V.   SNMPRI'S "NEW SCHEDULES" ARGUMENT

SNMPRI contends that to receive a lifetime royalty buy out under Schedule 1 Nortel needed to execute yet another schedule, and it points to four other schedules as purported support.  See, e.g., SNMPRI's Pre-Hearing Br. ¶ 17 (Adv. D.I. 566); Trial Tr. 566:8-567:4. SNMPRI argued that any benefit of Schedule 1 simply "went poof" at the end of its three-year term. See, e.g., Ex. D-71 at 5. Later, it suggested Nortel could have obtained a royalty buy out under Schedule 1 if it executed yet another schedule, a "new" schedule.  Yet when Case was asked at his deposition whether there was an obligation on SNMPRI's part to agree to such a new schedule, he insisted the answer was "sometimes yes; sometimes no."  At Trial, Case opined that SNMPRI was obligated to agree to such a new schedule providing a lifetime royalty buy out for any product or project covered by Schedule 1.  Trial Tr. 248:9-17; 249:1-6.  SNMPRI's "new schedules" argument cannot avoid the meaning and effect of Schedule 1.  Schedule 1 says nothing about the need to enter into new schedules to obtain the benefit of the royalty buy out it confers. Ex. D-7C; Trial Tr. 568:5-11. The Court has no evidence of any communication concerning Schedule 1 that says or suggests that to receive the royalty buy out benefit, Nortel would need to execute another schedule. SNMPRI's licensing expert concedes that there is no communication contemporaneous with Schedule 1's negotiation or signing that memorializes the purported "two-part bargain" (that Schedule 1 would serve to extinguish the royalty buy out of the Bay Networks License but that Nortel could obtain the royalty buy out by executing another schedule) on which SNMPRI's "new schedules"

argument is based. Trial Tr. 568:21-569:14, 580:19-581:7.

The record concerning the four "new schedules" that SNMPRI points to demonstrates that they all involved projects fundamentally different from the BayStack/ES/ERS switches and Optivity products, which were legacy Bay Networks products developed by legacy Bay Networks groups using only SNMPRI software covered by the Bay Networks License and therefore fully covered by Schedule 1. The four new schedules addressed different circumstances:  (1) they involved SNMPRI software that was not covered by Schedule 1; (2) they involved new development projects that did not already have, and so needed to pay for, the SNMPRI development software; and (3) they involved projects for which no SSA was in place.

### A.    The "New Schedules"

The four new schedules on which SNMPRI relies to support its new schedules argument (12, 14, 20 and 37, collectively the "New Schedules") each involved an SNMPRI software product that was not covered by Schedule 1. See Ex. D-17; Ex. D-19; Ex. D- 20; Ex. D-32.  Schedule 1 granted rights to specific SNMPRI software products for specific operating systems, Ex. D-7C:

**Table 1 – SNMPRI Software Covered By Schedule 1**

| SNMPRI Product | Operating System |
|---|---|
| EMANATE | Windows NT, Solaris, VxWorks |
| Asynchronous Request Library | Solaris, HP-UX, AIX, and Windows NT |
| BRASS | Solaris |

By contrast, all four of the New Schedules included something different: a combination of SNMPRI software and an operating system for which it was to be used that was not covered by Schedule 1:

**Table 2 – SNMPRI Software Covered By The New Schedules**

| Schedule | SNMPRI Product | Operating System | Trial Exhibit |
|---|---|---|---|
| 12 | BRASS | Windows NT | D-17 |
| 14 | Cross Development Tools | Solaris 2.x | D-19 |
| 20 | BRASS | Windows NT | D-20 |
| 37 | EPIC | VxWorks | D-32 |

The new schedules included software that was not covered by Schedule 1. They could not be covered by Schedule 1 and instead would need a separate schedule.

**B.      The "New Schedules" Involved Development Projects**

Each of the four New Schedules involved a development project that needed to obtain "development software" and therefore needed to pay a "license fee" for that development software. There is a difference between: (1) "Development Software" for which a "License Fee" is paid; and (2) "Run-Time Software," for which "Royalties" are paid. As explained in the license agreement, "Development Software" is defined as "all or any part of any Source Code or Binary Code software product of SNMP." Ex. D-6A at 1-2. It is the software that a development group obtains from SNMPRI and uses to develop the software that will be integrated into a product. The payment that is made for "Development Software" is a one-time payment called a "License Fee." *See id.* at 6 (explaining in a section titled "License Fees and Royalties" that "license fees [are] for

Development Software."); Trial Tr. 105:11-22, 106:15- 107:2, 462:12-463:3. As Southwood noted, "[t]he license fee was paid at the time of the original transaction and the execution of the license and was associated with the delivery of our development tools to our customer." Trial Tr. 106:22-107:2.

By contrast, "Run-Time Software" is defined in the license agreement as "Binary Code which is developed by or for the Specified Entity, and which is derived from Development Software and integrated with a Nortel Networks Product." Ex. D-6 at 2. Thus, "Run- Time Software" is the software that is created from (or "derived from") the SNMPRI Development Software and that is actually integrated into a product, such as the BayStack/ES/ERS switches.   Trial Tr. 105:11-22, 106:15-107:6. As the license agreement explains, "Royalties" are what is paid for "Run-Time Software." Ex. D-6A at 2 ("royalties [are] for Run-Time Software.").  Royalties can take the form of a royalty buy out, such as provided under the Bay Networks License and Schedule 1, a royalty lease, or per copy royalties. Ex. D-2 at 19; Ex. D-4 at 1-2.

Bay Networks had already obtained the Development Software covered by the Bay Networks License and, correspondingly, by Schedule 1, and had paid the license fees for it. Specifically, for the EMANATE development software that was used by the BayStack group, Bay Networks paid a license fee of $68,000 in 1994. Ex. D-2 at 15; Ex. D-79A at 2. And Bay Networks paid a license fee of $43,332 in 1997 for the ARL development software used by the Optivity group.  Ex. D-4 at 1; Ex. D-79A at 2. Thus, there was no need to obtain or pay for the development software used by the BayStack and Optivity

38

groups because that had already occurred.

The fact that the development software had already been paid for and provided was specifically cited in the parties' discussion in May 2000 that confirmed that the Optivity group did not need to execute a new schedule.  The email from Vicky Allen summarizing her discussion and agreement with Southwood (which was sent to Hyslop and Southwood) stated that, "there is a Schedule 1 which covers all previous Bay Agreements" and accordingly a new schedule (which was to be Schedule 16) was "not needed" because "we have already paid the dev/runtime fees for the SNMP ARL product back in 97." Ex. D-257 at 1. At the hearing, Southwood confirmed that "dev" fees referenced here are the license fees that were paid for development software.  Trial Tr. 462:12-463:3.

The Optivity group, like the BayStack group, had already obtained the development software and paid the license fees for it.  By contrast, the New Schedules involved development projects that needed to obtain, and pay the license fee for, the development software.   The new development projects began by obtaining the development software on a trial basis under "evaluation licenses." See Ex. D-184; Ex. D-300; Ex. D-306 (Schedule 12); see also Ex. D-303; Ex. D-305 (Schedule 20); see also Ex. D-189; Ex. D-301; Ex. D-201; Ex. D-302 (Schedules 14 and 37). Under an evaluation license, SNMPRI would send development software to a Nortel group to use for a limited time to allow the group to test and evaluate the software in connection with a potential new development project.  Trial Tr.  493:15-494:2. Evaluation licenses thus were a way for

groups to get temporary access to software that they did not already have. Trial Tr. 493:15-19.

The groups executing New Schedules needed to obtain the SNMPRI development software, and they had to pay license fees for this new software. As discussed above, and as Southwood confirmed, license fees are fees a customer pays to obtain development software for development purposes at the initial stage of development. Trial Tr. 462:12-463:3; see also Ex. D-6A at 6; Ex. D-203 at 5.

The New Schedules were executed so that the development projects could obtain, and pay for, the development software which is reflected in the New Schedules themselves, as the only payment to be made (other than the maintenance fee, as discussed below) is for the "License Fee for development tools." Ex. D-17; Ex. D-19; Ex. D-20; Ex. D-32. Again, the BayStack and Optivity groups used EMANATE and ARL Development Software that had already been obtained and paid for under the Bay Networks License and was covered by Schedule 1, so there was no need to execute a new schedule.

At trial, SNMPRI cited three emails by Hyslop (of Nortel) as support for its argument. In fact, they all confirm the distinction between obtaining and paying for development software (also called "source code"), which the groups involved with the New Schedules needed to do, and paying royalties, which was covered by the royalty buy out.

First, SNMPRI points to a November 15, 1999 email from Hyslop to Southwood

in which Hyslop asks Southwood to review a memo that will be sent to others at Nortel.

The relevant portion states:

> "Column 1 divides the requirements into "Bay" and "NT" ["NT" refers to
> Nortel] requirements.  Those identified as "Bay" products are subject to the
> in place Bay-SNMPRI agreement (which has been assigned by Bay to
> Nortel); i.e. had the Bay-Nortel merger never occurred, Bay would have
> been entitled to deploy these products royalty free.* However, if any of
> these product development groups require source code development
> licenses (e.g. source code for Emanate or license fees for other SNMP RI
> software which will not be embedded into the Bay product), they must be
> paid for on a "Bay" product by "Bay" product basis as per the terms of the
> existing Bay-SNMPRI agreement.  Products identified as "NT" products in
> Column 1 will have to pay for both the development source code (and, if
> any, other non-embedded SNMPRI tools) and also pay runtime royalties.

Ex. P-39.  The second sentence refers to the fact that Bay-related products will receive the

benefit of the royalty buy out, i.e., they can be deployed "royalty free." The following

sentence then explains that *if* any of these development groups needs to obtain SNMPRI

development software, they will need to pay for it. It states: "However, if any of these

product development groups require source code development licenses (e.g. source code

for Emanate or license fees for other SNMPRI software which will not be embedded into

the Bay product), they must be paid for . . . ." *Id.*   As discussed, that was exactly the

situation with the four New Schedules:  each one involved a new project that did not

have, and so needed to obtain and pay for, SNMPRI development software; and so they

executed a schedule under which they did so.  And, as also discussed, this was not the

case for the BayStack and Optivity groups:  they were using development software that

they had already acquired and paid for.

Second, SNMPRI points to an internal email from Hyslop to a group working on a project called "VIPER." Ex. D-159.02; Ex. P-42. VIPER was an "NT" (i.e., Nortel) project, and so would "have to pay for both the development source code . . . and also pay runtime royalties." Ex. P-39. Consistent with this understanding, Hyslop wrote:

> You have been identified as having a need to have a copy of SNMP RI's Emanate source code; i.e. you are developing an embedded application using one of the VxWorks, Vertex, pSOS or Chorus real time operating systems. . . . Emanate source code is normally priced at $50,000 US, but SNMP will significantly discount this price (to the $20K-$25K) range provided that we order several copies, so there are significant savings to be realized by pooling the separate Nortel product requirements for Emanate source code. . . . Please respond as soon as possible if you have the funds in hand (1999 Nortel funding) to acquire Emanate source code.

Ex. P-42.

Hyslop's email confirms that a development group that needs to have a copy of development source code will need to pay the license fee for it. The email also includes a sentence after the email's body, in which Hyslop wrote: "PS Brian: note that the Bay buy out is a buy out for royalties only, and Bay must still, on a product by product basis, get the right to use the Emanate source code." Ex. P-42. The sentence is exactly consistent with the point already discussed above and reflected in the italicized portion of this email quoted above. If a development group needed to obtain development software, it would need to pay the license fee to acquire it. Again, that was true of the four New Schedules, and it was not true of the BayStack and Optivity groups.

42

Third, SNMPRI points to an email regarding Schedule 5, in which Hyslop states:

> The items that you are buying in Schedule 5 . . . are items that both Preside and the OPS group, would have to buy whether or not these SNMPRI products are required to develop either new Preside products or Optivity products. It is true that Bay, under the Bay - SNMP RI agreement has a "buy-out", but that "buy-out" is restricted solely to royalties for deployed Optivity products; the buy-out does not cover the SNMPRI products required to develop the Optivity products.

Ex. P-43 at 1.  SNMPRI focuses on the last sentence and suggests that it somehow supports its argument. SNMPRI's Pre-Hearing Br. ¶¶ 4-5, 21 (Adv. D.I. 566). The email makes the very same point as already discussed: the buy-out covers royalties, and it does not cover the fee for acquiring the SNMPRI development software required to develop products. Ex. P-43 at 1.  Indeed, Southwood confirmed exactly this point at trial:

> I would comment that at the very end of the paragraph, where he says, "The buy out does not cover SNMPRI products required to develop the Optivity products," that's a reference to our license fees, not to our royalty obligations.

Trial Tr. 168:19-24.

The email confirms that the license fee was to be paid when a development project needed to acquire SNMPRI development software code to develop products.  Trial Tr. 168:17-24; 462:12-463:3; 206:22-107:2.  Again, the four New Schedules were for development projects that needed to acquire and pay for development software.  The BayStack and Optivity groups did not.

In sum, these emails certainly do not support SNMPRI's arguments. To the contrary, they confirm and highlight the distinction between the circumstances giving

43

rise to the New Schedules, on the one hand, and the facts concerning the BayStack and Optivity groups on the other.

### C.    The "New Schedules" Involved Development Projects That Needed Software Service Agreements

Another distinction between the New Schedules and the BayStack and Optivity groups is that the New Schedules involved development projects that needed to set up SSAs for their newly acquired software. As discussed, the New Schedules included software that was not covered by the Bay Networks License and Schedule 1, and that the development projects needed to acquire (and pay for). Accordingly, they needed to set up SSAs for their projects as well.

This is reflected in the New Schedules, as they each provided for the payment of a "Yearly Maintenance Fee," which is the payment for the first year of the SSA. Ex. D-17 at 1; Ex. D-19 at 1; Ex. D-20 at 1; Ex. D-32 at 1.   These payments are also reflected in SNMPRI's "customer ledger."    Schedule 12 was associated with the Customer ID "NORTEL0018", Ex. D- 79A at 13; Ex. D-186; Schedule 20 was associated with the Customer ID "NORTEL0032," Ex. D-79A at 19; Ex. D-254; Schedule 37 was initially associated with the Customer ID "NORTEL0019," Ex. D-79A at 14; Ex. D-253; and Schedule 14 was associated with the Customer ID "NORTEL0014" (payments for the SSA associated with Schedule 37 were also subsequently moved to that Customer ID), Ex. D-79A at 12, 14; Ex. D-252; Ex. D-255.   By contrast, the BayStack and Optivity groups had already acquired their development software and initiated an SSA under the Bay Networks License. Accordingly, they had no need to execute a new schedule. Instead,

they simply proceeded under the existing SSAs.

This point is specifically noted in the email exchange between Allen, Hyslop and Southwood that explains and confirms why Optivity would continue forward under Schedule 1 and its existing SSA, and had no need to execute a new schedule. Ex. D-257. Allen's email states: "As we will continue to use the SNMP ARL product, we will continue to pay maintenance, per the $9,600/year fee stated in the Bay agreement." *Id.* at 1. The same was true for the SSA for the EMANATE software used by the BayStack group. Reflecting this understanding, payments for these SSAs, which covered the software licensed under the Bay Networks License and Schedule 1, were tracked in SNMPRI's customer ledger under the "Bay" Customer ID. Ex. D-79A at 8-9.

The record demonstrates that the projects covered by the New Schedules were fundamentally different from the BayStack/ES/ERS switches and the Optivity products. Indeed, these facts serve to highlight why the BayStack/ES/ERS switches (and the Optivity products) were fully covered by Schedule 1 and had no need of a new schedule.

### D.    Evidence That Does Not Support The "New Schedules" Argument

SNMPRI cites a handful of emails as purported support of its "new schedules" argument. First, SNMPRI cites the three emails by Hyslop that are addressed in the preceding section. Ex. P-39; Ex. P-42; Ex. P-43. As shown, these emails confirm and highlight why the New Schedules were appropriate for the development projects they covered and why no new schedule was needed for the BayStack group's use of the EMANATE software in the BayStack/ES/ERS switches. Second, SNMPRI points to an

45

August 2003 email exchange between Tremblay of Nortel and Southwood and Hopper of SNMPRI.  SNMPRI stated that, under Schedule 1, "BAY has a Royalty-BuyOut on EMANATE Sources." Ex. D-158.02 at 1 (emphasis supplied).  This email exchange occurred in August 2003, months after the end of Schedule 1's three-year term. Thus, if SNMPRI actually had held the understanding of Schedule 1 that it proposes now, it would have said that any right to use software covered by Schedule 1 was extinguished in June 2003 and that schedule should be considered "finished." But SNMPRI said no such thing. Instead it said that Nortel/Bay "has a Royalty-BuyOut on EMANATE Sources" under Schedule 1. *Id.*

SNMPRI seeks to ignore that clear statement, and instead it points to a sentence about one of the New Schedules, Schedule 12.  In that portion, Southwood refers to what he describes as his understanding with Hyslop concerning new schedules. Ex. D-158.02 at 3.  Tremblay was new to the relationship and was not involved with Schedule 1 or any of the New Schedules.  He had no basis to respond to Southwood's statement nor was there anything for him to say or do in response to Southwood's statement.  The statement refers to Schedule 12 and therefore cannot negate the parties' statements and actions concerning Schedule 1, including the statement about Schedule 1 in the very same document.

The record of SNMPRI's statements and actions concerning Schedule 1 in the period after this August 2003 exchange, includes:  (1) Southwood's express confirmation in April 2004 that Nortel has the ongoing right to use the ARL software under Schedule

46

1, because that software was licensed "under the old Bay [Networks] license completed before Nortel purchased Bay [Networks]" and "the old license is incorporated into the current license under [S]chedule 1" (Ex. D-271 at 2); (2) SNMPRI's repeated renewals of the SSA with Nortel covering the Schedule 1 software in the years following 2003 (Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D- 95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1); and (3) Southwood's express statement in January 2006 to the BayStack group that he was "pleased" they were operating under "the 'old Bay [Networks] license' incorporated into the Nortel license" via Schedule 1, Ex. D-85 at 1, and his formal letter stating that Nortel "has a license . . . under Nortel Schedule 1 [which] incorporates the paid-up royalties' license previously established by Bay Networks," Ex. D-78A at 3.

## VI.    DR. RICHARD RAZGAITIS AND EVIDENCE OF LICENSING CUSTOM AND PRACTICE

Nortel's licensing expert, Dr. Richard Razgaitis ("Razgaitis"), testified based on his knowledge of custom and practice in the technology licensing industry.

### A.    Razgaitis Has Extensive Experience In Technology Licensing

Razgaitis has over 30 years of experience negotiating, drafting and executing technology licenses, as well as working with the underlying technology that has been the subject matter of such licenses.  Trial Tr. 404:9-12. He holds a Ph.D. in mechanical engineering and thermofluid sciences from Southern Methodist University, an M.B.A. from Ohio State University, an M.Sc. in aerospace engineering from the University of Florida and a B.Sc. in Aeronautical and Astronautical Engineering from the University of

Illinois. Trial Tr. 396:11-19.   Razgaitis has also taught as a professor of mechanical engineering for thirteen years at the University of Portland and Ohio State University. Trial Tr. 397:13-15; Ex. D-204 ¶ 9.

From 1981-85, Razgaitis was Principal Research Scientist at Battelle Memorial Institute, a 6,000-person research and development organization.  Trial Tr. 397:15- 398:4; Ex. D-204 ¶ 6. In 1985, the focus of Razgaitis's responsibilities at Battelle transitioned to technology licensing, when he became Director of Technology and later, Vice President of Commercial Development.  Trial Tr. 398:8-399:6.

From 1995-98, Razgaitis served as Vice President of Technology Licensing at Bellcore, a telecommunications software company.  Ex. D-204 ¶ 5; Trial Tr. 401:8-17.  He supervised a licensing team and also worked to identify licensing opportunities, pursue potential licensees and draft term sheets related to Bellcore's proprietary software. Trial Tr. 401:18-403:1.  Since 1998, Razgaitis has been working as a technology/IP licensing consultant.  Trial Tr. 403:13-21; Ex. D-204 ¶ 4.  In this capacity, he has advised companies on opportunity discovery, licensing strategy and valuation.  Ex. D-204 ¶ 4; Trial Tr. 403:22-404:8.

Since 1985, Razgaitis has been a member of the Licensing Executive Society (the "LES").  Trial Tr. 406:4-16; Ex. D-204 ¶ 12.  He is also a founder and president of the Licensing Foundation, Inc., which LES established to promote education about IP licensing, and in 2011, received the Barnes Award from the LES for his education and mentorship contributions to the licensing industry. Trial Tr. 406:19-24; Ex. D-204 ¶¶ 12,

19.  Razgaitis is also the author of four books and three book chapters on technology and IP valuation, licensing strategy and licensing negotiations.  Ex. D-204 ¶ 13.

**B.**     **Nortel Would Not Lose Rights Under Schedule 1**

Razgaitis testified at trial that it would be contrary to custom and practice for the parties to agree to a license that stripped Nortel's rights to distribute that software on a specified date without (1) providing a mechanism for Nortel to extend those rights at a known price; and (2) imposing an obligation on Nortel to return or destroy the SNMPRI software if it no longer had the right to use the software in its switches. Schedule 1, however, contains no such provisions.

Mead, a software engineer who worked on the BayStack/ES/ERS switches at Bay Networks, Nortel and Avaya, testified that the BayStack/ES/ERS switches were based on a common code base called the "BayStack operating system software," or "BoSS." Mead Dep. 174:8-9, 174:25-175:5, 183:6-19, 193:2-3. Mead further testified that, prior to Nortel's acquisition of Bay Networks, SNMP's software was integrated into BoSS and, as a result, was incorporated into each of the BayStack/ES/ERS switches.  Mead Dep. 176:25-177:20, 232:6-14.  Mead explained that SNMPRI's software touched on a number of different components of BoSS.  Mead Dep. 229:18-230:22.

As a result, it would be extremely arduous to remove SNMPRI's software from BoSS and from the BayStack/ES/ERS switches. *id.* 145:13-146:25, 230:13-231:12, 233:4-12, because it is woven into the core codebase and would be difficult to disentangle.  *Id.* 230:13- 231:12, 233:4-12.   In fact, when Avaya removed SNMPRI software from the

BayStack/ES/ERS switches in 2013, the entire process took two and a half years. Mead Dep. 140:4-9, 141:13-16, 146:4-8.   Mead also testified that the same time-consuming process would have been required had Nortel lost its rights to use SNMPRI software in its switches prior to the line of business sale to Avaya. Mead Dep. 233:4-12.

Razgaitis explained that given the integration of SNMPRI software into the BayStack/ES/ERS switches, it would be contrary to custom and practice for Nortel and SNMPRI to have agreed to an arrangement where Nortel would lose its rights under Schedule 1 to distribute SNMPRI software in its switches in June 2003. Trial Tr. 420:14-421:12, 426:20-427:5, 430:2-6.   Specifically, an agreement that would strip Nortel of its rights to distribute SNMPRI software in the BayStack/ES/ERS switches in June 2003 would result in a "cliff" that would leave Nortel with "terrible options."   Trial Tr. 420:23-421:5, 421:9-12.   In such a scenario, Nortel would have been "mortally worried" about the untenable choice of "hav[ing] to stop selling the product or . . . hav[ing] to have some kind of an emergency program of reconfiguring in a way that won't violate some other third-party agreement." Trial Tr. 421:5-9, 422:5-8.

Nortel would have needed "absolute clarity and absolute certainty about what it could do to extend its rights" beyond the date on which it could potentially lose its rights to use SNMPRI's software in its switches.   Trial Tr. 427:1-5. Schedule 1, however, contains no provisions explaining how Nortel could extend those rights or at what price.   Ex. D-7C; Trial Tr. 427:24-428:2.

Given the absence of such language, Razgaitis explained that SNMPRI's argument

50

"that June 20 of '03 meant the termination of the licensing rights" would be contrary to custom and practice, because a licensee in Nortel's position would need "the certainty that they could get subsequent rights . . . and the terms of those rights." Trial Tr. 429:24-430:6.  Razgaitis further testified that it would be entirely inconsistent with custom and practice for Nortel and SNMPRI to rely (as SNMPRI now suggests) on an informal, unwritten agreement that might permit Nortel to extend its royalty buy-out to use SNMP Research software in products covered by Schedule 1 by executing new schedules.  Trial Tr. 430:19.  That is because Nortel would have needed its right to extend its license to use SNMP software in its existing BayStack/ES/ERS switches to be specified in writing:

> [T]o have an informal arrangement would make no sense.  You would want to have business certainty, because you would be faced otherwise with the possibility that the informal arrangement changed, that the parties change, the licensor changed, they changed their strategy.  People change, people leave, people get acquired.

Trial Tr. 431:5-12.

In addition, the absence of language in Schedule 1 requiring certification by Nortel that it had removed SNMPRI software from its products in June 2003 and/or providing for the destruction or return of SNMPRI software, if it no longer had the right to use that software, further contradicts SNMPRI's argument.  Trial Tr. 426:4-15. Razgaitis explained that, as a matter of custom and practice, such language would be necessary if the parties had to ensure SNMPRI that its software was not in use by a company that had no right to use it.  Trial Tr. 426:16-19.

51

### C.      The Testimony Of David Tollen

David Tollen ("Tollen") testified as SNMP's expert witness.  Tollen graduated *cum laude* from Harvard Law School in 1993, receiving a J.D., and received an L.L.M. from Cambridge University in 1994.  Tollen served as general counsel of a publicly traded software company and as a vice president of business development of a technology startup.  Tollen authored *The Tech Contracts Handbook:  Cloud Computing Agreements, Software Licenses, and Other IT Contracts for Lawyers and Business People* (ABA).  He represents buyers and sellers of information technology, and his primary work involves negotiating and drafting software license agreements and other IT contracts.  Tollen has negotiated and drafted more than 1,000 information technology contracts, most involving software. Ex. P-79.

SNMPRI's effort to undermine Razgaitis's opinions through the testimony of Tollen fails for several reasons.  First, Tollen inappropriately attempted to tell the Court how to read the text of Schedule 1. Second, Tollen's opinion that Nortel was required to execute new schedules in order to extend its rights under Schedule 1 is not supported by, and is contradicted by, contemporaneous documentary evidence. Third, Tollen's opinion disregards evidence that contradicts his arguments.  Finally, Tollen's suggestion that Razgaitis has confused software licensing concepts with patent licensing concepts mischaracterizes Razgaitis's analysis and relies on a basic misunderstanding of one of his sources.

**D.     Tollen's Testimony Is An Inappropriate Attempt To Testify to the Ultimate Issue**

Tollen's testimony consisted principally of an attempt to tell the Court what Schedule 1 means. See, e.g., Trial Tr. 550:24-551:18, 559:21-560:10; see also Trial Tr. 560:11-15 (Tollen, an attorney, citing his legal experience as the basis for his opinion).  The Court sustained an objection to some of this testimony, excluding it as inappropriate subject matter for an expert on industry custom and practice. Trial Tr. 552:16-19.  The Court stated:  "I don't think he testified about custom and practice. I think he opined on the legal issue, whether there was a termination after three years." Trial Tr. 552:16-19.

In addition, Tollen's argument is contrary to the Court's May 2, 2017 ruling that Schedule 1 is ambiguous.  May 2 Tr. 123:11-13.  Indeed, Tollen's reading of Schedule 1 ignores the fact that key provisions of Schedule 1 incorporate the royalty buy out from the Bay Networks License. Thus, his opinion is not correct and is contrary to the Court's own prior determinations.

**E.     Tollen's Testimony Is Not Supported**

Under Tollen's proposed interpretation of Schedule 1, Nortel would lose all rights to use the covered SNMPRI software after June 2003 unless it executed a new schedule. Trial Tr. 555:5-18.  However, as Tollen admits, Schedule 1 says nothing about any need (or ability) to enter into other schedules. Further, Tollen was forced to admit that there is no contemporaneous writing signed by the parties that memorializes any need by Nortel to execute new schedules to extend its rights under Schedule 1 beyond June 2003 or any

ability to do so. Trial Tr. 568:5-569:14.

The November 16, 1999 email from Southwood to Hyslop concerning the meaning and effect of Schedule 1, which does not mention any need (or ability) to execute new schedules, caused Tollen to testify implausibly. The relevant text of Southwood's email states:

> Rick Barnes, our counsel, is crafting the final Bay transfer to Nortel based on the previous term which expired Nov. 1.  I told him that the royalty buy out would expire in three years.  I thought we agreed to that in our conference room.
>
> By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.

Ex. D-76C at 1.

Tollen's opinion depends on his assertion that the parties only memorialized the first paragraph of the quoted language in Schedule 1 and that the second paragraph refers to something different, a purported "informal arrangement" between the parties concerning the execution of new schedules. Trial Tr. 577:13-579:1. The argument that the first and second paragraphs are referring to different things is unacceptable.  In the first paragraph Southwood states that SNMPRI's counsel is drafting the "final Bay transfer to Nortel" (which is Schedule 1) and says, "I told him the royalty buyout would expire in three years." The second paragraph then explains what Southwood means in the first paragraph by "expire," stating "By expire I mean  . . . ."  Tollen's suggestion that the first paragraph refers to Schedule 1 but the second paragraph does not, and that it instead

refers to some other agreement, is inconsistent with what the text actually says.

### F.    Tollen's Testimony Does Not Account For the Facts

Tollen also claims that the New Schedules the parties executed during Schedule 1's three-year term support his reading of that document. Trial Tr. 555:15-17. Tollen's opinion and SNMPRI's argument are defeated by the fact that the New Schedules involved new development projects fundamentally different from the Nortel BayStack group's use of the EMANATE software covered by Schedule 1. Specifically, the New Schedules involved software not covered by Schedule 1 and development projects that (1) did not already have, and so needed to acquire and pay for, the necessary development software; and (2) did not have in place, and so needed to establish a SSA for the software they were acquiring.

### G.    Razgaitis Did Not Confuse Patent Licensing And Software Licensing

Tollen testified that Razgaitis was somehow "confused between patent licensing and software licensing," suggesting that Razgaitis's opinions are not valid outside of the patent licensing context. Trial Tr. 563:22-24. Contrary to Tollen's testimony, Razgaitis's opinions are not specific to patent law. Razgaitis' testimony is grounded in licensing practices and business principles in the software industry, as well as the realities of software engineering. See, e.g., Trial Tr. 420:23-421:12, 426:4-427:5, 429:23-430:6, 430:21-431:19. Specifically, Razgaitis's principal point is that it would be inconsistent with basic licensing custom and practice for a licensee to enter into an agreement under which it would lose the right to use software that has been integrated into an existing product line,

without also including in that agreement a mechanism to continue those rights going forward.

Tollen based his testimony on the false contention that one of the sources Razgaitis consulted, a treatise by Brian Brunsvold, deals exclusively with patent licensing and not software licensing. Trial Tr. 564:21-565:4. However, the first footnote on the first page of that book explicitly refutes that contention, stating:

> The reader should not assume that references in this work to "license agreements" or various cognates of "license" are limited to patent license transactions. . . . [S]uch terms are used to broadly refer to intellectual property transactions and related contracts . . . .

Brian G. Brunsvold *et al.*, Drafting Patent License Agreements 1 n.1 (7th ed. 2012).

## H.    Razgaitis's Opinion And Transferability

SNMPRI also challenged Razgaitis's opinion by claiming it was based on a purportedly inaccurate "premise" that after Nortel acquired Bay Networks, it automatically inherited the right to continue using SNMP Research software under the Bay Networks License. Trial Tr. 26:1-11. SNMPRI contends this premise would be inaccurate because the Bay Networks License is non-transferable. Trial Tr. 25:1-26:11.

Razgaitis explained that a company that has integrated licensed software into its existing product lines would not enter into an agreement under which it would lose the right to use that software, without also including in the agreement an established mechanism to continue that right going forward. If the agreement is going to set a date on which the licensee no longer has rights to use software that has been integrated into existing products, it also needs a provision establishing a framework for extending those

rights going forward.  The licensee would not simply rely on the licensor's good will or some informal, unwritten agreement.

The record is clear that Nortel believed it retained rights under the Bay Networks License and made this clear to SNMPRI. Indeed, it was Nortel that first raised the issue. Nearly nine months after the acquisition, Hyslop pointed out to Southwood that it had "occurred to [him] that the SNMPRI Bay agreement should be formally assigned to Nortel as Nortel has been operating as though it were the licensee since the Nortel acquisition of Bay last September." Ex. D-155.01.  Hyslop attached a draft "Memorandum of Agreement" to his email that would formally assign the Bay Networks License to Nortel. Ex. D-155.01; Ex. D- 155.02.

The contemporaneous record reflects that SNMPRI was considering the issue, but there is no statement in which it clearly expressed a disagreement with Nortel's position. See Ex. D-208; Ex. D-209; Ex. D-144.  On August 9, 1999, Southwood faxed to Hyslop a draft of a "Temporary License Agreement," which would have assigned the Bay Networks License to Nortel until November 1, 1999. Ex. D-87. A week later, Hyslop emailed Southwood to make clear, again, that Nortel continued to believe its "rights to use SNMP products set out in the [SNMPRI] – Bay agreement are paid up rights."  Ex. D-86. Hyslop's email also notes that SNMPRI was still considering the issue and had not expressed a contrary view. *Id.* This contradicts SNMPRI's suggestion that when Southwood sent a draft of a Temporary License Agreement a week earlier, this must have meant that "Nortel knew . . . it had no rights from the Bay license and needed an

57

assignment." Trial Tr. 26:12-14.

SNMPRI claims the Temporary License Agreement was signed. It has not produced any signed copy. Trial Tr. 233:14-18, 234:23. A November 16 email from Southwood to Hyslop refers to a November 1 term, which would have been the end date under the draft Temporary License Agreement, but Hyslop did not confirm the accuracy of that reference. As noted, a week after Southwood faxed a proposed draft of the temporary license on August 9, Hyslop wrote an email to make clear that Nortel believed it already had paid-up rights under the Bay Networks License. There is no documentary evidence to suggest that Nortel's view on this subject ever changed or that SNMPRI held a contrary view.

Against this documentary evidence, Case claims that at a meeting in October 1999 with Hyslop he allegedly "told [Nortel] that the SynOptics-Bay agreement was nontransferable and that they had no rights under the SynOptics-Bay agreement." Trial Tr. 245:23-246:2. However, Case's testimony is not supported by Southwood's contemporaneous "activity report" from this meeting, which describes Southwood's meeting with Hyslop and mentions that Case merely "stopp[ed] in" at one point. Ex. D-249. In any event, neither Case nor Southwood claimed in testimony that Hyslop or anyone else from Nortel agreed with SNMPRI's position. See Trial Tr. 134:23-135:9, 245:23-246:4. Instead, both testified that Nortel pushed back and demanded "some benefit flowing from those royalty buy-outs that [it had] paid just recently." Trial Tr. 135:4-6, 246:2-4.

Whether Nortel continued to have rights to distribute SNMPRI software in products covered by the Bay Networks License was a business point for discussion. Schedule 1 can therefore be read as a compromise between the parties' positions: just as Southwood explained in his November 16 email, the Bay Networks royalty buy out would extend to "[a]ll products of units and projects originating from what was Bay Networks" that were in existence during its three-year term, while development projects begun after that period would not receive the royalty buy out.  Ex. D-76C at 1.

## VII.    THE PARTIES' CONDUCT AND STATEMENTS ALTERNATIVELY ESTABLISHED AN IMPLIED-IN-FACT CONTRACT

It is clear that Schedule 1 conferred a lifetime royalty buy out on products of units and projects that Bay Networks originated and that existed during its three-year term. Further the lifetime royalty buy out survived the end of the term.  However, even if the Court accepted SNMPRI's interpretation of Schedule 1 and all rights granted thereunder nominally terminated on June 20, 2003, the parties' conduct and statements show that they continued to perform after this date on the basis that the products covered by Schedule 1 continued to be covered by the a lifetime royalty buy out.  This means that the parties' conduct and statements established an implied-in-fact contract extending the royalty buy out for products covered by Schedule 1 beyond the three-year term and until the products had aged out of the marketplace.

In January 2006, after the BayStack team had reached out to SNMPRI requesting a letter confirming that it was a licensee of SNMPRI software, Southwood responded in an

email that he was "pleased . . . that it was the 'old Bay license' incorporated into the Nortel license" under which the BayStack group was operating. Ex. D-85 at 1. He then issued a formal letter on behalf of SNMPRI confirming Nortel's ongoing right to use the software covered by Schedule 1, which stated:

> Nortel Networks has a license with SNMP Research for EMANATE® sources running on Windows, Solaris, and VxWorks as referenced under Nortel Schedule 1. That schedule incorporates the paid-up royalties' license previously established by Bay Networks.

Ex. D-78A at 3.

SNMPRI repeatedly renewed the SSA with Nortel covering the EMANATE software licensed under Schedule 1 after June 2003, confirming Nortel's ongoing right to use the software. Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1. Under the SSA, SNMPRI provided updated versions of the Schedule 1 software and support for that software to the BayStack group, and SNMPRI collected thousands of dollars in payments from Nortel each year in return. Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1; Trial Tr. 513:19-514:4. In addition, SNMPRI actively pursued and solicited Nortel to renew the SSA. Ex. D-82; Ex. D-83 at 1 (emails from SNMPRI to the BayStack group asking it to renew the SSA). SNMPRI's conduct clearly communicated to Nortel that it had an ongoing right to use the software covered by the SSA and Schedule 1 and Nortel's continued payment of the fee necessary to renew the SSA clearly communicated to SNMPRI that it understood it had the right to use that software.

Despite Case's close business and personal relationships with Reeves and the BayStack team, neither he nor anyone at SNMPRI ever told anyone at Nortel that the BayStack/ES/ERS switches would become infringing when Schedule 1's three- year term ended. After June 20, 2003, no one at SNMPRI ever suggested to anyone at Nortel that the BayStack/ES/ERS switches were now infringing. Rather, as discussed, SNMPRI continually reaffirmed Nortel's ongoing right to use the software licensed under Schedule 1.

SNMP argues that the Optivity group's use of SNMPRI's ARL software is not at issue. It is, however, a situation that matches in all material respects the BayStack group's use of SNMPRI's EMANATE software. Southwood confirmed in 2004 that Optivity's use of the ARL product continued to be covered by Schedule 1. He expressly stated that Nortel had a license to ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under [S]chedule 1." Ex. D-271 at 2.

The parties' conduct and statements after June 20, 2003 show that they continued to perform on the basis that the legacy Bay Networks products covered by Schedule 1 still enjoyed a lifetime royalty buy out with respect to the designated SNMPRI software. Therefore, even if Nortel's interpretation of Schedule 1 were to be rejected, an implied-in-fact contract was created and confirmed that the lifetime royalty buy out for the products covered by Schedule 1 was not extinguished at the end of Schedule 1's three-

year term.

## CONCLUSIONS OF LAW

The above Findings of Fact set forth the factual basis supporting the Court's conclusions concerning the meaning and effect of Schedule 1. The Court will summarize some of the factual findings but the Court's ruling relies on, and incorporates, the entirety of the factual findings.

## NORTEL'S UNDERSTANDING OF SCHEDULE 1 IS CORRECT

### A.        Schedule 1 Is Ambiguous

Under New York law, the first step in interpreting a contract is answering "the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). "An ambiguity exists where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* (*quoting Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)); *see also Dev. Specialists, Inc. v. Peabody Energy Corp.* (*In re Coudert Bros.*), 487 B.R. 375, 380 (S.D.N.Y. 2013) ("[I]n analyzing contractual text, a court need not turn a blind eye to context." (*citation omitted*)).

"Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language. Hence, only

where the language and the inferences to be drawn from it are unambiguous may a district court construe a contract as a matter of law . . . ." *Alexander & Alexander Servs. Inc.*, 136 F.3d at 86 (*quoting Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir.1990)) (*citation omitted*).  To conclude that contractual language is unambiguous, a Court must find that "it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 329 (S.D.N.Y. 2010) (alteration in original) (*quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989)); *see also Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP (In re Energy Future Holdings Corp.*), 2017 WL 1170830, at *4 (D. Del. 2017).

Applying these principles, the Court concluded at a hearing on May 2, 2017 that Schedule 1 is ambiguous.  Order re Motion to Exclude, May 4, 2017 (Adv. D.I. 560); May 2 Tr. 120:1-130:16. The Court is therefore free to consider both the agreement's text and "any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."  *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86. Because "the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006).

The Court concludes that both the provisions of Schedule 1 and the available extrinsic evidence support Nortel's understanding of the agreement.  Any existing products and any development projects originating from Bay Networks that emerged

63

during the three- year term of Schedule 1 would take advantage of the lifetime royalty

buy out until the products aged out of the marketplace.

### B.    Schedule 1's Provisions Support Nortel

Schedule 1 specifically refers to and incorporates the Bay Networks License.

Under New York law, a document is incorporated by reference into a contract where (1)

the contract identifies the document to be incorporated "beyond all reasonable doubt,"

and (2) the parties clearly knew of and assented to the incorporated terms. *Laureate Educ.,*

*Inc. v. Ins. Co. of Pennsylvania*, 2014 WL 1345888, at \*7 (S.D.N.Y. 2014) (quoting *PaineWebber*

*Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996)).[6]

Accordingly, interpreting the meaning of Schedule 1 requires consideration of the

Bay Networks License and the rights it conferred. The Bay Networks License provided

royalty buy outs for SNMPRI's EMANATE and ARL products. Bay Networks purchased

the EMANATE buy out and Nortel completed the purchase of the ARL buy out in

February 2000, more than a year after it had acquired Bay Networks. Ex. D-4 at 3; Ex. D-

80 at 1; Ex. D-79A at 2, 8. By acquiring these buy outs, Bay Networks and later Nortel

---

[6]    Schedule 1's incorporation of the Bay Networks License meets both requirements. First, Schedule 1 identifies the Bay Networks License beyond reasonable doubt by listing the specific documents (including their titles and dates of execution) that it comprises. Ex. D-7C at 1. Second, that the parties knew of and assented to the incorporation of the Bay Networks License is evident from the plain text of Schedule 1: Key sections of Schedule 1 (addressing "Run-Time Software," "Yearly Maintenance Fee" and "Royalties") are comprised solely of a cross- reference to terms "described in" the Bay Networks License. *Id.* Thus, those sections of Schedule 1 are entirely dependent on the Bay Networks License and would be unintelligible without it. *See Sbarra v. Totolis*, 191 A.D.2d 867, 870 (N.Y. App. Div. 1993).

obtained the right to "distribute in perpetuity an unlimited number of binary copies" of

the designated SNMPRI software. Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.[7]

Schedule 1 preserved the royalty buyouts for all products and projects originating

from Bay Networks that existed when Schedule 1 was signed or that came into existence

during its three-year term.  The specific provisions of Schedule 1 that implemented this

result are as follows:

- The "Specified Product or Project" section identifies the products and projects that would receive this benefit as follows: "[a]ll products of units and projects originating from what was Bay Networks."  Ex. D-7C at 1.

- The "Development Software" and "Run-Time Software" sections refer to the Bay Networks License to identify the specific SNMPRI software that was covered by the royalty buy out under the Bay Networks License and would likewise be covered by Schedule 1, including EMANATE. *Id.*

- The "Royalties" section refers to the Bay Networks License, stating:  "As described in the agreements and amendments thereto between SNMPRI and Bay Networks and its predecessor entities."  As noted, the Bay Networks agreements provided for a royalty buy out as to the designated SNMPRI software, including EMANATE.  *Id.*

- The "Additional Conditions" section states as follows:

    This Schedule supersedes all of the prior agreements between SNMPRI and Bay Networks and its predecessor entities as

---

[7] SNMPRI argues that its proposed interpretation of Schedule 1 is supported by a general rule against construing contracts in a way that imposes a lifetime obligation. SNMPRI's Pre-Hearing Br. ¶¶ 44-45 (Adv. D.I. 566). The Bay Networks License itself granted lifetime rights: the royalty buy out conferred the right to "distribute in perpetuity an unlimited number of binary copies" of the licensed software. Ex. D-4 at 2; Ex. D-2 at 19; Trial Tr. 308:11-310:7.  The Supreme Court's opinion in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 937 (2015) supports upholding a lifetime obligation when it is expressly provided for in the agreement at issue, as is the case here. 135 S. Ct. at 937 ("Indeed, we have already recognized that a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." (alterations in original) (citations omitted)).

referenced above, and all such agreements are hereby terminated by execution of this Schedule.

This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below. *Id.* at 2.

The combined effect of these provisions is that "[a]ll products of units and projects originating from what was Bay Networks" in existence during Schedule 1's three-year term will receive a royalty buy out in accordance with the Bay Networks License so that they can use the designated SNMPRI software during the lifetime of the product line.   This conclusion is consistent with the fact that Schedule 1 provides a royalty buy out for the products and projects it covers. Schedule 1 refers to the royalty provisions of the Bay Networks License, which provide for a royalty buy out for the designated SNMPRI software.   It is confirmed by the November 16, 1999 email by Southwood concerning Schedule 1, which states that the parties intended Schedule 1 to provide the "lifetime royalty buy out" to the products and projects it covers. Ex. D-76C at 1.

SNMPRI contends the result of this language is that, after three years, any right to use the software covered by the Bay Networks License and Schedule 1 is stripped away from the legacy Bay Networks products and projects, such that these products' and projects' continued use of that software would become infringing.   The Court does not accept SNMPRI's interpretation.   SNMPRI violates the fundamental tenet of New York law that a contract must be considered from the perspective of a "reasonably intelligent person who has examined the context of the entire integrated agreement." *Alexander &*

66

*Alexander Servs.*, 136 F.3d at 86.   SNMPRI asks the Court to disregard what Schedule 1 actually says and does in incorporating the royalty buy out of the Bay Networks License and to read the language in the "Additional Conditions" section without the appropriate context.

Second, SNMPRI's proposed new interpretation would lead to the unreasonable consequence that would cause existing products and projects covered by Schedule 1 to be stripped of their right to use the SNMPRI software at the three-year mark.   They would be infringing from that point onward.   This would be unworkable for Nortel because it had incorporated the SNMPRI software into the core codebase of the BayStack/ES/ERS switches and to extricate this software from the core codebase would be difficult and time-consuming, just as it would be very difficult to remove thread of a particular color from a multicolor jacket.   Mead Dep. 145:13-146:25, 230:13-231:12, 231:14-232:4, 233:4-12; Trial Tr. 420:14-422:8.

If the parties had intended Schedule 1 to strip existing products of their right to use SNMP software, they would have included in Schedule 1 a mechanism for extending the right to use the SNMP software in these products beyond the three-year mark, as Razgaitis testified.   Trial Tr. 426:20-427:5, 429:18-430:6.   For example, there would be a provision for an additional payment to be made to give these products the right to use the software until they aged out of the market, just as the Bay Networks License itself had provided.   In the absence of such a provision, Nortel would be at SNMPRI's mercy at the end of the three year term.   Trial Tr. 420:23-421:5, 421:9-12.   As Razgaitis explained at trial,

the fact that Schedule 1 lacks any mechanism for extending Nortel's rights beyond the end of its three-year term which indicates, based on industry custom and practice, that the parties did not intend for these rights to be stripped away at the three-year mark. Trial Tr. 429:18-430:6.

The Court agrees with Nortel that Bay Networks products and projects that were in existence during Schedule 1's three-year term received the royalty buy out of the Bay Networks License, so that they would be able to use the software covered by Schedule 1 until they aged out of the market. Schedule 1 would not cover any new project that Nortel began to develop after the three-year mark. In that circumstance, at the beginning of such a new development project, Nortel could decide whether it was interested in using SNMPRI software in the new development. If so, it could discuss that possibility with SNMPRI and seek to agree on mutually acceptable terms. If not, it could develop its own software or choose from other vendors. Nortel's reading of Schedule 1 means that neither party would be at the other's mercy after Schedule 1 ended. Thus, "the context of the entire integrated agreement" from the perspective of "a reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," supports Nortel's interpretation of Schedule 1. *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86 (citation omitted).

SNMPRI's reading ignores key parts of Schedule 1, in particular the incorporation of the royalty buy out from the Bay Networks License, and would produce a result that is both inequitable and commercially unreasonable. SNMPRI's proposed interpretation

of Schedule 1 would be incompatible with the goal of contract interpretation under New York law, which "must be to accord the words of the contract their 'fair and reasonable meaning'" by taking into account "not merely literal language, but whatever may be reasonably implied therefrom." *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citations omitted). "[P]arties to an agreement are presumed to act sensibly in regard to it and an interpretation that produces an absurdly harsh result is to be avoided." *Martilet Mgmt. Servs., Inc. v. Bailey*, 2013 WL 5420966, at *3 (S.D.N.Y. 2013) (alteration in original) (citations omitted); *see also Williston on Contracts* § 32.11 (4th ed. 2017) ("[I]nterpretations which render the contract fair and reasonable are preferred to those which render the contract harsh or unreasonable to one party."). Therefore, "[a] court will endeavor to give the [contract] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994) (second alteration in original) (citation omitted). Here, the Court concludes that Nortel's explanation of Schedule 1 is "most equitable to both parties."

## C.    The Parties' Interactions Support Nortel

Having concluded that Schedule 1 is ambiguous, the Court "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86. This includes evidence of (1) the parties' negotiations, *Prior v. Innovative Commc'ns Corp.*, 207 F. App'x 158, 162 (3d Cir. 2006) (applying New York law, noting that the parties' "course of

negotiations" is proper extrinsic evidence); (2) correspondence between the parties, *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 160 (2d Cir. 2000) (finding letters sent by the parties prior to the execution of an agreement to be probative extrinsic evidence); (3) the parties' course of performance under the contract, *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) (noting that proper "extrinsic evidence includes the contracting parties' course of performance"); *New Windsor Volunteer Ambulance Corps, Inc.*, 442 F.3d at 113 (affirming the district court's reliance on "the parties' course of conduct over the years in order to determine their intent"); and (4) expert evidence on custom and practice in the relevant industry, *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 871, 873 (N.Y. 2004) (interpreting an ambiguous agreement based in part on expert testimony that where music publishers intend to share the benefit of foreign tax credits with songwriters, they include an express clause to that effect); *Last Time Beverage Corp. v. F & V Distrib. Co., LLC*, 951 N.Y.S.2d 77, 81-82 (N.Y. App. Div. 2012) (relying on expert testimony that franchisors in the soft drink industry ordinarily give exclusive rights to distributors to distribute new soft drinks in their territory to aid in interpreting an ambiguous agreement). The extrinsic evidence in each of these categories confirms that Nortel's position on Schedule 1 is correct.

### 1. SNMPRI Confirmed Schedule 1's Meaning And Effect Before Signing

Southwood, SNMPRI's point person in the negotiations, expressly explained and confirmed Schedule 1's meaning shortly before it was signed. Southwood did so in an

email to Nortel's lead negotiator, Hyslop. Southwood made clear in his email that he understood that "everyone's expectations are [being] fixed for all time." Ex. D-76C at 1. Referring to Schedule 1 which he described as the "final Bay transfer to Nortel" Southwood stated the following:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit. Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.

*Id.*

Southwood noted in his email that he had communicated the same understanding of Schedule 1 to SNMPRI's counsel, Rick Barnes ("Barnes"), that he was providing to Nortel. *Id.* Barnes was drafting the text of Schedule 1. Less than 48 hours later, Southwood sent Hyslop a draft of Schedule 1, which has exactly the same content as the final signed version. Ex. D-183.01; Ex. D-183.02. As in his November 16 email, Southwood's November 18 email attaching the draft of Schedule 1 called it "the permanent Bay to Nortel transfer." Ex. D-183.01; Ex. D-183.02.

Southwood's email is important in two respects. First, it confirms that Schedule 1's purpose is to confer the lifetime royalty buy out on the products and projects it covers. Southwood's email refers to the "buy out" and the "lifetime royalty buy out." Ex. D-76C at 1. Given that Schedule 1 confers a lifetime royalty buy out, it makes no sense for SNMPRI to contend that the products and projects it covers would be stripped of their right to use the designated software after three years. That is directly antithetical to the

71

meaning and purpose of a lifetime royalty buy out, which is to confirm a right to use the software for the lifetime of the product line.

Second, Southwood's explanation of what it means to provide that Schedule 1 will expire goes to the heart of SNMPRI's argument. SNMPRI contends that because Schedule 1 says it will terminate and be of no further effect after three years, that means that any product or project it covers will lose its right to use the SNMPRI software after three years. SNMPRI contends that "terminate means terminate," and so Schedule 1 must be interpreted in the way it urges. Southwood's email, however, explicitly explains what is meant by saying that Schedule 1 will terminate—i.e., "expire"—in three years.

Southwood first says that the parties agreed "that the royalty buy out would expire in three years." Southwood explains what that means: "By expire I mean that new products/projects brought on line after three years would address royalties on their own merit. Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace." Ex. D-76C at 1.

### 2. The May 2000 Email From Case To Reeves Confirms The Meaning of Schedule 1

Writing to Reeves in May 2000, Case referred to "Schedule 1 [as] the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assured him "I was correct when I told you that the cost is $0." Ex. D-77. Case's description is fully consistent with Nortel's reading of Schedule 1. It "grandfathers the Bay licenses over to the new Nortel master agreement," so that the BayStack/ES/ERS switches can continue

using the SNMPRI software.  It also provides that there  would be no additional cost.

Case's email is also important for what he did not say to Reeves.  There is no suggestion, as SNMPRI contends now, that Schedule 1 would serve to strip the BayStack/ES/ERS switches of the right to use the SNMPRI software after three years, and that the cost of obtaining an ongoing right to use the software would not be zero but instead would be tens of millions of dollars.  Case said no such thing in this email. He did not say any such thing at any time, including during the period leading up to the end of Schedule 1's three- year term. Nor did anyone else acting for SNMPRI or SNMPR say any such thing to anyone at Nortel at any time.

### 3. SNMPRI's Repeated Renewal of The SSA Confirms Nortel's Continued Use

SNMPRI's repeated renewal of the SSA covering the Schedule 1 software for years after June 2003 further confirms Nortel's ongoing  right to use that software. SNMPRI claims that it was a "mistake." Trial Tr. 269:22- 270:1 (Case contending that "we shouldn't have done it.  That was a mistake."). SNMPRI's claim of a purported mistake is not credible.

It is black letter New York law that "when resolving disputes concerning the meaning of ambiguous contract language, unexpressed  subjective views have no proper bearing. Only the parties' objective manifestations of intent are considered." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 302 (S.D.N.Y. 1997); *see also Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 377-78 (S.D.N.Y. 2006) ("[O]nly  objective manifestations of intent are relevant under New York law. . . . [S]tatements of subjective intention

uncommunicated to the other contracting party are immaterial in construing the terms of the contract." (citations omitted)).  Unlike the subjective intent or *post hoc* conclusions of contracting parties, the parties' course of dealing throughout the life of a contract is highly relevant to determining the meaning of the terms of the agreement." *Faulkner*, 452 F. Supp. 2d at 381.  In fact, "[a]s the Supreme Court has explained, '[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" *Id.* (second alteration in original) (quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913)).

SNMPRI confirmed Nortel's right to use the software by repeatedly renewing the SSA for the Schedule 1 software for years after June 2003, under which SNMPRI provided Nortel with updated versions of the Schedule 1 software and in return collected thousands of dollars from Nortel.  The Court looks to the parties' course of conduct.

### 4.  SNMPRI Confirmed That The Buy Out Gave Nortel An Ongoing Right

SNMPRI stated in August 2003, after the end of Schedule 1's three-year term, that Nortel had an ongoing royalty buy out under Schedule 1.  This confirmation came as part of an email exchange beginning in July 2003 between Tremblay, a Nortel employee who was just becoming involved in the relationship with SNMPRI, and SNMPRI employees Southwood and Hopper.  Ex. D-158.01; Ex. 158.02. Tremblay was reviewing the license agreement between Nortel and SNMPRI and its various schedules and seeking to learn about their status. Trial Tr. 190:1-9; Tremblay Dep. 90:18-91:1.  In that context, Hopper

made the following statement about Schedule 1 in an August 2003 email to Tremblay: "According To John [Southwood], as I understood him, BAY *has* a Royalty-BuyOut on EMANATE Sources on WinNT, Solaris, and VxWorks as well as Asynchronous Request Libraries on Solaris, HP-UX, AIX and WinNT." Ex. D-158.02 at 1. Given that this statement was made months after the end of Schedule 1's three-year term, the reference to Schedule 1 as continuing to provide a royalty buy out is directly contrary to the argument SNMPRI is proposing now. At Trial, Southwood contended this was yet another "mistake," claiming that Hopper did not "understand [him] correctly." Trial Tr. 195:11-196:1. The claim of mistake is not credible. As a legal matter, SNMPRI's contention that it harbored a subjective understanding that was the opposite of what it objectively manifested to Nortel is simply not relevant. *See, e.g., Faulkner*, 452 F. Supp. 2d at 377-78.

**5.     In January 2006, SNMPRI Expressly Confirmed That Nortel Had An Ongoing Right To Use The Schedule 1 Software**

The Court previously discussed that in a formal letter that Southwood issued under SNMPRI letterhead to Nortel in January 2006, SNMPRI confirmed that "Nortel has a license" to the software covered by Schedule 1 and that Schedule 1 "incorporates the paid-up royalties' license previously established by Bay Networks." Ex. D-78A at 3. In the email exchange, Southwood stated that he was "pleased" that the BayStack group at Nortel was operating under "the 'old Bay license' incorporated into the Nortel license" through Schedule 1. Ex. D-85 at 1.

The communication is highly probative. In the exchange, the Nortel BayStack group made clear to SNMPRI that they were continuing to use the SNMPRI software. Ex.

D-84 at 1 (stating that Trapeze Networks is "using the SNMP Research engine in their code, and so are we;" see also Ex. D-85 at 1 (referring to the BayStack group)). Nortel obviously understood it was acting appropriately, and it clearly was not hiding anything from SNMPRI. Trapeze had asked Nortel to provide a letter confirming its license, and the Nortel BayStack group asked John Southwood at SNMPRI to provide the letter. Ex. D-84 at 1.

If SNMPRI actually had held the understanding of Schedule 1 that it now urges, its response would have been that Nortel had no right to use the Schedule 1 software; that those rights were extinguished in June 2003, and that Nortel was infringing. Instead, SNMPRI said the opposite. Southwood stated that he was "pleased" that the BayStack group at Nortel was operating under "the 'old Bay license' incorporated into the Nortel license" through Schedule 1. Ex. D-85 at 1.

Southwood then issued the formal letter on SNMPRI's letterhead confirming Nortel's ongoing right to use the software covered by Schedule 1:

> Nortel Networks has a license with SNMP Research SNMPRI for EMANATE® sources running on Windows, Solaris, and VxWorks as referenced under Nortel Schedule 1. That schedule incorporates the paid-up royalties' license previously established by Bay Networks.

Ex. D-78A at 3. SNMPRI formally confirmed in the January 2006 letter that "Nortel has a license" to the software "under Nortel Schedule 1," which "incorporates the paid-up royalties' license previously established by Bay Networks." *Id.*

SNMPRI claims it made yet another "mistake." See, e.g., Trial Tr. 206:2-9 (Southwood claiming his letter was a "mistake"). The Court does not find the claim of

mistake to be credible.  SNMPRI cannot contend that the January 2006 letter, and the statements in the email exchange leading up to the letter, were "mistakes."

### 6. SNMPRI Never Told Nortel That It Would Lose Its Right To Use SNMPRI Software At The End Of Schedule 1's Three-Year Term

Neither SNMPRI nor SNMPR ever suggested to Nortel that its right to use SNMPRI software under Schedule 1 would be stripped away at the end of Schedule 1's three-year term.  Case had extensive and longstanding contacts with the BayStack group, including through Reeves, the head of the group until 2004.  He never suggested that the BayStack/ES/ERS switches for which Reeves was responsible would become infringing in June 2003.  In addition to his longstanding relationship and contacts with Reeves and others at Nortel, Case actually met with Reeves and gave a presentation to the "Nortel-BayStack team" in April 2003 — just two months before the end of Schedule 1's three-year term.  In the invitation that Case prepared for his presentation to the Nortel-BayStack team, Case touted the fact that SNMPRI continued to be the BayStack group's "supplier of source code for SNMP-based network management." Ex. D-243.  It would make no sense for the BayStack team to invite Case for an update presentation if it was not using SNMPRI software. In the presentation itself, Case praised the longstanding relationship between SNMPRI and Nortel. Ex. D-138 at 3.

After presenting to the BayStack group, Case traveled to the Interop convention in Las Vegas, where he observed Nortel celebrating the 50 millionth Ethernet port sold, joining Reeves in the Nortel booth.  Trial Tr. 330:21-331:11; 332:7-9, 340:20-24, 342:2-5; Ex. D-221 at 2.  After returning to his office, he reported on his meetings with Nortel and

their celebration at the Interop convention:

> Jeff also met with . . . Nortel in CA. Nortel had just celebrated the first
> profitable quarter in some time. . . . Nortel was also celebrating the 50
> millionth ethernet port sold during Interop. They are all managed by
> SNMP.

Ex. D-221 at 2.

Case contends that he had formed a belief that Reeves and the BayStack group had

removed the SNMPRI Research software from the BayStack/ES/ERS switches. This is not

credible. Moreover, even if it were credible that Case was unsure about whether these

products continued to use SNMPRI software, it is not credible that he would not have

inquired. The fact that Case never suggested that the BayStack group would lose the right

to use the SNMPRI software two months later and that no one from SNMPRI or SNMPR

ever made such a suggestion to Nortel is compelling evidence that the parties did not have

such an understanding.

### 7. The Optivity Group's Use Of ARL Confirmed That Nortel's Rights Continued After June 2003

The Optivity Group's use of SNMPRI's ARL software demonstrates that both

parties believed Nortel retained the right to use SNMPRI software in products covered by

Schedule 1 after June 2003. Like the BayStack/ES/ERS switches, Optivity was a legacy

Bay Networks product that used software covered by the Bay Networks License and

subsequently Schedule 1. Around the same time that the parties were negotiating

Schedule 1 and the master license agreement, the parties discussed the possibility of

entering into a new schedule (tentatively numbered Schedule 16), which would have

78

covered Optivity's use of ARL. However, in a conversation that he subsequently memorialized in an email, Southwood confirmed that such a schedule was unnecessary because it would "duplicate[] the transaction completed in 1997 between Bay and SNMPRI," i.e., Amendment 2 to the Bay Networks License, which granted Bay Networks the right to use and distribute ARL. Ex. D-258 at 4. Then in 2004, after the end of Schedule 1's three-year term, Southwood again confirmed that the Optivity group had rights to ARL under "the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under [S]chedule 1." Ex. D-271 at 2.

The parties' interactions in a situation parallel to the use of SNMPRI's EMANATE software in the BayStack/ES/ERS switches demonstrate that Nortel's understanding of Schedule 1 is correct. Schedule 1 conferred the lifetime royalty buy out from the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term, including both the BayStack/ES/ERS switches and the Optivity product. Ex. D-7C at 1.

### D. SNMPRI's "New Schedules" Argument Does Not Have Merit

SNMPRI's fallback argument that Nortel could obtain the Bay Networks License royalty buy out that was incorporated into Schedule 1, but only if it executed another schedule, is also meritless. Among other reasons, an argument that involves pointing to schedules other than Schedule 1 cannot trump the evidence concerning Schedule 1 itself, including its provisions and the parties' consistent course of conduct and statements concerning it.

The four new schedules to which SNMPRI points addressed different circumstances:  (1) they involved SNMPRI software that was not covered by Schedule 1; (2) they involved new development projects that did not have the SNMPRI development software, and therefore needed to pay a license fee to acquire it; and (3) they involved projects for which no SSA was in place.  None of these circumstances applied to the BayStack group's use of EMANATE or to the Optivity group's use of ARL, which SNMPRI confirmed was also covered by Schedule 1 without any need to execute a new schedule. Rather, the BayStack and Optivity groups were using software covered by Schedule 1; they had already acquired and paid for the development software; and they already had in place an SSA for the software they were using, which they continued operating under. *Id.*  Thus, SNMPRI's "new schedules" argument does not have merit.

### E.    The Expert Evidence Supports Nortel's Understanding Of Schedule 1

Razgaitis, who has extensive experience in software and other intellectual property licensing, has testified that SNMPRI's interpretation of Schedule 1 is not consistent with industry custom and practice. If, as SNMPRI contends, Schedule 1 acted to strip away Nortel's rights to use and distribute SNMPRI software with legacy Bay Networks products and projects at the three-year mark, custom and practice would require that it include provisions (1) indicating how and at what cost Nortel could extend its rights beyond the three-year mark; and (2) requiring Nortel, in the event it did not extend its rights, to return or destroy the SNMP software in its possession. Clarity as to how Nortel

could extend its rights would have been particularly important here because SNMPRI's EMANATE was integrated into the BayStack operating system software (i.e., BoSS) that ran the BayStack/ES/ERS switches and would have been difficult and time-consuming to remove and replace. As Razgaitis explained, based on industry custom and practice the absence of these provisions from Schedule 1 indicates that it was not intended to strip away Nortel's right to use SNMPRI software in June 2003.

SNMPRI attempted at trial to undermine Razgaitis's opinions through the testimony of its proposed licensing expert, Tollen, but, this attempt fails. Much of Tollen's testimony was an inappropriate attempt to instruct the Court on the proper reading of Schedule 1. The remainder was an unconvincing defense of SNMPRI's "new schedules" argument, which was undermined by (1) Tollen's failure to recognize that the projects covered by the four new schedules are not comparable to the BayStack/ES/ERS switches, (2) his disregard of SNMPRI's determination that the Optivity products—which are comparable to the BayStack/ES/ERS switches—did not need a new schedule and (3) his reading of Southwood's November 16, 1999 email, which does not mention any need to enter into new schedules in order for "[c]urrent Bay products and development projects . . . [to] take advantage of the lifetime royalty buy out until their products have aged out of the marketplace." Ex. D-76C at 1.

### IN THE ALTERNATIVE, THE PARTIES' CONDUCT AND STATEMENTS ESTABLISH AN IMPLIED-IN-FACT CONTRACT

The Court has found that Nortel had the right to use and distribute the software covered by Schedule 1 after June 2003. Nortel argues that had the Court found otherwise,

i.e., that the products and projects covered by Schedule 1 became infringing after June 2003, that Nortel's and SNMP's conduct and communications established an implied–in–fact contract which confirmed Nortel's ongoing right to use the SNMP software beyond the end of the three year term.

SNMPRI argues that (1) there can be no implied contract where there is a written agreement, (2) the implied-in-fact contract is unenforceable under the Statute of Frauds (3) SNMPRI did not receive consideration and (4) there was no mutual assent. The question of whether there was an implied-in-fact contract becomes relevant only had the Court found that Nortel did not contractually have the right to use the SNMPRI software identified in Schedule 1. The Court, of course, has found that Nortel had such a right. If, however, the Court was holding that the contractual right did not exist would the Court find, or be able to find, that Nortel and SNMPRI had an implied-in-fact contract? Again, for purposes of this question the Court assumes that it found that Nortel's Schedule 1 rights contractually expired on June 20, 2003.

The Court rejects the defenses which SNMP raises because they are not applicable to the issue. Nortel is claiming that the terms of an existing contractual relationship continued by SNMPRI's conduct and communications past an end date. Nortel is not seeking a brand new contract or different terms but, instead, that the application of Schedule 1 continued as an implied-in-fact contract on the same terms as previously existed. Nortel and SNMPRI did in fact memorialize their agreement in writings. There is Schedule 1 and the provisions of the Bay Networks license which Schedule 1

incorporated. There is also the January 2006 letter confirming the license. There are also the SSAs which are in writing. Accordingly, there was a prior writing which formed the basis of the parties' understanding and there was mutual assent. There was also consideration. SNMPRI ignores the consideration for Schedule 1 and the thousands of dollars for the SSAs. New York courts regularly find implied-in-fact contracts lasting more than one year. *See, e.g., Richmor Aviation, Inc. v. Sportsflight Air, Inc.*, 918 N.Y.S. 2d 806, 807 (N.Y. App. Div. 2011) implied-in-fact contract existed from November 2002 to January 2005); *Watts v. Columbia Artists Mgmt., Inc.*, 188 A.D. 2d 799, 800 (N.Y. App. Div. 1992) (implied-in-fact contract existed from September 1986 to September 1988). The Statute of Frauds does not apply.

"[I]t is well settled in New York that '[w]hen an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.'" *N. Am. Hyperbaric Ctr. v. City of New York*, 604 N.Y.S.2d 56, 57 (N.Y. App. Div. 1993) (second alteration in original) (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946)); *Richmor Aviation, Inc.*, 918 N.Y.S.2d at 808-09 ("[E]vidence that the parties continued to perform after [the contract's] expiration in substantially the same manner as they had performed during the initial term of the contract supports . . . [the] conclusion that the terms of the original contract continued to apply to the parties' subsequent agreement"); *Harco Nat'l Ins. Co. v. Arch Specialty Ins. Co.*, 2008 WL 1699755, at *6 (S.D.N.Y. 2008), aff'd, 328 F. App'x 678 (2d Cir. 2009) ("Where the parties continue to do business after the

expiration of a contract as though the same contract terms apply, New York Courts will construe their actions as extending the terms of the original contract.").

Here, the parties continued to perform on the basis that Nortel had an ongoing right to use the software covered by Schedule 1, beyond the end of its three-year term. The parties repeatedly renewed the SSA relating to the SNMPRI software and the former Bay Networks products covered by Schedule 1 for years after 2003. SNMPRI continued to send invoices to the same address for the same amount covering the same software that is covered by Schedule 1. Nortel paid those invoices and, in return, it received updated versions of the software covered by Schedule 1. The parties' conduct in connection with the yearly renewal of the SSA clearly demonstrates that the parties intended and understood that Nortel's right to use the software covered by Schedule 1 continued beyond June 2003.

SNMPRI also expressly confirmed in writing that Schedule 1 remained in effect after June 2003. In January 2006, a group at Nortel working on former Bay Networks products reached out to Southwood for confirmation that they had a license to SNMPRI software so that they could partner with another company also using that software. In response, Southwood confirmed in a formal letter that Nortel had a license with SNMPRI as referenced under Schedule 1. The schedule incorporated the paid-up royalties' license which Bay Networks established. Ex. D-78 at 3 (emphasis supplied). SNMPRI also confirmed in 2004 that Nortel had an ongoing right to use the Schedule 1 software, in connection with the Optivity group's right to continue distributing ARL. Southwood

explained: "where is the [license for] ARL? We found it under the old Bay license completed before Nortel purchased Bay, but the old license is incorporated into the current license under Schedule 1." Ex. D-271 at 2.

Thus, Nortel made clear to SNMPRI that it was continuing to use the software covered by the Schedule 1 royalty buy out in connection with former Bay Networks products, and SNMPRI confirmed that Nortel had the ongoing right to do so. Also relevant is what SNMPRI did not say. It never communicated to Nortel that it believed the royalty buy out rights conferred by Schedule 1 had ended or that Nortel lacked the ongoing right to use the software covered by Schedule 1. *See Richmor Aviation, Inc.*, 918 N.Y.S.2d at 808 (affirming a finding of an implied-in-fact contract in part because "neither party said or did anything that would repudiate an essential term of the written contract").

Therefore, the Court concludes that even if Schedule 1 could be interpreted in the way SNMPRI now proposes, SNMPRI and Nortel continued to operate on the basis that Nortel had the ongoing right to use the Schedule 1 software, establishing an implied-in-fact agreement to that effect.

## CONCLUSION

The Court recognizes SNMP's principal arguments that: (1) Schedule 1 is unambiguous and therefore extrinsic evidence is unwarranted; (2) the merger whereby Nortel acquired Bay Networks was a reverse triangular merger, and, accordingly the Bay License was not transferable to Nortel without SNMPRI's consent; and (3) Tremblay (of Nortel) testified that Schedule 1 terminated three years after its effective date and the

license was thereby terminated.  The Court has rejected these arguments.  First, while the individual words, "terminate," "no further effect" and "three years" are unambiguous, the record of the case establishes that Schedule 1 was the result of a more involved set of facts which render Schedule 1 ambiguous.  Second, whether California law impacted Nortel's rights in a reverse triangular merger is not the point.  What matters is what SNMP and Nortel did after the merger, how they treated their respective rights.  Third, Tremblay's involvement was relatively late in the SNMPRI - Nortel relationship.  Finally, it is clear to the Court that under New York law, SNMPRI's and Nortel's conduct establish that there was an implied-in-fact agreement which governs the relationship between Nortel and SNMPRI and, in turn, establish that Nortel had the right to use the software after June 2003.  The parties' relationship would otherwise be counterproductive.  The Court therefore finds in Nortel's favor.

Schedule 1 confers a lifetime royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term. Competent extrinsic evidence overwhelmingly confirms this meaning and effect. The Court will therefore rule in Nortel's favor concerning the meaning and effect of Schedule 1.  In addition, if the Court had not ruled in Nortel's favor concerning the meaning and effect of Schedule 1, the record of the parties' conduct and statements after June 2003 would establish an implied-in-fact contract with the same effect.

The Court directs Nortel to prepare an Order giving effect to the foregoing Opinion, to share the Order with SNMP, and to submit the Order under certification.

Dated:  August 21, 2017

_____
KEVIN GROSS, U.S.B.J.